| | |
|---|---|
| CINDY RODRIGUEZ, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Case No. |
| PROVIDENCE COMMUNITY | ) |
| CORRECTIONS, INC., et al. | ) (Class Action) |
| | ) JURY DEMAND |
| Defendants. | ) |

## MEMORANDUM IN SUPPORT OT MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

This Motion is narrowly limited to preventing the imminent unlawful jailing of Fred Robinson and Steven Gibbs, two of the named Plaintiffs. Although this case raises other serious issues, the scope of this Motion is confined to the discrete legal claim raised in Count Seven of the Complaint. *See* Doc. 1 at ¶ 300.

The Motion seeks to stop Mr. Robinson—who is an indigent man with a serious and life threatening physical disability—and Mr. Gibbs—who is an indigent man with serious intellectual and physical disabilities—from being arrested and languishing indefinitely in jail solely because of their inability to pay a preset money bond.

For the reasons set forth in detail below, Mr. Robinson and Mr. Gibbs seek simple relief that would be easy to craft and that would not unduly burden the Defendants: If the Defendants believe in good faith that Mr. Robinson has committed a violation of his probation because he has not paid his court debts and private PCC, Inc. probation fees from his 2011 misdemeanor marijuana possession case, they must either issue a valid summons for revocation proceedings or

1

release him after arrest pursuant to his own recognizance or unsecured bond with notice of a court date. Such preliminary relief would cure the imminent constitutional violation outlined in Count Seven of the Complaint, prevent irreparable harm, and allow Mr. Robinson a day in court to explain his ability to pay prior to languishing indefinitely in a jail cell. The same is true of Mr. Gibbs.

Because of the imminent and irreparable harm that they face, Mr. Robinson and Mr. Gibbs respectfully request that this honorable Court immediately enjoin the enforcement of the Defendants' secured money bond arrest warrant and set a briefing schedule and a hearing concerning this Motion as soon as is practicable for this Court's schedule. A proposed order is attached to the Motion.

## STATEMENT OF RELEVANT FACTS

### I. Policies and Practices Relevant to the Motion

Rutherford County has contracted with a private company, PCC, Inc., to operate as its "probation officer" in misdemeanor cases in which court debts are owed. *See* Doc. 1-1. As described in the Complaint, the primary purpose of the arrangement is to collect money, and probationers like Mr. Robinson and Mr. Gibbs can be removed from probation if they pay amounts of money determined by the County and the company.

The Complaint sets forth in great detail a scheme of serious criminal conduct and civil rights violations perpetrated by the Defendants that has devastated the poorest people in Rutherford County. *See generally* Doc. 1 at ¶¶ 14-76. One component of this scheme is that PCC, Inc. seeks and obtains arrest warrants for probationers who do not pay enough money to PCC, Inc. or who are alleged to have broken other PCC, Inc. conditions. The warrant issued will often designate a preset secured bond amount, meaning that the arrestee will be held in jail

without any court appearance for days or weeks until a revocation proceeding is held if the arrestee cannot pay that amount. In many cases, the preset bond amount far exceeds the total amount of the alleged debts. For Mr. Robinson, the preset bond amount exceeds his alleged debts by a factor of four.

Although the United States Constitution prohibits revocation unless a probationer has the ability to pay and willfully refuses, *Bearden v. Georgia,* 461 U.S. 660, 672-73 (1983), and although Tennessee law does not permit revocation of probation *at all* for non-payment of court costs and fees,[1] PCC, Inc. petitioned for the revocation of Mr. Robinson's probation solely on the basis of his non-payment a few days before his probationary term was set to expire. On September 29, 2015, counsel was informed that PCC, Inc. has also sought and obtained a similar arrest warrant for Mr. Gibbs.

## II.  Plaintiff Fred Robinson

Defendant Hyde and Defendant PCC, Inc. petitioned for revocation of Mr. Robinson's probation despite knowing that Mr. Robinson is indigent and that he suffers every day from cirrhosis of the liver. Because of his liver malfunction, his body routinely sends toxins to his brain, rendering him subject to periods of confusion and disorientation. Mr. Robinson also suffers from severe internal bleeding due to chronic stomach ulcers, which render him unable to

---

[1] The Tennessee Attorney General has, through formal opinions over the past 15 years, repeatedly made clear that the Defendants' actions are illegal under Tennessee law.

> A criminal defendant may not have his probation revoked through a violation warrant for failing to pay costs assessed in a criminal action. Op. Tenn. Atty. Gen. 00-162 (October 18, 2000). Tenn. Code Ann. § 40-24-105(a) provides that costs "shall not be deemed part of the penalty, and no person shall be imprisoned ... in default of payment of costs ...." Instead, costs may be collected in the same manner as a judgment in a civil action.

Tenn. Op. Atty. Gen. No. 03-106 (2003) (applying the same rule to jail fees); Tenn. Op. Atty. Gen. No. 03-072 (2003) ("A criminal defendant may not have his probation revoked through a violation warrant for failing to pay costs assessed in a criminal action."); Tenn. Op. Atty. Gen. No. 00-162 (2000, 2000 WL 1616911, ("[A] criminal defendant may not have his probation revoked through a violation warrant for failing to pay costs assessed in a criminal action."); Tenn. Op. Atty. Gen. Nos. 03-106; 03-072; 00-162 (accord); Tenn. Op. Atty. Gen. No. 06-062 (2006), 2006 WL 1197456 (same).

work.  His only source of income is his federal disability income, which is calculated to provide him enough resources for his survival.  He has no significant assets.  Over the past few years, Mr. Robinson has made repeated and desperate pleas to PCC, Inc. not to jail him because of his inability to pay.  *See* Exhibit 1, Declarations of Fred Robinson and Steven Gibbs.  In spite of all this, PCC, Inc. has successfully petitioned for Mr. Robinson's jailing and revocation on multiple occasions in the past several years shortly before his term expires on the basis of non-payment. As a result, he has been repeatedly jailed and then placed back on PCC, Inc. probation and told to pay even more.

When Defendant Hyde petitioned for revocation in August 2015, she obtained an arrest warrant for Mr. Robinson that requires that he be held in jail unless he pays a preset $10,000 money bond.  *See* Exhibit 2, PCC, Inc. Arrest Warrant for Fred Robinson.  Because Mr. Robinson is unable to afford that bond, if he is arrested, he will languish in jail indefinitely without any court hearing until the County sets revocation proceedings for his case.

Mr. Robinson has been on probation with PCC, Inc. for four years since he was convicted in 2011 of misdemeanor marijuana possession and misdemeanor possession of drug paraphernalia in Rutherford County.  He has remained on probation with PCC, Inc. solely because he has not been able to pay to get taken off.  From the very beginning, Mr. Robinson has been told that, pursuant to County and PCC, Inc. policy, he can be taken off private probation as soon as he pays enough money.  Because Mr. Robinson is indigent and disabled—and has been throughout his PCC, Inc. probation—he has endured years of onerous and humiliating supervision, repeated threats, and indefinite jailings.  He now comes to this court under the threat of yet another indefinite jailing that, because of his disability, endangers his life.

