# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| CINDY RODRIGUEZ, et al. | ) |
| | ) |
| Plaintiffs, | ) CASE NO. 3:15-cv-01048 |
| | ) JUDGE SHARP |
| v. | ) |
| | ) |
| PROVIDENCE COMMUNITY | ) |
| CORRECTIONS, INC., et al. | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

Plaintiffs are residents and misdemeanor probationers of Rutherford County, Tennessee who filed suit on behalf of themselves and those similarly situated. Defendants are Rutherford County, Tennessee ("the County"), Pathways Community Corrections, Inc. ("PCC"),[1] and individual probation officers ("Individual Defendants").[2] Pending before the Court is Plaintiffs' Motion for a Preliminary Injunction (Docket No. 36), to which Defendants have responded in opposition (Docket Nos. 39, 41, 51) and Plaintiffs have replied (Docket Nos. 44, 45). Also pending before the Court are two evidentiary filings: Defendant PCC's Motion to Exclude Extraneous Exhibits (Docket No. 48) and Plaintiffs' Objections to New Evidence Offered by PCC., Inc. (Docket No. 52). For the reasons set forth below, the Court denies both evidentiary requests and grants Plaintiffs' Motion for a Preliminary Injunction.

## I. Factual & Procedural Background

Plaintiffs have filed a class action lawsuit seeking to address one aspect of the growing privatization of the criminal justice system, namely, Rutherford County's use of a profit-driven

---

[1] PCC previously did business as Providence Community Corrections, Inc.

[2] The Court refers to the County, PCC, and the Individual Defendants collectively as "Defendants."

1

corporation to administer misdemeanor probation services. Plaintiffs allege that Rutherford County's current arrangement violates both federal and state law, but they seek injunctive relief based specifically on Count VII of the Complaint, which alleges violations of Plaintiffs' Fourteenth Amendment rights. (Docket No. 1 at ¶¶ 300-01). The facts giving rise to the instant request for injunctive relief are largely undisputed.

Rutherford County contracts with PCC to provide probation services. (Docket No. 41 at 3). According to the contract, PCC is to "[m]onitor and collect payments for fines, court costs, and restitution" and "[m]onitor compliance with conditions placed on referred cases as ordered by the court." (Docket No. 1-1 at 6). The contract also binds PCC to "[r]eport to the Court any and all violations of court-ordered conditions for any probationer who is materially in violation of such conditions." (Id.). The County agreed to "[h]old each referred case accountable for all payment of services, fines, restitution or other court-ordered fees and obligations" and to "[c]reate appropriate sanctions for failure to pay as well as other court-ordered conditions as determined by the Court." (Id. at 7). The issue now before the Court is how Defendants sanction probationers for violating the conditions of their probation. More specifically, Plaintiffs challenge Defendants' failure to account for indigency when the only probation violation alleged is nonpayment and when using secured money bonds to jail probationers pending revocation proceedings.[3]

When a probationer is in violation of the conditions of his or her probation, whether stemming from inability to pay or otherwise, PCC brings "Affidavits of Complaint for Violation of Probation" to either the Rutherford County General Sessions Court or the Rutherford County

---

[3] A secured bond is one that is backed by some type of security and in the context of confinement, a criminal defendant would post a bond backed by a surety in order to obtain release and promise attendance at a future court proceeding. Bond, Black's Law Dictionary (10th ed. 2014). In this case, a secured money bond is one that requires monetary payment to obtain release until revocation proceedings.

Circuit Court. (E.g., Docket No. 3-2; Docket No. 37-1 and 37-2; Docket No. 44-1; Docket No. 45-2 to 45-5). Once signed by a judge, these affidavits become arrest warrants that can be executed by the County, thereby triggering the process for revocation proceedings. Plaintiffs assert that prior to the initiation of this litigation, PCC brought affidavits to Rutherford County General Sessions Court and/or Rutherford County Circuit Court with the bond amount already filled in by PCC's probation officers. A General Sessions Court judge, the Honorable Ben Hall McFarlin, confirmed that he had previously received affidavits with bond amounts already listed in the past but does not believe the practice currently exists. (Draft Transcript for Nov. 6, 2015 Preliminary Injunction Hearing at 69) (hereinafter "Nov. 6 Hr'g Tr."). Where PCC has not filled in the bond line on the affidavit, judges in Rutherford County set the amount of the secured money bond. (Nov. 6 Hr'g Tr. at 68-70).