### III. Plaintiff Steven Gibbs

Mr. Gibbs is a 61-year-old man with serious intellectual and physical disabilities. He is currently on probation with PCC, Inc. because of a conviction for driving with a suspended license. He has repeatedly informed PCC, Inc. that he is destitute and depends on federal disability income to meet the basic necessities of life. *See* Exhibit 1. Throughout his supervision, he has been repeatedly threatened that, if he does not make sufficient payments, PCC, Inc., then the company will "violate" his probation. *Id.*

On September 29, 2015, Mr. Gibbs and counsel for Mr. Gibbs learned that PCC, Inc. had sought and obtained a warrant for Mr. Gibbs's arrest. The Defendants have represented to counsel for Mr. Gibbs that there is now a warrant for his arrest with a $10,000 secured bond attached, meaning that Mr. Gibbs will remain in jail indefinitely until probation revocation proceedings are held unless he can pay the preset money bond.[2] Mr. Gibbs is indigent and unable to make that payment. *See* Exhibit 1.

### ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Mr. Robinson easily satisfies each of these requirements.

### I. Mr. Robinson and Mr. Gibbs Are Highly Likely to Succeed on the Merits Because the Defendants' Conduct Violates Basic Equal Protection and Due Process Principles.

### A. A Person Cannot Be Jailed for Non-Payment Without An Inquiry Into His Ability to Pay and Findings that the Non-Payment Was Willful.

---

[2] The Defendants refused to provide counsel for Mr. Gibbs with a copy of the warrant or the allegations against him.

5

The constitutional principles at issue in this case are well-established. In *Bearden v. Georgia*, 461 U.S. 660, 672-73 (1983), the Supreme Court explained that to "deprive a probationer of his conditional freedom simply because, through no fault of his own he cannot pay a fine … would be contrary to the fundamental fairness required by the Fourteenth Amendment."

As a result, *Bearden* held that a court must engage in an inquiry into whether the probationer had an ability to pay such that the non-payment was "willful" before imprisoning the person for the failure to pay. The Court criticized the Georgia trial court's lack of attention to the constitutional process that ensures that the poor will not be jailed because they are poor:

> The focus of the [lower] court's concern, then, was that the petitioner had disobeyed a prior court order to pay the fine, and for that reason must be imprisoned. But this is no more than imprisoning a person solely because he lacks funds to pay the fine, a practice we condemned in *Williams* and *Tate*. By sentencing petitioner to imprisonment simply because he could not pay the fine, without considering the reasons for the inability to pay or the propriety of reducing the fine or extending the time for payments or making alternative orders, the court automatically turned a fine into a prison sentence.

*Id*. at 674.

While *Bearden* has constituted the basic articulation of the Supreme Court's jurisprudence on jailing the poor for nonpayment for over 30 years, it was itself founded on a long line of precedent. In *Tate v. Short*, 401 U.S. 395, 398 (1971), the Court held that imprisoning a defendant who was unable to pay a fine violated the Equal Protection Clause of the Fourteenth Amendment: "[T]he Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full." These cases and the cases they rely on articulate some of the most fundamental principles of the American legal tradition. *See Griffin v. Illinois*, 351 U.S. 12, 19 (1956) ("There can be no equal justice where the kind of trial a man gets

6

depends on the amount of money he has."); *Douglas v. California*, 372 U.S. 353, 355 (1963) (condemning the "evil" of "discrimination against the indigent"); *Williams v. Illinois*, 399 U.S. 235, 241 (1970) ("[T]he Court has had frequent occasion to reaffirm allegiance to the basic command that justice be applied equally to all persons.").

Because *Bearden* holds that Mr. Robinson and Mr. Gibbs cannot be jailed without an inquiry into—and findings concerning—the willfulness of their non-payment, the Defendants' attempt to jail Mr. Robinson and Mr. Gibbs before ever undertaking the constitutionally required inquiry violates fundamental and longstanding notions of due process. Those principles ensure that individuals who owe money cannot be deprived of their property or liberty without a prior meaningful opportunity to be heard.

Moreover, the Supreme Court has long held that, absent "extraordinary circumstances," a person must be given a meaningful opportunity to be heard *prior* to a deprivation of liberty or property. *Fuentes v. Shevin*, 407 U.S. 67, 90 (1975) (internal quotations and alterations removed); *Connecticut v. Doehr*, 501 U.S. 1, 15 (1991) (holding that due process is offended when a delayed hearing "would not cure the temporary deprivation that an earlier hearing might have prevented").[3]

The central point of *Bearden* and *Turner v. Rogers*, 131 S. Ct. 2507, 2520 (2011), is that the government cannot accomplish this fundamental liberty deprivation until it follows rigorous

---

[3] *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976), sets forth a three-part balancing test to determine what process is due when an individual's liberty is threatened by government action: 1) the court considers the nature of the private right at stake; 2) the court examines the risk of erroneous deprivation given the procedures currently being employed and assesses the probable value of additional safeguards; and 3) the court evaluates the government's interest in avoiding additional procedural safeguards. Here, the private right at stake is the most fundamental liberty interest that exists—the right to be free from a cage. *See, e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) ("[L]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action."). Moreover, risk of erroneous deprivation is enormous. Because nonpayment can be punished with imprisonment only if it is willful, the jailing of people prior to inquiring into their ability to pay (especially given that the overwhelming number of such people are and have already been found indigent) is highly likely to result in the wrongful deprivation of liberty. Finally, the risk to the government of issuing a summons and holding a hearing prior to depriving a person of this fundamental liberty is non-existent.

procedures. In *Turner,* the Supreme Court explained the procedural requirements that must be followed before a government attempts to jail a person for non-payment. *Turner* held that South Carolina's incarceration of a man for unpaid child support payments "violated the Due Process Clause" because the court had imprisoned him without complying with sufficient pre-deprivation procedures. *Id.* Whether the jailing is pursuant to probation revocation proceedings as in *Bearden* or pursuant to contempt proceedings as in *Turner,* the Court explained the basic procedural protections that a government must provide before jailing a person for non-payment:

> Those safeguards include (1) notice to the defendant that his "ability to pay" is a critical issue in the … proceeding; (2) the use of a form (or the equivalent) to elicit relevant financial information; (3) an opportunity at the hearing for the defendant to respond to statements and questions about his financial status, (e.g., those triggered by his responses on the form); and (4) an express finding by the court that the defendant has the ability to pay.

*Id.* at 2519. The Court held that Turner's imprisonment was unconstitutional because the South Carolina court did not comply with the procedures that were essential to "fundamental fairness."