Because payment of "all required supervision fees, court fines and court costs"[4] is a rule of probation, a probationer who is unable to make payments is technically in violation of the conditions of his or her probation. (Docket No. 1-2) ("Rules of Probation").[5] Other conditions of probation also impose costs on probationers. Litter removal, for example, is a condition that is required for first-offense DUI convictions. (Docket No. 51 at 4). This condition costs $132 in Rutherford County, id., and those who wish to satisfy this condition but cannot afford to pick up trash are in violation of the conditions of their probation. Probationers must also make monetary payments to complete alcohol, drug, and domestic violence classes. A probationer who is unable to pay the monetary fees associated with the conditions of his or her probation is precluded from

---

[4] These court-ordered fees, fines and costs, including supervision fees owed to PCC, are collectively referred to herein as "court costs."

[5] Plaintiffs allege, and Defendants have not disputed, that the "Rules of Probation" sheet is "prepared jointly by PCC, Inc. and the County" and must be signed by probationers at the commencement of their period of probation. (Docket No. 1 at ¶ 21).

3

satisfying those conditions and is in violation. As set forth in the contract, that probationer would become subject to arrest or other sanction by the County.[6] Judge McFarlin stated that in the General Sessions court, when a probationer's only violation is failure to pay, the resulting warrant calls for those arrested to be released on recognizance ("ROR"). (Nov. 6 Hr'g Tr. at 75). Even if true of the General Sessions Court, Plaintiffs submitted at least two arrest warrants from the Rutherford County Circuit Court that subjected probationers whose only violation was failure to pay to imprisonment on secured money bonds. (Docket No. 45-3).[7]

Defendants use secured money bonds for all other probation violations. Thus, when the probation violation arises out of a probationer's inability to pay but is technically categorized as a substantive violation—e.g., failure to complete litter removal—the probationer will be held on a secured money bond. These bonds require monetary payment in order for a probationer to obtain release pending his or her revocation hearing. Those who can afford the bond payment are able to purchase immediate freedom and return on their assigned court date. Those who cannot make bond payments are kept in jail until their eventual hearings. According to Judge McFarlin, he issues almost no warrants for secured money bonds lower than $2,500. (Nov. 6. Hr'g Tr. at 96). At no point in this process do Defendants inquire into probationers' indigency or consider whether another method of ensuring attendance at the revocation hearings might be equally effective. (Id. at 91).

---

[6] Probationers also must pay $20 for drug testing. Defendants assert that if a probationer cannot pay for the drug test when he or she reports to a probation officer, then PCC "absorbs the cost" of the test. (Docket No. 51-1 at 2). However, Plaintiffs have submitted a PCC-generated document which indicates that PCC instead adds the cost of the drug test to the probationer's total debt. (Docket No. 1-3 at 2).

[7] The two nonpayment warrants that Plaintiffs submitted show that Named Plaintiff Fred Robinson was jailed on a $5,000 secured bond in 2012, a bond that nearly doubled the total he owed in court costs, and was jailed on a $10,000 secured bond in 2015, a bond that approximately tripled his total court costs. The utility of such high secured bonds is dubious: if Mr. Robinson could not make PCC's requisite payments, setting his bond so high virtually ensured his prolonged detention.

4

Probationers may receive an informal hearing when Rutherford County judges come to the jail on Mondays and Fridays as part of what is called the "ten-day docket." At least one of the potential class members has attested to the fact that individuals jailed based on probation violations are not seen as part of the ten-day docket, although other probationer declarations indicate that judges do see PCC probationers during these visits. (Pls. Exs. 5-18 at Nov. 6 Hr'g). Plaintiffs' declarations reveal that during these ten-day docket "hearings," the probationers meet with judges and prosecutors, who give them the options of 1) immediately pleading guilty to the alleged probation violation and receiving a sentence; or 2) requesting representation and waiting for a formal revocation hearing. (Id.). According to Plaintiffs' declarations, probationers are told that pleading guilty will help them obtain swifter release whereas waiting for a public defender will take at least thirty days. (Id.). Confirming these allegations, Judge McFarlin testified that a probationer might have to wait in jail for thirty to sixty days before his or her actual court date.[8] (Nov. 6 Hr'g Tr. at 81). Judge McFarlin continued that judges and prosecutors do not engage in any sort of inquiry into indigency when conducting the ten-day docket. (Id. at 91-92).