Relying on Supreme Court precedent, the Sixth Circuit has held that pay-or-jail schemes are unconstitutional when they operate to jail the poor. For example, in *Alkire v. Irving*, 330 F.3d 802 (6th Cir. 2003), the court rejected the defendants' motion for summary judgment, holding that the Constitution prohibits the incarceration of "an indigent defendant for his failure to pay a debt" and thus also requires an inquiry into a defendant's indigence and willfulness in failing to pay before a court can jail the individual for failing to pay fines and court fees. *Id.* at 819. In that case, both the clerk's office and the judge were alleged to have ignored whether a defendant's failure to pay his court debts was due to his poverty. An inquiry into this question, the Sixth Circuit explained, is "precisely what the Fourteenth Amendment requires." *Id.*

The Sixth Circuit underscored the importance of this inquiry in *Powers v. Hamilton County Pub. Defender Com'n*, 501 F.3d 592 (6th Cir. 2007), when it held that a public defender

office can be liable for "failing to seek indigency hearings on behalf of criminal defendants facing jail time for unpaid fines." *Id.* at 617. The court explained that though the "judge had a duty to independently" determine that "actually indigent" defendants could not be jailed for unpaid fines, the public defender was liable for leaving the "judge with the misleading impression" that some defendants are not impoverished. *Id.* at 611. Tennessee courts have also long recognized the requirement of indigency hearings before jailing a person for nonpayment. *See, e.g.*, *State v. Dye*, 715 S.W.2d 36 (Tenn. 1986); *State v. Bradley*, 2011 WL 2682183 (Ct. Crim. App. Tenn. 2011).

The Defendants violate these basic principles by seeking to jail Mr. Robinson and Mr. Gibbs for unpaid court debts and private probation fees for days or weeks before providing them any process, let alone the process required by *Turner*.

### B. The Constitution Prohibits Keeping a Person in Jail Solely Because the Person's Poverty Renders Her Unable to Afford a Monetary Bond Payment

The same fundamental principles prohibit the use of a money bond to keep an indigent person like Mr. Robinson or Mr. Gibbs in jail after arrest. The Defendants' post-arrest scheme of using a preset money bond is similar to the schemes declared unconstitutional earlier this year in *Jones v. City of Clanton*, 2:15-cv-34-MHT (M.D. Ala. September 15, 2015) (issuing final judgment and opinion declaring fixed secured bail unconstitutional without a hearing on indigence),[4] and *Pierce et al. v. City of Velda City,* 15-cv-570-HEA (E.D. Mo. June 3, 2015) (issuing a declaratory judgment that the use of preset secured bond is unconstitutional as applied to the indigent and enjoining its operation).[5] Indeed, other federal court cases in recent months have ordered the immediate release of indigent arrestees because the use of secured bond to detain them is unconstitutional. *See Cooper v. City of Dothan*, 1:15-cv-425-WKW (M.D. Ala.

---

[4] Attached as Exhibit 3.
[5] Attached as Exhibit 4.

June 18, 2015) (issuing Temporary Restraining Order and holding that the City of Dothan's practice of preset secured money bond violated the Fourteenth Amendment);[6] *Snow v. Lambert et al.*, 3:15-cv-00567-SDD-RLB (Doc. 23) (M.D. La. August 27, 2015) (ordering the immediate release of indigent arrestee held on secured money bond).

The Defendants' scheme is also indistinguishable from the practices condemned by the United States Department of Justice earlier this year in a federal court case raising the same issues against the City of Clanton, Alabama. *See* Exhibit 6 at 1, United States Department of Justice, Statement of Interest, *Varden et al. v. City of Clanton,* 15-cv-34 (M.D. Ala. 2015) (arguing on behalf of the United States government that the use of preset secured money bond to keep indigent arrestees in jail "not only violates the Fourteenth Amendment's Equal Protection Clause, but also constitutes bad public policy.").

1.   **The Constitution Prohibits Keeping a Person in Jail Solely Because the Person's Poverty Renders Her Unable to Afford a Monetary Payment**

Relying on well-settled Supreme Court precedent, it has long been the law of this Circuit that any kind of pay-or-jail scheme is unconstitutional when it operates to jail the poor. *Alkire*, 330 F.3d at 819; *Powers*, 501 F.3d at 617; *see also Frazier v. Jordan,* 457 F.2d 726, 728–29 (5th Cir. 1972) (finding that an alternative sentencing scheme of $17 dollars or 13 days in jail was unconstitutional as applied to those who could not immediately afford the fine because it created a system in which "[t]hose with means avoid imprisonment [but] the indigent cannot escape imprisonment."); *Barnett v. Hopper*, 548 F.2d 550, 554 (5th Cir. 1977) ("To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws."), vacated as moot, 439 U.S. 1041 (1978).[7]

---

[6] Attached as Exhibit 5.

[7] Other federal district courts have consistently enforced these fundamental principles. *See, e.g.*, *United States v. Flowers*, 946 F. Supp. 2d 1295 (M.D. Ala. 2013). In *Flowers*, the court was confronted with an analogous situation:

Just as it is illegal to jail people for fines and court costs that they cannot pay, it is also illegal to arrest and keep them in jail on a money "bond" that they cannot afford simply because they owe fines and court costs. Justice Douglas, writing at the onset of the successful movement to rid the federal courts of the use of the kind of poverty jailing currently prevalent in Rutherford County, famously set forth the fundamental question: "To continue to demand a substantial bond which the defendant is unable to secure raises considerable problems for the equal administration of the law. . . . Can an indigent be denied freedom, where a wealthy man would not, because he does not happen to have enough property to pledge for his freedom?" *Bandy v. United States*, 81 S. Ct. 197, 197-98 (1960).

The leading precedent on Justice Douglas's question is *Pugh v. Rainwater*, 572 F.2d 1053, 1056 (5th Cir. 1978) (*en banc*). The panel opinion, *Pugh v. Rainwater*, 557 F.2d 1189, 1190 (5th Cir. 1977), struck down on its face the Florida Rule of Criminal Procedure dealing with money bail because it is unconstitutional to keep an indigent person in jail prior to trial solely because of the person's inability to make a monetary payment. The *en banc* court agreed with the constitutional holding of the panel opinion but reversed the panel's facial invalidation of the *entire* Florida Rule. *Rainwater*, 572 F.2d at 1057.