The Court also finds these jailhouse guilty pleas troubling. Probationers who plead guilty to violations often receive as part of their sentence an extension of their PCC probation term, thus incurring more fees which they cannot pay, resulting in another probation violation and arrest warrant, leading to repeated jailing and perhaps another guilty plea, and so the cycle continues. Indeed, Defendants trap probationers in a pernicious cycle for years on end. One of the arrest warrants Plaintiffs submitted shows a probationer whose term with PCC has been

---

[8] A review of the arrest warrants that Plaintiffs submitted shows probationers' court dates set from as few as four days to as many as 73 days after arrest.

extended at least five times, leaving her trapped by PCC since early 2010. (Pls.' Ex. 4 at Nov. 6 Hr'g).

Again, if Probationers had the financial means to pay the court costs and probation fees in the first instance, many could avoid violation and arrest entirely. Similarly, if they had the means to post bond, they could secure release pending formal revocation proceedings. Although Defendants do not bother to take it into account, extreme poverty often produces the underlying probation violation and results in prolonged detention.

Plaintiffs previously challenged this probation violation process in reference to two of the Named Plaintiffs, Steven Gibbs and Fred Robinson. (Docket No. 2). After the Court granted a Temporary Restraining Order ("TRO") preventing the arrest of Mr. Gibbs and Mr. Robinson (Docket No. 13), the parties stipulated to converting the TRO into a preliminary injunction, (Docket No. 19). The stipulation enjoined Defendants from seeking, serving, or executing arrest warrants based solely on nonpayment of court costs for the arrest of Mr. Robinson and Mr. Gibbs. The stipulated injunction also prohibited seeking, serving, or executing a warrant for violation of probation that would arrest either Plaintiff and subject him to a "preset secured money bond."[9] Plaintiffs now seek injunctive relief on a classwide basis.

## II. Evidentiary Objections & Scope of Relief Sought

Both parties filed objections to evidence submitted in association with Plaintiffs' Motion for a Preliminary Injunction. Specifically, Plaintiffs object to a declaration submitted by Defendants (Docket No. 51-1), and Defendants challenge Plaintiffs' submission of declarations

---

[9] It has since come to light that "preset secured money bond" is a not an "industry term" but was coined by Plaintiffs' counsel. As discussed at the preliminary injunction hearing, the Court understands the term to mean a secured money bond imposed without a hearing on or inquiry into the probationer's ability to pay the bond. (Nov. 6 Hr'g Tr. at 102). In an effort to promote consistency and the economy of words, the Court adopts that definition of the term and occasionally employs it herein.

6

of potential class members (Pls.' Exs. 5-16 at Nov. 6 Hr'g) and arrest warrants issued for nonpayment of court costs (Docket No. 45-2).

As a threshold matter, the Court notes that neither party submitted any legal authority that would support the exclusion of evidence. Instead, the parties make conclusory allegations that the declarations and arrest warrants are not relevant to the Court's consideration of Plaintiffs' request for injunctive relief. This is not so: the declarations – both Plaintiffs' and Defendants' – and arrest warrants contain useful information about the mechanics of Defendants' probation scheme. The arrest warrants also prove that ROR warrants are a viable alternative to jail when it comes to addressing probation violations. Because the declarations and arrest warrants provide critical context for the injunctive relief sought and because neither party has presented any persuasive grounds for exclusion, the Court will consider all of the evidence on the record.