---

a criminal defendant faced incarceration because he could not afford the cost of release on home confinement monitoring. The Court found that keeping a person in jail solely because he could not afford to pay for home confinement monitoring would be "wrong" and that "the Constitution's guarantee of equal protection is inhospitable to the Probation Department's policy of making monitored home confinement available to only those who can pay for it." *Id.* at 1302. As *Flowers* described the basic violation: "[A] defendant identical to Flowers but with a thicker billfold would receive home confinement, while Flowers would receive prison." *Id.* at 1301; *see also, e.g.*, *United States v. Waldron*, 306 F. Supp. 2d 623, 629 (M.D. La. 2004) ("It is well established that our law does not permit the revocation of probation for a defendant's failure to pay the amount of fines if that defendant is indigent or otherwise unable to pay. In other words, the government may not imprison a person solely because he lacked the resources to pay a fine."); *De Luna v. Hidalgo County*, 853 F. Supp. 2d 623, 647-48 (S.D. Tex. 2012) ("[T]he Court finds that … before a person charged with a … fine-only offense may be incarcerated by Hidalgo County for the failure to pay assessed fines and costs, this deprivation of liberty must be preceded by some form of process that allows for a determination as to whether the person is indigent and has made a good faith effort to discharge the fines, and whether alternatives to incarceration are available."); *Brown v. McNeil*, 591 F. Supp. 2d 1245, 1260 (M.D. Fla. 2008) (granting federal habeas petition because "Petitioner did not have the ability to remain current with his supervision payments given his other financial obligations at the time," which meant that the state's revocation of his conditional release constituted "an unreasonable application of clearly established federal law.").

11

*Rainwater*'s reasoning is easy to understand. The *en banc* court held that the Florida Rule itself did not require on its face the setting of monetary bail for arrestees, but that, if such a thing were to happen to an indigent person, it would be unconstitutional. In other words, the court held that the Florida courts could not be expected to enforce the new Rule—which had been amended during the litigation in that case—in a manner that violated the Constitution by requiring monetary payments to secure the release of an indigent person. The court explained the binding constitutional principles at stake:

> We have no doubt that in the case of an indigent, whose appearance at trial could reasonably be assured by one of the alternate forms of release, pretrial confinement for inability to post money bail would constitute imposition of an excessive restraint. We do not read the State of Florida's new rule to require such a result.

*Id*. at 1058.[8] Summing up its reasoning, the *en banc* court held: "*The incarceration of those who cannot [afford a cash payment], without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements*."[9] *Id*. at 1057 (emphasis added); *see also, e.g.*, *Williams v. Farrior*, 626 F.Supp. 983, 985 (S.D. Miss. 1986) ("For the purposes of the Fourteenth Amendment's Equal Protection Clause, it is clear that a bail system which allows only monetary bail and does not provide for any meaningful consideration of other possible alternatives for indigent pretrial detainees infringes on both equal protection and due process requirements.").

---

[8] *Rainwater* further explained that it refused to require a priority to be given in all cases—including those of the non-indigent—to non-monetary conditions of release. The court noted that, at least for wealthier people, some might actually prefer monetary bail over release with certain other conditions, and that the court would not invalidate a state Rule that allowed for those other conditions in appropriate cases. *Id*. at 1057.

[9] Four circuit judges wrote a powerful dissent in *Rainwater*. Although they agreed with the constitutional principles announced by the majority that the Constitution forbids jailing the poor when they cannot afford monetary bail, they were concerned about the majority's faith in the Florida courts not to apply the new state Rule in unconstitutional ways to detain the indigent. *Id*. at 1067 ("I cannot escape the conclusion that the majority has chosen too frail a vessel for such a ponderous cargo of human rights.") (Simpson, J., Dissenting).

12

The Defendants' scheme does exactly what *Rainwater* and the entire line of precedent on which it was founded reject: it carves out jail for those who cannot afford to pay the Sheriff while reserving freedom for those who can. The Defendants have determined that people arrested for owing unpaid court costs and probation fees or committing other technical violations of probation, like Mr. Robinson and Mr. Gibbs, are eligible for immediate release after arrest. The Defendants cannot make exercising that right to freedom contingent solely on the ability to pay preset amounts of cash. *Cf. Bearden*, 461 U.S. at 667-68 (holding that "if [a] State determines a fine or restitution to be the appropriate and adequate penalty for [a] crime, it may not thereafter imprison a person solely because he lacked the resources to pay it"); *see also* Declaratory Judgment, *Pierce et al. v. City of Velda City,* 15-cv-570-HEA (E.D. Mo. June 2, 2015) ("If the government generally offers prompt release from custody after arrest upon posting a bond pursuant to a schedule, it cannot deny prompt release from custody to a person because the person is financially incapable of posting such a bond."); *Jones v. City of Clanton*, 2:15-cv-34-MHT (M.D. Ala. September 15, 2015), Doc. 77; *see also Cooper v. City of Dothan*, 1:15-cv-425-WKW (M.D. Ala. June 18, 2015) (issuing Temporary Restraining Order and holding that the City of Dothan's fixed secured bond system violated the Fourteenth Amendment).

The Defendants' scheme is also contrary to overwhelming state court precedent in the neighboring states that have considered the issue. In *State v. Blake*, 642 So. 2d 959, 968 (Ala. 1994), the Alabama Supreme Court struck down a state statute that allowed for indigent arrestees to be held for 72 hours solely because they could not afford monetary payments to secure their release prior to their first appearance. The Court held:

> [A]n indigent defendant charged with a relatively minor misdemeanor who cannot obtain release by cash bail, a bail bond, or property bail, must remain incarcerated for a minimum of three days, and perhaps longer, before being able to obtain judicial public bail. *We conclude that, as written, article VII of the Act violates an*

13

> *indigent defendant's equal protection rights guaranteed by the United States Constitution, because the classification system it imposes is not rationally related to a legitimate governmental objective.*

*Id* (emphasis added) (quotations removed).[10] The Mississippi Supreme Court also long ago condemned the jailing of the poor based on inability to pay secured monetary bail. *See, e.g., Lee v. Lawson*, 375 So. 2d 1019, 1023 (Miss. 1979) ("A consideration of the equal protection and due process rights of indigent pretrial detainees leads us to the inescapable conclusion that a bail system based on monetary bail alone would be unconstitutional."). In *Lawson*, the court explained that Mississippi law provided for release without payment of money and that, following the American Bar Association Standards, Mississippi courts should adopt a presumption of release on recognizance, at least in cases not involving "violent or heinous crimes." *Id.* ("There is incorporated in these standards a presumption that a defendant is entitled to be released on order to appear or on his own recognizance."). The court declared that this presumption of non-monetary release "will go far toward the goal of equal justice under law." *Id.* at 1024.[11]

---

[10] *Blake* struck down the scheme holding indigent defendants on small cash bonds for at least 72 hours under even rational basis review. *Blake* inappropriately applied rational basis review even after correctly stating the legal rule that strict scrutiny must be applied to any government action that deprives a person of a fundamental right. The panel decision in *Rainwater*, therefore, was correct in its determination that jailing a person—and depriving her of the *most fundamental* right to liberty—requires that strict scrutiny be applied. *See United States v. Salerno*, 481 U.S. 739, 750 (1987) (recognizing "fundamental nature of this right" to pretrial liberty); *United States v. Montalvo-Murillo*, 495 U.S. 711, 716 (1990) (holding that release prior to trial is a "vital liberty interest"); *Schilb v. Kuebel*, 404 U.S. 357, 365 (1971) ("[A] statutory classification based upon suspect criteria or affecting 'fundamental rights' will encounter equal protection difficulties unless justified by a compelling governmental interest."); *see also, e.g., Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 781 (9th Cir. 2014) (*en banc*) (applying strict scrutiny to strike down Arizona bail law that required detention after arrest without individualized consideration of an arrestee's circumstances). The difference is immaterial here, though, because *Blake* correctly held that jailing indigent people who are otherwise deemed eligible for release solely because they cannot make small payments is not even rationally related to a legitimate government objective, let alone necessary to achieve a compelling one.