Defendants do, however, point to one important issue in their objections: the scope of Plaintiffs' request for injunctive relief. Early in the litigation, which still remains in its infancy, Plaintiffs endorsed the practice of arresting and releasing probationers on their own recognizance where the only violation alleged was nonpayment. (Docket No. 3 at 1-2) (noting that if Named Plaintiff Fred Robinson had violated his probation by nonpayment of court costs, Defendants "must either issue a valid summons for revocation proceedings or release him after arrest pursuant to his own recognizance or unsecured bond with notice of a court date."); (Docket No. 37 at 2) (suggesting that after a nonpayment violation Defendants "must either issue a valid summons for revocation proceedings or release them after arrest pursuant to their own recognizance or unsecured bond with notice of a court date."). In later filings and during the preliminary injunction hearing, however, Plaintiffs made statements indicating that any arrest at all, regardless of whether the probationer is ROR-ed, would be problematic. For example, one of

7

Plaintiffs' reply briefs states that the preliminary injunction is about "whether people can be *arrested* solely for not paying PCC, Inc." (Docket No. 45 at 1) (emphasis added). The Court believes that this inconsistency is the unintentional product of imprecise wording, not a late-stage attempt to expand the scope of relief. The Court construes Plaintiffs' Motion as seeking to enjoin the arrest and *detention* of probationers where the only probation violation alleged is nonpayment of court costs.

The Court finds it useful to clarify the precise nature of Plaintiffs' allegations in their Motion for Preliminary Injunction. Plaintiffs do not argue that PCC may not report probation violations; that Defendants may not arrest probationers for violating their probation; or even that Defendants may never use secured money bonds. Instead, Plaintiffs argue that when Defendants determine that a secured money bond would be the best method to ensure the probationer's attendance at his or her eventual revocation hearing, they must account for indigency when setting the amount of the bond. Plaintiffs also do not argue that nonpayment does not qualify as a probation violation. Instead, they argue that where nonpayment is the only violation alleged, the probationer cannot be jailed after arrest—the functional equivalent of probation revocation—without an inquiry into whether the nonpayment was willful. With this in mind, the Court turns to the legal issues at hand.

### III. Abstention

Defendants assert that the Court must abstain from this case under the doctrine of Younger v. Harris, 401 U.S. 37 (1971). Younger abstention directs federal courts not to interfere with a pending state criminal proceeding. More specifically, federal courts are not to intervene where there are ongoing state judicial proceedings that implicate important state interests and those proceedings provide an adequate opportunity to address constitutional challenges.

8

Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 431 (1982). Defendants contend that by virtue of their status as PCC probationers, all potential class members are party to pending state proceedings that implicate important interests. They also assert that probationers may raise constitutional concerns at numerous junctures during the sentencing and probation process, thus satisfying Younger.

Plaintiffs dispute the application of Younger. They rely in part on Gerstein v. Pugh, 420 U.S. 103, 107 n.9 (1975), in which the Supreme Court noted that Younger does not bar equitable relief where the injunction is directed not at "state prosecutions as such" but rather "at the legality of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution." Id. Gerstein stands for the principle that when it comes to the adequacy of the state court proceedings as an opportunity to address constitutional harms, the opportunity must be available *before* the harm is inflicted.

Plaintiffs have the better of the argument. Defendants fail to make an inquiry into probationers' ability to pay before jailing them on secured money bonds. A state court judge has confirmed that no such inquiry occurs as part of the ten-day docket, meaning that such an inquiry could occur, at earliest, at a probationer's revocation hearing. By that point, the constitutional harm alleged, a liberty deprivation absent an inquiry into indigency, has already occurred. Probationers who plead guilty to the alleged probation violation while in jail do not even have formal revocation hearings at which they could raise constitutional challenges. Even if Defendants did inquire into indigency during the ten-docket, that would still be too little, too late. Probationers are not actually guaranteed to see a judge within ten days and are not represented by an attorney during these jailhouse meetings. By the time they participate in the ten-day docket, probationers have already suffered a liberty deprivation and been forced to remain in jail due to

9

their inability to post bond. Once again, that modicum of process occurs after the alleged constitutional injury.