    The fact that someone like Mr. Robinson has unlawfully remained on misdemeanor PCC, Inc. probation for four years solely because he has not been able to purchase his way off supervision does not diminish his fundamental liberty interest in freedom from confinement in a cage.

[11] *See also, e.g., Robertson v. Goldman*, 369 S.E.2d 888, 891 (W.Va. 1988) ("[W]e have previously observed in a case involving a "peace bond," which we said was analogous to a bail bond, that if the appellant was placed in jail because he was an indigent and could not furnish [bond] while a person who is not an indigent can avoid being

## 2. The Defendants Have Simple, Constitutional Alternatives to Jailing the Poor For Their Unpaid Debts

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The same bedrock principle applies to detention prior to debt-collection proceedings for the nonpayment of court debts. As *Salerno* held, any system of post-arrest detention must meet careful scrutiny because it deprives the arrestee of a "fundamental" right. *Id.*

All over the country, in the area of post-arrest procedure, jurisdictions have taken this constitutional obligation seriously and instituted simple alternatives to the odious system of jailing those who cannot pay and releasing those who can. In Washington, D.C., for example, arrestees are released on their own recognizance with appropriate non-financial conditions. *See* D.C. Code § 23-1321.[12] In Clanton, Alabama, after being confronted with a federal suit similar to this one in January 2015, the City adopted a new policy of releasing all arrestees on a $500 unsecured recognizance bond, allowing every new arrestee to be released on the promise to pay that amount should the person later fail to appear. *See Jones et al. v. City of Clanton*, 2:15-cv-34-MHT (M.D. Ala. 2015). In April 2015, facing a similar federal lawsuit, Velda City, Missouri, ended its use of secured bail and implemented a system of recognizance release for all new arrestees. *Pierce et al. v. City of Velda City*, 4:15-cv-570-HEA (E.D. Mo. 2015). The City of Dothan, Alabama, voluntarily did the same in June 2015, after a federal judge issued a Temporary Restraining Order. *Cooper v. City of Dothan*, 1:15-cv-425-WKW (M.D. Ala. June

---

placed in jail by merely furnishing the bond required, he has been denied equal protection of the law.") (internal quotes removed).

[12] The federal government and the District of Columbia both removed money bail virtually entirely from their court systems after the Department of Justice, Congress, and an overwhelming consensus of legal experts concluded that the old system of post-arrest detention based on money bail was fundamentally unfair and unconstitutional. For example, federal law explicitly forbids obtaining post-arrest detention through the use of money bail that a person cannot meet. *See* 18 U.S.C. § 3142(c)(2) ("The judicial officer may not impose a financial condition that results in the pretrial detention of the person.").

15

18, 2015). In eliminating their money bail schemes, these cities joined many other cities and counties in following the advice of the *en banc* court in *Rainwater*: "Systems which incorporate a presumption favoring personal recognizance avoid much of the difficulty inherent in the entire subject area." *Rainwater*, 572 F.2d at 1057.[13] The Defendants could cure the illegality at the core of this pernicious money bond scheme simply by allowing arrestees to sign unsecured bonds in the same monetary amounts that they currently use or by releasing arrestees on their own recognizance prior to debt-collection proceedings.[14]

In those jurisdictions that follow *Rainwater*'s guidance and rely on non-financial conditions, recognizance, or unsecured bond, chaos in the streets has not ensued. The Defendants are free to choose reasonable measures among these options without offending the Fourteenth Amendment, but they may not use preset secured monetary bail to detain the indigent.

Like the federal courts, state courts, and the Department of Justice, the American Bar Association's seminal Standards for Criminal Justice condemn the Defendants' policies as having no place in American law. *American Bar Association Standards for Criminal Justice – Pretrial Release* (3rd ed. 2007) ("ABA Standards").[15] The ABA Standards, which have been relied on in more than 100 Supreme Court decisions for decades, first began addressing post-

---

[13] The *en banc* court in *Rainwater* also cited favorably to overwhelming academic authority outlining the unconstitutionality of generic bail schedules, calling the academic consensus "convincing." *Rainwater*, 572 F.2d at 1056 ("The punitive and heavily burdensome nature of pretrial confinement has been the subject of convincing commentary.").

[14] Although not necessary for disposing of the equal protection and due process violations alleged here, it should be noted that the $10,000 secured money bond for nonpayment of court costs and private probation fees is outrageous and excessive under the Eighth Amendment, and it runs afoul of other constitutional prohibitions alleged in the Complaint, such as the requirement that debtors with court debts be afforded protections that are comparable to those enjoyed by all judgment debtors. *See, e.g.*, *James v. Strange*, 407 U.S. 128, 139 (1972) (striking down Kansas procedures for recoupment of indigent defense costs because it treated indigent defendant debtors substantially more harshly than private creditors could lawfully treat debtors under state law).

[15] Available at http://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/pretrial_release.authcheckdam.pdf.

16

arrest release procedures in 1968. The latest revision of the ABA Standards now constitutes one of the most comprehensive and definitive statements available on the issue of post-arrest release, and they set forth clear, reasonable, and simple alternatives to the unconstitutional scheme used by the Defendants. For example, the ABA Standards call for the presumption of release on recognizance, followed by release pursuant to the least restrictive non-financial conditions; most importantly, they condemn the preset secured bonds used by Defendants:

> Consistent with these Standards, each jurisdiction should adopt procedures designed to promote the release of defendants on their own recognizance or, when necessary, unsecured bond. Additional conditions should be imposed on release only when the need is demonstrated by the facts of the individual case….

ABA Standards § 10-1.4(a).[16]

> The judicial officer should not impose a financial condition of release that results in the pretrial detention of a defendant solely due to the defendant's inability to pay.

ABA Standards at § 10-1.4(e).

> Financial conditions other than unsecured bond should be imposed only when no other less restrictive condition of release will reasonably ensure the defendant's appearance in court. The judicial officer should not impose a financial condition that results in the pretrial detention of the defendant solely due to an inability to pay.

ABA Standards at § 10-5.3(a). The National Association of Pretrial Services Agencies (NAPSA) has also issued definitive Standards that condemn the use of fixed secured money bail.

*See* NAPSA, Standards on Pretrial Release (3rd Ed. 2004) at § 2.5(f).[17]

---

[16] Moreover, the ABA Standards state that, when financial conditions are imposed, "the least restrictive conditions principle requires that unsecured bond be considered first." *Id*. § 10-1.4(c) (commentary) at 43-44. The ABA commentary goes on: "If the court finds that unsecured bond is not sufficient, it may require the defendant to post bail; however, the bail amount must be within the financial reach of the defendant and should not be at an amount greater than necessary to assure the defendant's appearance in court." *Id*. at 44.