Plaintiffs also note that their challenge does not disturb or even touch the underlying state court criminal convictions. Plaintiffs therefore dispute the existence of pending state court proceedings. The Sixth Circuit has read Gerstein to require federal courts to ask "whether the issue raised is collateral to the principal state proceeding" before invoking Younger abstention. Parker v. Turner, 626 F.2d 1, 8 (6th Cir. 1980). This supports Plaintiffs' contention that no state court proceedings are "pending" within the meaning of Younger. In the same vein, Plaintiffs point to a district court in Alabama that recently rejected the application of Younger where the federal lawsuit challenged probation. Ray v. Judicial Corr. Servs., No. 2:12-CV-02819-RDP, 2013 WL 5428360 (N.D. Ala. Sept. 26, 2013). The Ray court declined to abstain in part because the relief sought was "not intended to contradict or overturn the substance of the prior state court proceedings but instead targets [Defendant's] post-judgment procedure." Ray, 2013 WL 5428360, at *12. Because the federal lawsuit addressed only post-judgment procedure, the concerns animating Younger were absent. Id.

Plaintiffs challenge the constitutionality of certain discrete aspects of Defendants' post-judgment procedure. The harm alleged—that probationers do not receive inquiries into indigency as required by the Fourteenth Amendment—has been inflicted before a probationer could voice any constitutional concerns. This alleged constitutional infirmity could be remedied without affecting the underlying state court judgments. Accordingly, Younger abstention is inappropriate.

## IV. Classwide Injunctive Relief

Defendants argue that the Court should deny classwide injunctive relief because Plaintiffs have not yet certified a class in accordance with Federal Rule of Civil Procedure 23. Defendants even accuse Plaintiffs of attempting to sidestep Rule 23 entirely by seeking to obtain a classwide preliminary injunction. The Court disagrees with this characterization and finds that the preliminary injunctive relief Plaintiffs seek is well-suited to classwide application.

Plaintiffs allege a systemic deficiency: the lack of inquiry into indigency before either 1) jailing probationers on secured money bonds; or 2) jailing probationers when the sole violation is nonpayment. A finding that this deficiency violates the Fourteenth Amendment applies with equal force to all probationers trapped in Defendants' system. The Court can craft injunctive relief that will alleviate this injury pending a final ruling on the merits without necessitating individualized remedies. Put another way, addressing all PCC probationers' constitutional right to indigency inquiries requires not individualized remedies, but rather universal changes.

Neither must Plaintiffs seek Rule 23 certification in order to enjoin the conduct about which they complain. "[A] district court may, in its discretion, award appropriate classwide injunctive relief prior to a formal ruling on the class certification issue based upon either a conditional certification of the class or its general equity powers." Thomas v. Johnston, 557 F. Supp. 879, 917 (W.D. Tex. 1983) (citation omitted). See also Lee v. Orr, No. 13-cv-8719, 2013 WL 6490577, at *2 (N.D. Ill. Dec. 10, 2013) ("The court may conditionally certify the class or otherwise order a broad preliminary injunction, without a formal class ruling, under its general equity powers. The lack of formal class certification does not create an obstacle to classwide preliminary injunctive relief when activities of the defendant are directed generally against a class of persons." (internal quotation marks and citation omitted)), subsequent determination,

2013 WL 3776962 (N.D. Ill. July 18, 2013); Kaiser v. County of Sacramento, 780 F. Supp. 1309, 1312 (E.D. Cal. 1991) (granting class-wide injunctive relief even though the court had only provisionally certified the class and had not yet fully addressed defendants' class certification arguments); NEWBERG ON CLASS ACTIONS § 4:30 (5th ed. 2013) ("[A] court may issue a preliminary injunction in class suits prior to a ruling on the merits.").

Because Plaintiffs suggest relief that is well-suited to classwide application and because the Court may grant such relief even at this preliminary stage, the Court finds that Defendants' Rule 23-based arguments unavailing.

## V. **Injunctive Relief**

The standard for a preliminary injunction is well-established. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Plaintiffs have established these four factors and the Court finds injunctive relief to be warranted.

A. Likelihood of Success on the Merits

Plaintiffs assert that Defendants' lack of inquiry into indigency violates the Fourteenth Amendment. The Court agrees with Plaintiffs that the Fourteenth Amendment requires an inquiry into indigency before probationers are held on secured money bonds and before they can be jailed solely on the basis of nonpayment. Accordingly, Plaintiffs are likely to succeed on the merits of their Fourteenth Amendment claims.