[17] Available at, http://www.pretrial.org/download/performance-measures/napsa%20standards%202004.pdf. The NAPSA Standards provide:

> Financial conditions should be the result of an individualized decision taking into account the special circumstances of each defendant, the defendant's ability to meet the financial conditions

The ABA Standards are widely viewed as authoritative in a variety of contexts,[18] and they are seen as the seminal text reflecting best practices by the leading commentators on post-arrest procedures. *See* Department of Justice, National Institute of Corrections, *Fundamentals of Bail* (2014) at 75 (discussing the importance of the ABA Standards and their rejection of standardized financial conditions of release after arrest). These Standards, which include detailed treatment of all relevant policies and procedures necessary for creating a lawful and effective post-arrest release system, have been a model for numerous jurisdictions around the country to eliminate the antiquated and unlawful practice of detention based on nonpayment.

The Defendants' poverty-based post-arrest detention scheme makes a mockery of the "carefully limited" circumstances in which continued detention of an arrestee is constitutionally permissible. *See Salerno*, 481 U.S. at 755. Even putting to one side the other Claims for Relief in the Complaint and assuming that the Defendants' debt-collection practices are lawful at all, it is clearly illegal to hold arrestee-debtors in custody pending those proceedings when they cannot pay for their release.

The Constitution guarantees that the poor will not face a different legal system than the system faced by wealthier people. Because Mr. Robinson and Mr. Gibbs are being threatened with imminent and continued jailing based solely on their inability to pay the amount of money

---

and the risk of the defendant's failure to appear for court proceedings, and should *never be set by reference to a predetermined schedule of amounts based solely on the nature of the charge*.

*Id*. at § 2.5 (f) (emphasis added). The Commentary to § 2.5 (f) of the NAPSA Standards further explains:

Some jurisdictions have historically used a "bail schedule" that establishes set bond amounts for various charge categories and excludes consideration of other factors that may be far more relevant to the risk of nonappearance. The practice of using a bail schedule easily leads to detention for those too poor to post the bail amount and to the release of others for whom the amount is relatively nominal and thus creates no incentive to return to court.

[18] *See, e.g.*, *Strickland v. Washington*, 466 U.S. 668, 688 (1984) (relying on the ABA Standards to ascertain "prevailing norms of practice"). As Chief Justice Burger explained when discussing an earlier version of the ABA Standards, the ABA Standards constitute "the single most comprehensive and probably the most monumental undertaking in the field of criminal justice ever attempted by the American legal profession in our national history." Warren E. Burger, *The ABA Standards for Criminal Justice*, 12 Am. Crim. L. Rev. 251 (1974).

18

preset by the Defendants, they are highly likely to prevail on the merits of their constitutional claim.

## II. Mr. Robinson and Mr. Gibbs Will Suffer Irreparable Constitutional Harm If This Court Does Not Issue an Injunction

Without intervention from this Court, Mr. Robinson and Mr. Gibbs will suffer the serious and irreparable harm of being jailed. Imprisoning a human being in a jail cell in violation of his constitutional rights is undoubtedly an irreparable harm to his body and his mind. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint— lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.").

Even one additional night in jail is a harm to a person that cannot be later undone. *See, e.g.*, *United States v. Bogle*, 855 F.2d 707, 710–711 (11th Cir. 1988) (holding that the "unnecessary deprivation of liberty clearly constitutes irreparable harm"); *Wanatee v. Ault*, 120 F.Supp.2d 784, 789 (N.D. Iowa 2000) ("[U]nconstitutional incarceration generally constitutes irreparable harm to the person in such custody."); *Ward v. Wolfenbarger*, 340 F.Supp.2d 773, 778 (E.D. Mich. 2004) (holding that an inmate "would suffer irreparable harm each day that he would remain imprisoned in violation of the U.S. Constitution"); *SEC v. Bankers Alliance Corp*., 1995 WL 317586, *3 (D.D.C.1995) ("As for the question of irreparable harm in the absence of a stay, clearly Mr. Lee will be harmed by being incarcerated."); *Lake v. Speziale*, 580 F. Supp. 1318, 1335 (D. Conn. 1984) (granting preliminary injunction requiring court to inform child support debtors of their right to counsel because unlawful incarceration would be irreparable harm); *Cobb v. Green*, 574 F. Supp. 256, 262 (W.D. Mich. 1983) ("There is no adequate remedy

19

at law for a deprivation of one's physical liberty. Thus the Court finds the harm asserted by plaintiff is substantial and irreparable.").[19]

Moreover, even a few days in jail can have devastating consequences in a person's life, such as the loss of a job or the inability to arrange safe alternate care for minor children. It also exposes arrestees to the notorious risks of being locked up in Tennessee jails.[20] Forcing a person to risk all of these additional harms because they cannot raise cash to avoid them would only further contribute to the unnecessary and irreparable harm visited on Mr. Robinson and Mr. Gibbs.

---

[19] Each jailing also carries with it numerous other indignities, including intrusive body searches and cramped, crowded, and unsanitary living conditions.

[20] Medical care in Tennessee jails is woefully inadequate. Twenty percent of inmates at the Rutherford County Jail have diagnosed mental health disorders, though the actual percentage of inmates suffering from mental illness is likely much higher. *See As Mental Health Services Decline, Jail Numbers Rise in Tennessee*, available at http://www.treatmentadvocacycenter.org/about-us/our-blog/123-tn/2923-as-mental-health-services-decline-jail-numbers-rise-in-tennessee (last visited September 25, 2015). Due to overcrowding, inmates in Rutherford County are reported to be sleeping three to a cell and on the floors. These inhumane conditions are creating safety risks that have led to fights and suicides. *See Mental illness growing inside county jails*, Daily News Journal, available at http://www.dnj.com/story/news/local/2015/09/18/mental-illness-harder-handle-jail-crowding-rises/32510113/ (last visited September 25, 2015).