1. *Defendants' Use of Secured Money Bonds*

Plaintiffs must demonstrate that they are likely to succeed on their claim that jailing probationers subject to preset secured money bonds while they await formal revocation hearings violates the Fourteenth Amendment.[10] Defendants are correct that succeeding on this claim involves importing pre-trial jurisprudence into the post-conviction, probation realm. Yet the Court finds that this extension of the Fourteenth Amendment is not so much a logical leap but a constitutionally mandated conclusion.

The use of secured money bonds has the undeniable effect of imprisoning indigent individuals where those with financial means who have committed the same or worse probation violations can purchase their freedom. This effect stands in flat contradiction to the long-held and much-cherished principle that "[t]here can be no equal justice where the kind of [treatment] a man gets depends upon the amount of money he has." Griffin v. Illinois, 351 U.S. 12, 16 (1956). The Fourteenth Amendment precludes imprisoning someone because he or she does not have enough money: "When a defendant is imprisoned for financial inability to pay a fine immediately, he is treated more severely than a person capable of paying a fine immediately. The sole distinction is one of wealth, and therefore the procedure is invalid." Barnett v. Hopper, 548 F.2d 550, 553 (5th Cir. 1977) vacated as moot, 439 U.S. 1041 (1978).

One year after Barnett, the Fifth Circuit explicitly noted the constitutional problems inherent in using secured money bonds without inquiring into indigency: "Utilization of a master bond schedule provides speedy and convenient release for those who have no difficulty in meetings its requirements. The incarceration of those who cannot, without meaningful consideration of other possible alternatives, infringes on both due process and equal protection

---

[10] Again, the Court uses the phrase "preset secured money bonds " to refer to secured money bonds that are assigned without an inquiry into the individual's ability to pay the bond and whether alternative methods of ensuring attendance at revocation hearings would be adequate.

requirements." Pugh v. Rainwater, 572 F.2d 1053, 1057 (5th Cir. 1978). A slew of recent district court cases have aptly and appropriately applied Pugh to invalidate bond systems that have the effect of imprisoning indigent individuals where those with financial resources would go free. See, e.g., Jones v. City of Clanton, 2:15-cv-34-MHT at *2 (M.D. Ala. Sep. 15, 2015) ("The use of a secured bail schedule to detain a person after arrest, without a hearing on the merits that meets the requirements of the Fourteenth Amendment regarding the person's indigence and the sufficiency of the bail setting, is unconstitutional as applied to the indigent."); Cooper v. City of Dothan, 1:15-cv-425-WKW (M.D. Ala. June 18, 2015) (issuing a TRO on Fourteenth Amendment grounds where a post-arrest detention scheme was premised upon a secured bond system that failed to account for indigency); Pierce et al. v. City of Velda, 15-cv-570-HEA at *1 (E.D. Mo. June 3, 2015) (issuing a declaratory judgment stating that the Fourteenth Amendment does not allow holding someone "in custody after an arrest because the person is too poor to post a monetary bond. If the government generally offers prompt release from custody after arrest upon posting a bond . . . it cannot deny prompt release from custody to a person because the person is financially incapable of posting such a bond.").

The Court finds that the equal protection principles articulated by Pugh and its progeny apply with equal force to the probationers in the instant case. Defendants assert that such cases are inapposite because they address pretrial release, yet they have provided no persuasive reasoning or authority as to why one's status as a PCC probationer would lessen his or her rights under the equal protection clause. Defendants in this case have determined that PCC probationers are eligible for immediate release upon payment of a monetary bond. They make this determination without any inquiry into indigency. In so doing, Defendants deny release only to those too poor to post bond, meaning that one's freedom is conditioned upon one's financial

14

resources. The Constitution protects those in the criminal justice system from such perverse contingencies.