The situation in Rutherford County is similar to that in other counties in Tennessee. For example, the Department of Justice issued a report in 2011, detailing the inadequate medical and mental health care, food, clothing, and shelter available at the jail in Robertson County. *See Department of Justice Report on Robertson County*, available at http://www.justice.gov/sites/default/files/crt/legacy/2011/09/06/robertson_co_findlet_8-26-11.pdf (last visited September 25, 2015). Additionally, due to increased violence throughout Tennessee's correctional facilities, the Tennessee's Correction Commissioner recently ordered an independent audit of Tennessee's prisons to review inadequate staffing levels. *See Independent audit will review staffing, violence at Tenn. Prisons*, available at http://www.local8now.com/news/local/headlines/Independent-audit-will-review-staffing-violence-at-prisons-323166751.html (last visited September 25, 2015); *see also, e.g.*, Tennessee Advisory Committee on Intergovernmental Relations, Commission Report, March 2007, *Beyond Capacity: Issues and Challenges Facing County Jails* 26, *available at* http://www.state.tn.us/tacir/PDF_FILES/Other_Issues/beyond%20capacity.pdf (reporting that "overcrowding has detrimental effects on safety, food service, medical care, recreation and sanitation in jails"); Brian Haas, *Tennessee Jails Have More Inmates Than Beds, and There's No Solution in Sight*, The Tennessean (Feb. 22, 2013), http://archive.tennessean.com/article/20130222/NEWS03/102220002/12-10-12-TN-jails-more-inmates-than-beds-there-s-no-solution-sight ("Tennessee's jails are bursting at the seams. Nearly half of the state's 109 jails have more inmates than beds, some holding two or three times as many inmates as they are certified for. Detainees in these counties find themselves sleeping on floors in common areas, using portable showers and toilets brought in so jails remain legal to operate."); *see also, e.g.*, Bureau of Justice Statistics, Sexual Victimization In Prisons And Jails Reported By Inmates, 2011-12-Update, *available at* http://www.bjs.gov/index.cfm?ty=pbdetail&iid=4654 (finding that 3.2% of jail inmates reported being sexually abused during their current stay in jail).

20

Mr. Robinson and Mr. Gibbs are therefore threatened imminently with languishing in jail solely because they and their families do not have enough money to buy their release or to pay PCC, Inc. what it demands. Mr. Robinson and Mr. Gibbs ask this Court to enjoin the Defendants from having them arrested and keeping them in jail because they cannot afford to pay cash up front to secure their release.

### III. An Injunction Will Serve the Public Interest and Will Not Harm the Defendants.

As numerous courts have emphasized, "It is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (quoting and citing cases). Overwhelming federal precedent considers the amelioration of constitutional violations to be in the public interest. *See G & V Lounge v. Michigan Liquor Control Comm.*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Giovani Carandola v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("The final prerequisite to the grant of a preliminary injunction is that it serve the public interest. Again, we agree with the district court that upholding constitutional rights surely serves the public interest."). It is hard to imagine anything more in the public interest than remedying clear constitutional violations. *Freedberg v. United States Dept. of Justice*, 703 F. Supp. 107, 111 (D.D.C. 1988) ("And insofar as the public interest is concerned, it was perhaps put best by another judge of this district court, in another case … who said, simply, it is in the public interest to uphold a constitutionally guaranteed right.") (quotations and citation omitted); *see also, e.g.*, *Wiley Mission v. New Jersey, Dep't of Cmty. Affairs*, 2011 U.S. Dist. LEXIS 96473, at * 59 (D.N.J. Aug. 25, 2011) (granting permanent injunction against a state agency in part because "requiring the Department to abide by the Constitution serves the public interest"). As the Court explained in *Glatts v. Superintendent*

21

*Lockett*, 2011 U.S. Dist. LEXIS 1910, at *18-19 (W.D. Pa. 2011) ("[O]ne must consider the other side of the scale of public interest, which is, having a State's employees follow the Federal Constitution is also in the public interest.").

Nor would an injunction harm the Defendants. The Defendants already offer release to every arrestee probationer who pays them. At worst, the Defendants would be required to do what other cities and counties throughout the country do every day: issue valid notice to appear for court proceedings rather than holding poor court debtors in jail indefinitely until they pay.

Indeed, continuing to keep impoverished arrestees in jail cells because of their poverty has significant *negative* consequences for the public interest. In the last several years, law enforcement officials and researchers have learned even more about the negative effects of post-arrest poverty custody. The National Institute of Corrections at the Department of Justice (DOJ) has led the way in highlighting both the unequal nature of generic secured bail and its negative impacts on community safety. *See* United States Department of Justice, National Institute of Corrections, *Fundamentals of Bail*, at 28-29 (2014).[21] There is now overwhelming evidence that keeping indigent people in jail—even for a few days after an arrest—has terrible consequences. First, it is enormously expensive to house people in jail.[22] Second, jailing the poor can devastate lives by disrupting stable employment and child custody arrangements.[23] Third, even just 72

---

[21] *See also, e.g.*, Arnold Foundation, *The Hidden Costs of Pretrial Detention* (2013) at 3, *available at*: http://www.arnoldfoundation.org/wp-content/uploads/2014/02/LJAF_Report_hidden-costs_FNL.pdf (studying 153,407 defendants and finding that "when held 2-3 days, low risk defendants are almost 40 percent more likely to commit new crimes before trial than equivalent defendants held no more than 24 hours"); Arnold Foundation, *Pretrial Criminal Justice Research Summary* (2013) at 5, *available at*: http://www.arnoldfoundation.org/wp-content/uploads/2014/02/LJAF-Pretrial-CJ-Research-brief_FNL.pdf (finding that "low-risk defendants held 2-3 days were 17 percent more likely to commit another crime within two years" and that those detained "4-7 days yielded a 35 percent increase in re-offense rates").

[22] *See* The Price of Jails: Measuring the Taxpayer Cost of Local Incarceration, Vera Institute of Justice (May 2015), available at http://www.safetyandjusticechallenge.org/wp-content/uploads/2015/05/The-Price-of-Jails-report.pdf (explaining that even the reported costs of approximately $50 to $570 per inmate per day in custody at local jails around the country was a significant underestimate of the cost to local jurisdictions of incarceration in local jails).

[23] *See The True Cost of Incarceration on Families*, *available at* http://whopaysreport.org/.

hours in jail after an arrest leads to worse outcomes for all involved by increasing poverty, hurting an arrestee's family, and making it more likely that an arrestee will recidivate.[24]  *See* DOJ, National Institute of Corrections, at 24-29;[25] *see also, e.g.*, International Association of Chiefs of Police, Resolution (October 2014), 121st Annual Congress at 15-16 ("[D]efendants rated low risk and detained pretrial for longer than one day before their pretrial release are more likely to commit a new crime once they are released, demonstrating that length of time until pretrial release has a direct impact on public safety.").[26]

## IV.     The Court Should Use Its Discretion Not to Require the Posting of Security

Federal Rule of Civil Procedure 65(c) provides that the court require the moving party to post security to protect the other party from any financial harm likely to be caused by a temporary injunction if that party is later found to have been wrongfully enjoined.  Rule 65(c), however, "vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond," *DSE v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), *including the discretion to require no bond at all.  See New Orleans Home for Incurables, Inc. v. Greenstein*, 911 F. Supp. 2d 386, 412-13 (E.D. La. 2012) (citing *Corrigan Dispatch Co. v. Casa Guzman,*

---

[24] For all of these reasons, as well as the issues of fundamental fairness that render pretrial poverty-based custody unconstitutional, opposition to the routine use of generic bail schedules has been incorporated into the policy positions of the major American law enforcement stakeholders.  *See, e.g.*, National Sheriff's Association, Resolution 2012-6 ("[A] justice system relying heavily on financial conditions of release at the pretrial stage is inconsistent with a fair and efficient justice system.").