Another line of Fourteenth Amendment cases, those which address the due process rights of probationers and individuals convicted of fine-only offenses, buttresses the Court's conclusion that Plaintiffs are likely to succeed on the merits of their Fourteenth Amendment claims. In Tate v. Short, 401 U.S. 395 (1971) the Supreme Court disavowed the notion that a conviction under a fine-only statute can give rise to imprisonment where the defendant cannot pay the fine in full. The Supreme Court held that to allow imprisonment under such circumstances would unconstitutionally "convert a fine into a jail term for an indigent defendant." Id. at 398.[11] Ten years later, in Bearden v. Georgia, 461 U.S. 660 (1983), the Supreme Court extended Tate and found that before a court may revoke a defendant's probation for nonpayment the court must inquire into indigency. In so holding, the Supreme Court noted how "due process and equal protection principles converge" in the context of individuals indebted by virtue of their criminal histories. Bearden, 461 U.S. at 665. Although Tate and Bearden do not map precisely on to the probation scheme now before the Court, they underscore courts' duty to be mindful of indigency when faced with probation violations.

Contrary to their assertions, Defendants are not saved by Morrissey v. Brewer, which held that it was not unreasonable to hold a defendant for two months before holding a formal revocation hearing. 408 U.S. 471, 485 (1972). Before reaching that conclusion, the Supreme Court acknowledged that probation revocation occurs in two stages: "The first stage occurs when the parolee is arrested and detained, usually at the direction of his parole officer. The second

---

[11] Tate built on Williams v. Illinois, 399 U.S. 235 (1970), wherein the Supreme Court disallowed imprisoning defendants beyond the statutory maximum solely because they are too poor to pay the associated fine.

15

occurs when parole is formally revoked." Morrissey, 408 U.S. at 485.[12] The Supreme Court's holding regarding the two-month lapse in time referred to the second of the two stages, the final revocation hearing. Defendants fail to acknowledge the first stage entirely, including Morrissey's holding that "due process would seem to require that some minimal inquiry be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available." Id. The Morrissey Court then listed several facets of this preliminary hearing, including that the probationer receive notice of the hearing, be given the opportunity to "appear and speak in his own behalf," and be able to present "letters, documents, or individuals who can give relevant information to the hearing officer." Morrissey, 408 U.S. at 487. This Court views indigency as being among the things that could be addressed during this first stage. Based on the facts now on the record, Defendants do not seem to provide probationers with any sort of preliminary safeguard. Worse, because many probationers are pressured into pleading guilty to the underlying violation before formal revocation hearings can occur, they never get the chance to raise indigency. As noted in Section I, supra, these guilty pleas also often entail extending probationers' terms with PCC, which keeps probationers trapped in PCC's abhorrent cycle of debt and liberty deprivations. Morrissey weakens, not supports, Defendants' position.

   2. *Jailing Probationers Based Solely on Nonpayment*

Although the invalidation of Defendants' use of preset secured money bonds likely disposes of the other conduct about which Plaintiffs' complain—jailing probationers when the only probation violation alleged is nonpayment—the Court addresses this issue separately. Arresting and detaining probationers solely for failure to pay, without conducting an inquiry into

---

[12] Although the scheme now before the Court pertains to probation, not parole, the two are "constitutionally indistinguishable." Gagnon v. Scarpelli, 411 U.S. 778, 782 n.3 (1973).

whether the nonpayment is willful rather than due to an inability to pay, is precisely the conduct the Supreme Court rejected in Bearden v. Georgia, 461 U.S. 660, 672-73 (1983) (remanding to a state court for an inquiry into whether the probationer's failure to pay was willful and into the existence of alternatives to imprisonment).

Defendants argue that this point is moot as they do not have a practice of jailing probationers where the only violation of probation is nonpayment. (Docket No. 39 at 5-6). According to Defendants, such individuals are arrested, but the arrest warrant provides for them to be ROR-ed and the individuals are released with instructions to return on the assigned date for their revocation proceedings. Plaintiffs have, however, provided at least two warrants where nonpayment resulted in arrest warrants with secured money bonds, one of which is from August 2015. (Docket No. 45-2). To jail an indigent probationer whose only violation is nonpayment on a secured money bond is functionally to revoke her probation.[13] A person who cannot afford to pay her court costs is likely unable to pay for her freedom, meaning that she will be stuck in jail, perhaps for months, before she can explain her inability to pay. In this way, court costs become jail sentences in violation of the Fourteenth Amendment.