[25] A*vailable at*, http://static.nicic.gov/UserShared/2014-11-05_final_bail_fundamentals_september_8,_2014.pdf. Summarizing the current state of research, the DOJ report, *id.* at 29, concluded:

> [R]esearchers found that low- and moderate-risk defendants held only 2 to 3 days were more likely to commit crimes and fail to appear for court before trial than similar defendants held 24 hours or less. As the time in jail increased, the researchers found, the likelihood of defendant misbehavior also increased. The study also found similar correlations between pretrial detention and long-term recidivism, especially for lower risk defendants. In a field of paradoxes, the idea that a judge setting a condition of bail intending to protect public safety might be unwittingly increasing the danger to the public—both short and long-term—is cause for radically rethinking the way we administer bail.

[26] *Available at* http://www.theiacp.org/Portals/0/documents/pdfs/2014Resolutions.pdf.

S.A., 569 F.2d 300, 303 (5th Cir.1978)); *Steward v. West*, 449 F.2d 324, 325 (5th Cir. 1971) (finding that no injunction bond need be posted when "it is very unlikely that the defendant will suffer any harm"); *RoDa Drilling v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) ("[T]rial courts have wide discretion under Rule 65(c) in determining whether to require security…."); *Donohue v. Mangano*, 886 F. Supp. 2d 126, 163 (E.D.N.Y. 2012) ("[A] district court has wide discretion to dispense with the bond requirement of Fed.R.Civ.P. 65(c) where there has been no proof of likelihood of harm…."); *Council on American-Islamic Rels. v. Gaubatz*, 667 F. Supp. 2d 67, 81 (D.D.C. 2009) (same). The Court should use its considerable discretion to find that no security (or a nominal security of $1) is required in this case for several important reasons.

First, the likelihood of the Defendants suffering any harm from an improperly issued injunction requiring the Defendants to comply with federal law is almost non-existent. *See, e.g.*, *Gaubatz*, 667 F. Supp. 2d at 81 (requiring no bond where the defendant would not be substantially injured by the issuance of an injunction); 11A Charles A. Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2954 (2d ed.) ("[T]he court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant."). Indeed, the limited injunction sought in this Motion would not even eliminate the Defendants' ability to release Mr. Robinson or Mr. Gibbs on an unsecured bond. The Defendants may issue the same bond to Mr. Robinson and Mr. Gibbs and charge them the same amount of money should they fail to appear in court. Thus, no financial harm would result from this preliminary injunction.

Second, Mr. Robinson and Mr. Gibbs are living in poverty, and the very reason for bringing this case is their lack of financial resources. *See, e.g.*, *Mitchell et al. v. City of Montgomery*, 14-cv-186-MEF, Doc. 18 at 3, (May 1, 2014) (issuing preliminary injunction

without requiring a bond for indigent plaintiffs because they were likely to succeed on the merits and because the City was unlikely to suffer significant financial harm); *Swanson v. Univ. of Hawaii Prof. Assembly*, 269 F. Supp. 2d 1252, 1261 (D. Haw. 2003) (waiving the security requirement for public employees based on ability to pay and also because the injunction sought enforcement of constitutional rights); *Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929, 952 (E.D. Mo. 2004) (requiring no bond for homeless plaintiffs); *Wayne Chem. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (requiring no bond for indigent person); *Bass v. Richardson*, 338 F. Supp. 478, 490 (S.D.N.Y.1971) ("It is clear to us that indigents, suing individually or as class plaintiffs, ordinarily should not be required to post a bond under Rule 65(c)."); *see also* 11A Wright & Miller § 2954 (courts can waive the bond requirement in cases involving poor plaintiffs).

Finally, Mr. Robinson and Mr. Gibbs are overwhelmingly likely to succeed on the merits of this narrow claim in Count Seven of the Complaint. The outcome of any future trial, if necessary, is likely to reaffirm the basic principles that have been repeatedly reaffirmed by the Supreme Court, the Sixth Circuit, and every other American tribunal to address them.

## CONCLUSION

Mr. Robinson and Mr. Gibbs ask this Court to prevent the Defendants from arresting them and keeping them in jail because of their inability to make a monetary payment.

Respectfully submitted,

*s/ Jonathan Cole*
Jonathan Cole (TN #16632)
Sarah Murray (TN #33454)
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
211 Commerce Street, Suite 800
Nashville, Tennessee 37201
Tel.: (615) 726-7335
Fax: (615) 744-7335

25

Email: jcole@bakerdonelson.com
smurray@bakerdonelson.com

_s/Matthew White_
Lori H. Patterson (TN #19848)(*Pro Hac Vice Forthcoming*)
Kristine L. Roberts (TN #23856)
Matthew G. White (TN #30857)
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
First Tennessee Bank Building
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Tel.: (901) 577-8182
Fax: (901) 577-0724
Email: lpatterson@bakerdonelson.com
klroberts@bakerdonelson.com
mwhite@bakerdonelson.com

_s/ Alec Karakatsanis_
Alec Karakatsanis (D.C. #999294)(*Pro Hac Vice* forthcoming)
Phil Telfeyan (Cal. #258270)(*Pro Hac Vice* forthcoming)
Equal Justice Under Law
916 G Street, NW Suite 701
Washington, DC 20001
Tel.: (202)-670-1004
Email: alec@equaljusticeunderlaw.org
ptelfeyan@equaljusticeunderlaw.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify on this the 1st day of October, 2015, a true and correct copy of the forgoing was filed with the Court. In addition, the foregoing will be served via private process server upon the following:

Ernest G. Burgess
Rutherford County Mayor
County Courthouse, One Public Square
Room 101
Murfreesboro, TN 37130

Jim Cope
Rutherford County Attorney
16 Public Square North
Murfreesboro, TN 37130

Providence Community Corrections, Inc.
c/o Corporation Service Company, Registered Agent
2908 Nashville, TN 37203

Jasmine Jackson
Providence Community Corrections
309 West Main Street
Murfreesboro, TN 37130

Briana Woodlee
Providence Community Corrections
309 West Main Street
Murfreesboro, TN 37130

Amanda Roberts
Providence Community Corrections
309 West Main Street
Murfreesboro, TN 37130

Tiara Smith
Providence Community Corrections
309 West Main Street
Murfreesboro, TN 37130

Kelly Haley
Providence Community Corrections
309 West Main Street
Murfreesboro, TN 37130

Amanda Schexnayder
Providence Community Corrections
309 West Main Street
Murfreesboro, TN 37130

Kayla Banks
Providence Community Corrections
309 West Main Street
Murfreesboro, TN 37130

Kelly McCall
Providence Community Corrections

309 West Main Street
Murfreesboro, TN 37130

Nisha Hyde
Providence Community Corrections
309 West Main Street
Murfreesboro, TN 37130

                        *s/ Jonathan Cole*_____