When Defendants use secured money bonds on their arrest warrants for probation violations, they simultaneously indicate that probationers are eligible for release but condition that release on financial resources, thereby implicating the protections of the Equal Protection Clause. By holding probationers on these secured money bonds, especially those probationers

---

[13] Two other aspects of this case indicate that Defendants' probation scheme is the functional equivalent of what Bearden prohibits: probation revocation due to nonpayment without an indigency inquiry. First, PCC probationers are, by definition, misdemeanor offenders who could not afford to pay their court costs at the outset. Those who can afford to pay court costs immediately can avoid PCC. Second, as articulated above, a number of probation conditions other than court costs also require monetary payment. If a person cannot afford to pick up trash or attend court-ordered classes, she necessarily violates the terms of her probation and makes herself vulnerable to arrest and prolonged detention on a secured money bond. These characteristics not only put Defendants on notice that indigency is likely to play a part in probation violations, but also amplify the need for inquiries into indigency that are constitutionally required.

whose violations arise directly from their indigency, Defendants effectively revoke their probation, raising additional equal protection concerns and also implicating the Due Process Clause. The crucial deficiency is that at no point do Defendants inquire into indigency, a failing the Court finds especially odious given the makeup of PCC probationers and the nature of the probation violations alleged. Because Fourteenth Amendment jurisprudence requires more, Plaintiffs have proven that they are likely to succeed on the merits.[14]

B.  Irreparable Harm

Plaintiffs seeking preliminary relief must also "demonstrate that irreparable injury is *likely* in the absence of an injunction." Winter, 555 U.S. at 22 (emphasis in original). The irreparable harm alleged here is the unconstitutional liberty deprivation which stems from Defendants' practice of jailing probationers on secured money bonds within an indigency inquiry. "When an alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary." 11A Wright & Miller, FEDERAL PRACTICE & PROCEDURE, § 2948.1 (3d ed. 1998). In support of their allegations, Plaintiffs have submitted numerous arrest warrants and declarations. Defendants' witness, Judge McFarlin, testified that he sees approximately one hundred probation violation arrest warrants per week and generally sets a secured money bond of at least $2,500 for all violations other than nonpayment. (Nov. 6 Hr'g Tr. at 88). Plaintiffs' submissions show that Defendants regularly execute warrants and jail probationers on secured money bonds. The evidence on the record indicates that the constitutional violation alleged here forms an integral and seemingly inevitable aspect of the

---

[14] To be clear, the Court does not find that Defendants are constitutionally required to release probationers pending revocation proceedings. The Court holds only that where Defendants have determined that release on money bond is appropriate—which seems to be Defendants' default practice for probation violations—indigency must be accounted for when setting the bond.

current probation scheme. Plaintiffs have therefore proven that irreparable constitutional harm will likely to occur in the absence of an injunction.

C.     Balance of the Equities & the Public Interest

The two remaining considerations, the balance of the equities and the public interest, also support granting a preliminary injunction. In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co., 480 U.S. 531, 542 (1987). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Weinberger v. Romero–Barcelo, 456 U.S. 305, 312 (1982).

Defendants do not allege any injury arising from Plaintiffs' proposed injunction other than to say that an injunction will necessitate them to "scramble to create alternative measures to deal with probationers." (Docket No. 39 at 15). Yet some the arrest warrants that Plaintiffs' filed reveal that a viable alternative—ROR warrants—already exist. Should Defendants feel the need to continue to use money bonds, the Court declines to categorize the need to erect the proper constitutional safeguards as an injury. Both parties agree that enforcing constitutional rights serves the public interest and the Court does not find such an obvious point to require much more explanation.

In sum, all four of the factors a court considers when presented with a request for a preliminary injunction weigh in favor of granting the sought-after relief. Neither abstention nor Rule 23 shields Defendants. A preliminary injunction is an extraordinary remedy never awarded as of right. Munaf v. Geren, 553 U.S., 674, 689-90 (2008). But the injustice perpetrated here is just that: extraordinary.

## I. Conclusion

Plaintiffs' Motion for a Preliminary Injunction is hereby GRANTED. The specific terms of the injunction are set forth in the attached Order.

It is SO ORDERED.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE