**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

CINDY RODRIGUEZ, et al.       )
                            )
         Plaintiffs,       )
                            )
v.                         )
                            )    Case No. 3:15-CV-01048
PROVIDENCE COMMUNITY  )    Judge Sharp
CORRECTIONS, INC., et al.    )    Judge Holmes
                            )
         Defendants.    )
                            )

## MEMORANDUM

Presently pending before the Court are three motions: Defendants' two Motions to Dismiss, (Docket Nos. 59 & 61), and Plaintiffs' Motion to Amend/Correct the Complaint, (Docket No. 114).[1] For the reasons stated herein, Defendants' Motions to Dismiss will be granted in part and denied in part and Plaintiffs' Motion to Amend/Correct the Complaint will be denied.

## I.    Factual & Procedural Background

Plaintiffs, probationers, on behalf of themselves and a class of those similarly situated, bring claims against Rutherford County ("the County"), Pathways Community Corrections, Inc. ("PCC"), and individual employees of PCC who served as probation officers ("Individual Defendants").[2] Plaintiffs bring eight causes of action: five separate constitutional claims (Counts II and IV-VII); a Racketeer Influenced and Corrupt Organizations ("RICO") Act claim (Count I);

---

[1] Also pending is a Partial Motion for Summary Judgment by Plaintiffs, (Docket No. 107). Defendants have yet to respond to the summary judgment motion and, as such, the Court will reserve ruling on it.

[2] The Court will refer to PCC and the Individual Defendants collectively as the "Private Defendants."

a claim to declare the Defendants' contract void and unenforceable (Count III); and a claim for abuse of process (Count VIII).

This Court has previously summarized many of the allegations contained in Plaintiffs' Complaint and hereby incorporates that discussion by reference. (Docket No. 68 at 1-6). The gravamen of Plaintiffs' claims is that the County's outsourcing of misdemeanor probation services to a private for-profit corporation, PCC, resulted in an unconstitutional scheme that deprived indigent probationers of their due process and equal protection rights. More specifically, Plaintiffs allege that the Defendants' arrangement constitutes a "conspiracy to funnel misdemeanor probation cases in which court debts are owed to a private company, which then extorts money out of individuals who have no ability to pay court costs, let alone private fees." (Docket No. 1 at 1).

The County and the Private Defendants have separately moved to dismiss the claims against them. (Docket Nos. 59 & 61). Soon thereafter, this Court granted Plaintiffs' request for a preliminary injunction under Count VII and enjoined Defendants from seeking or executing arrest warrants based solely on the nonpayment of probation fees. (Docket No. 71). The injunction also prohibited the use of preset secured money bonds, defined as bonds "imposed without a hearing on or inquiry into the probationer's ability to pay the bond." (Id. at 2 n.1). Since this Court's entry of an injunction, the contract that formalized the arrangement between the County and PCC has expired and Defendants have opted to part ways. PCC no longer provides probation services in Rutherford County. The Parties have addressed the effect of the contract's expiration, if any, in their Reply, (Docket No. 90), and Sur-Reply, (Docket No. 94), briefs.

## II.    The Motion to Dismiss Standard

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take "all well-pleaded material allegations of the pleadings" as true. Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 722 (6th Cir. 2010). The factual allegations in the complaint "need to be sufficient to give notice to the Defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." Id. (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009)). In deciding a motion to dismiss under Rule 12(b)(6), the Court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007); Inge v. Rock Fin. Corp., 281 F.3d 613, 619 (6th Cir. 2002). The Court must assume that all of the factual allegations are true, even if they are doubtful in fact. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). In contrast, legal conclusions are not entitled to the assumption of truth, Iqbal, 129 S. Ct. at 1950, and "a formulaic recitation of the elements of a cause of action will not do," Twombly, 550 U.S. at 555 (internal citations and quotation marks omitted).

"In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." Gardner v. United States, 443 F. App'x. 70, 73 (6th Cir. 2011) (quoting Amini v. Oberlin College, 259 F.3d 493, 502 (6th Cir. 2001)). The Sixth Circuit has taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). Extrinsic materials that "fill in the contours and details" of a complaint without adding anything new may be considered without converting the motion to one for summary judgment. Yeary v. Goodwill Indus.-Knoxville, Inc.,

107 F.3d 443, 445 (6th Cir. 1997); Armengau v. Cline, 7 F. App'x 336, 344 (6th Cir. 2001).

Here, the Court has access to hearing testimony and a number of affidavits and arrest warrants, which Plaintiffs submitted in support of their Motion for a Preliminary Injunction. (Docket No. 3-1 to 3-6; Docket No. 49; Docket No. 70). Defendants have not disputed the factual accuracy of any of these submissions. Accordingly, the Court will rely upon Plaintiffs' evidentiary filings and the hearing testimony without converting the motions to dismiss into motions for summary judgment.

## III.    Legal Analysis—Joint Arguments

The County and the Private Defendants have filed separate motions to dismiss, but their motions are premised on many of the same arguments. The County seeks dismissal of Plaintiffs' Complaint on the grounds of abstention, immunity, and failure to join or notify necessary parties. The Private Defendants assert the same arguments for dismissal, as well as raising a handful of other arguments regarding standing the sufficiency of the pleadings. The Court begins by addressing the common arguments and will then address the arguments briefed only by the Private Defendants in Section IV, infra.

A.   Abstention

Defendants ask the Court to abstain from this case based on Younger v. Harris, 401 U.S. 37 (1941), and its progeny. This Court has already rejected application of Younger. (Docket No. 68 at 8-10). Specifically, this Court found:

> Plaintiffs challenge the constitutionality of certain discrete aspects of Defendants' post-judgment procedure. The harm alleged—that probationers do not receive inquiries into indigency as required by the Fourteenth Amendment—has been inflicted before a probationer could voice any constitutional concerns. This alleged constitutional infirmity could be remedied without affecting the underlying state court judgments. Accordingly, Younger abstention is inappropriate.

4

Id. at 10. In addition to the fact that Plaintiffs do not have an adequate opportunity to raise constitutional challenges before they suffer a constitutional injury, the Court finds that an incomplete sentence, such as an undischarged term of imprisonment, probation, or parole, does not constitute an 'ongoing state judicial proceeding' for purposes of Younger abstention. See, e.g., Trombley v. Cty. of Cascade, Mont., 879 F.2d 866 (9th Cir. 1989) (no ongoing proceeding when plaintiff "is currently out on parole"); Almodovar v. Reiner, 832 F.2d 1138, 1141 (9th Cir. 1987) ("Probation is not a pending criminal action for Younger purposes."); Baltzer v. Birkett, No. 02-CV-4718, 2003 WL 366577, at *3 (finding no ongoing proceeding when plaintiff was serving his prison sentence, but the time for appeal had expired). The mere existence of Plaintiffs' undischarged debts does not constitute an "ongoing state judicial proceeding," and Younger abstention therefore does not apply. See generally Steffel v. Thompson, 415 U.S. 452, 462 (1974) ("When no state criminal proceeding is pending at the time the federal complaint is filed, federal intervention does not result in duplicative legal proceedings or disruption of the state criminal justice system; nor can federal intervention, in that circumstance, be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles.").

This Court has already held that Younger abstention does not apply and Defendants have not presented any persuasive authority that would cause the Court to reverse course. The Court again declines to abstain from this proceeding.

B. Immunity

Both the County and the Private Defendants argue that they are immune from suit as either judicial or quasi-judicial actors. (Docket No. 60 at 11-15; Docket No. 62 at 2-6.) Yet the County cannot assert absolute judicial immunity merely by virtue of the fact that it pays General Sessions judges and is associated with Circuit Court judges. Neither can PCC, a private for-

profit corporation, invoke the quasi-judicial immunity reserved for governmental employees performing acts integral to the judicial process. As explained below, Defendants' requests for immunity pervert the doctrine and undermine the public policy rationale in which it is rooted.

*1.   The Historical Underpinnings and Scope of Immunity for Judicial Acts*

The Court begins by identifying and explaining the particular forms of immunity at issue here. The immunity afforded to judges acting within the scope of their jurisdiction is known as absolute immunity. This immunity has been narrowly extended to others who work in concert with judges or act in a judicial capacity ("quasi-judicial immunity"). Either form, when applicable, shields a defendant entirely by defeating a suit at the outset. Imbler v. Pachtman, 424 U.S. 409 (1976).

Absolute judicial immunity was first recognized by the Supreme Court in Bradley v. Fisher, 13 Wall. 335 (1872), wherein the Court noted the need for absolute immunity to protect judges from lawsuits claiming that their decisions had been tainted by improper motives. In order to preserve "that independence without which no judiciary can either be respectable or useful," id. at 347, the Court held judges to be immune from civil suit in cases where they were performing their judicial functions within the general scope of their jurisdiction. Because constitutional immunity for state officials is the mirror image of that for federal officials, the Supreme Court extended the absolute immunity doctrine to state judges sued on federal constitutional claims. Pierson v. Ray, 386 U.S. 547 (1967).

Absolute immunity has been narrowly extended to government officials in the "rare circumstances where the official is able to demonstrate that the application of absolute immunity to the circumstances presented is required by public policy." Scotto v. Almenas, 143 F.3d 105, 110 (2d Cir. 1998) (citing Cleavinger v. Saxner, 474 U.S. 193, 201 (1985); Butz v. Economou,

438 U.S. 478 (1978)). This narrow extension recognizes the reality that it may sometimes be "'better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.'" Imbler, 424 U.S. at 428 (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949) (L. Hand, J.), cert. denied, 339 U.S. 949 (1950)). Thus, the Supreme Court has forged a common sense approach to claims of quasi-judicial immunity that calls on courts to examine whether the policy rationale that animates the doctrine would support extending immunity to an official's conduct.

Crucially, absolute and quasi-judicial immunity only shield judges and those intimately involved with the judicial process from suits for money damages. The Sixth Circuit has explicitly recognized the availability of declaratory relief against judicial officers for claims under Section 1983. Ward v. City of Norwalk, No. 15-3018, 2016 WL 402975, at *4 (6th Cir. Feb. 3, 2016) ("Congress took note of this responsibility and enacted the amendatory language to § 1983, which effectively overruled Pulliam. Section 1983 now implicitly recognizes that declaratory relief is available against judicial officers.").

Neither the County nor the Private Defendants has articulated a compelling argument for what they seek: an unwarranted extension of a historically narrow doctrine.

### 2. The County's Request for Immunity

Plaintiffs assert claims against the County for damages as well as for equitable relief. The claims arise not via a theory of *respondeat superior*, but from the County's own conduct. Still, the County argues that because the Rutherford County General Sessions and Circuit Court judges would likely be immune if they were parties to the litigation, the County should also benefit from absolute immunity. The County does not address how or why absolute immunity, an individualized protection, would cover a governmental entity. Neither does the County

confront the well-established tenet of Section 1983 litigation that a governmental entity may never assert the judicial immunity asserted by its officer.  See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 701 (1978) ("[M]unicipal bodies sued under § 1983 cannot be entitled to an absolute immunity, lest our decision that such bodies are subject to suit under § 1983 'be drained of meaning.'" (quoting Scheuer v. Rhodes, 416 U.S. 232, 248 (1974)).  Instead, the County points to a number of inapposite cases that only address the extension of immunity to other individual actors.

The County identifies only a single case standing for the proposition that a county may invoke the immunity held by its officials.  Canning v. Poole, 2011 WL 676152, at *1 (E.D. Ky. 2011) (unreported).[3]  In Canning, the district court noted that "[t]he same public policy that requires immunity for a judge requires extension of that immunity to the state."  However, this Court does not find Canning persuasive.  The Canning court did not explain *how* granting immunity to the county would serve the public policy goals giving rise to immunity, and this Court finds extending absolute immunity to a county to be inconsistent with the policies undergirding absolute judicial immunity.  Absolute immunity is premised on the concept that the integrity of the judicial system is protected by immunizing judges and, for quasi-judicial immunity, those who act in concert with them.  Exposing judges to personal liability might invite an "avalanche" of vexatious and baseless challenges and, in so doing, "detract from independent and impartial adjudication."  Forrester v. White, 484 U.S. 219, 227 (1988).  Exposing counties to liability is unlikely to do the same.  To the contrary, holding counties liable for policies that deprive citizens of their rights is likely to incentivize counties to work toward systemic

---

[3] Plaintiffs dispute the applicability of Canning, arguing that the cited portion sought to hold the County liable under a *respondeat superior* theory whereas they seek to hold the County liable for its own policies and practices.  (Docket No. 76 at 15).  This is a mischaracterization.  Although Canning does reject a *respondeat superior* theory later in the decision, the portion relied upon by the County does precisely what the County says it does: extends a judge's absolute judicial immunity to a county.

compliance and the eradication of constitutional infirmities. County liability thus enables individual judges to freely manage civil and criminal proceedings within a system that fosters fidelity to the Constitution and its myriad protections.

Not only does this Court disagree with the Canning court when it comes to the furtherance of the policy goals undergirding immunity, but Canning also fails to address whether immunity would still apply when a Plaintiff adequately alleges liability under Monell, as the Plaintiffs do here. Monell and its offspring dictate that "under § 1983, local governments are responsible only for their own illegal acts. They are not vicariously liable under § 1983 for their employees' actions." Connick v. Thompson, ––– U.S. ––––, 131 S. Ct. 1350, 1359 (2011) (internal citation and quotation marks omitted). "A [governmental entity] is liable under § 1983 only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'caused' one of its employees to violate the plaintiff's constitutional rights." D'Ambrosio v. Marino, 747 F.3d 378, 386 (6th Cir. 2014) (quoting Monell, 436 U.S. at 692), cert. denied, 135 S. Ct. 758 (2014).

A Plaintiff may prove an illegal policy or custom by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013) (citing Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005)).

Plaintiffs seek to do just that: hold the County liable for its own actions, namely, its policies and practices that allegedly violate the Constitution, RICO, and state law. The

Complaint not only expounds on the problematic policies and practices at some length[4], but also accuses the County of "acting through PCC, Inc. as its agent," (Docket No. 1 at ¶ 60), not acting through judges. Far from an "end run" around judicial immunity, the allegations in the Complaint set forth a compelling claim of county liability, one which comports with the pleading requirements of <u>Monell</u> and <u>Burgess</u>.

Simply put, the County has not articulated any reason why the fundamental principles of municipal liability would not apply in this case. To apply absolute judicial immunity to a governmental entity, not an individual, would be an unfounded and unwarranted extension of a purposefully narrow doctrine. The County is not immune from Plaintiffs' claims.

### 3. PCC's Request for Quasi-Judicial Immunity

As noted above, absolute immunity has been narrowly extended to cover other government officials and actors who are integrally involved with the criminal justice system via the doctrine of quasi-judicial immunity. The Supreme Court has noted that it has been "quite sparing" in its recognition of absolute immunity and has "refused to extend it any further than its justification would warrant." <u>Burns v. Reed</u>, 500 U.S. 478, 486-87 (1991) (citing <u>Forrester v. White</u>, 484 U.S. 219, 224 (1988) and <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982)). Again, the occasions that have warranted application of quasi-judicial immunity are those that accord with immunity's overarching policy goals: protecting public servants from harassment so that the criminal justice system may function as it is meant to.

---

[4] <u>See, e.g.</u>, Docket No. 1 at ¶ 26 ("This incentive is magnified by *the policy of the County* to terminate supervised probation when court debts are paid in full and to extend supervised probation repeatedly and indefinitely if they are not paid."); ¶ 64 ("*It is the policy, pattern, and practice of PCC, Inc. and Rutherford County* not to inform probationers that their ability to pay is a critical issue at any revocation proceeding concerning their nonpayment."); ¶ 70 ("*Rutherford County has a policy and practice* of not conducting adversarial evidentiary hearings concerning violations of probation."); ¶ 97 ("PCC, Inc. and *Rutherford County have a policy, pattern, and practice* of revoking and extending probation for successive terms if a person has not paid off his or her court fines and costs by the end of the probationary period."); ¶ 136 ("Pursuant to County and PCC, Inc. *policy and practice*, Ms. Pullum was told that she would be jailed if she did not pay approximately $12 per day for this PCC, Inc. product.") (emphasis added throughout).

An official actor may be afforded the absolute immunity ordinarily accorded judges performing their authorized judicial functions if the private actor's role is "'functionally comparable'" to the roles of those judges, Butz, 438 U.S. at 513, or his acts are integrally related to an ongoing judicial proceeding, Bush v. Rauch, 38 F.3d 842, 847 (6th Cir. 1994). The principal hallmark of the judicial function is a decision in relation to a particular case. Bliven v. Hunt, 579 F.3d 204, 211 (2d Cir. 2009).

Like the County's request for absolute immunity, PCC's request for quasi-judicial immunity is also unwarranted. PCC is a private for-profit corporation, not a government official. Even if PCC's status as a private for-profit venture did not bar immunity, which it does, a functional analysis would reveal that the corporation's conduct does not insulate it from liability.

This Court cannot locate a single case squarely addressing the extension of absolute immunity or quasi-judicial immunity to a private for-profit actor. Plaintiffs assert that none exists and that quasi-judicial immunity has never been extended to a private party, let alone one with a financial interest in the proceedings. (Docket No. 94 at 4 n.2). Defendants disagree and point to Brown v. Tennessee, No. 3:13-CV-00191, 2013 WL 4508658, at *5 (M.D. Tenn. Aug. 23, 2013), report and recommendation adopted in part, No. 3:13-CV-00191, 2014 WL 1278770 (M.D. Tenn. Mar. 31, 2014), a case before this Court which also involved PCC. In that case, the magistrate judge assumed without deciding that quasi-judicial immunity could cover private entities so long as they satisfied the functional analysis. As Plaintiffs note, the pro se plaintiff in Brown neither challenged nor briefed immunity. Moreover, the plaintiff's complaint in that case was subject to dismissal even apart from any immunity issues because it was "comprised of conclusory allegations" and lacked the "specific details" necessary to support a claim of conspiracy. Brown, 2013 WL 4508658, at *5. Because the immunity issue was not the lynchpin

of the dismissal in <u>Brown</u> and because the magistrate judge did not analyze the extension of quasi-judicial immunity to a private for-profit corporation, the Court declines to rely on <u>Brown</u> for that proposition.

Given that no known court has squarely engaged in an analysis of the extension of quasi-judicial immunity to for-profit ventures, this Court undertakes to do so now. The longstanding rejection of extending qualified immunity for private contractors sheds some light on the matter. The Sixth Circuit has repeatedly noted that "a private party is governed only by self-interest and is not invested with the responsibility of executing the duties of a public official in the public interest." <u>Duncan v. Peck</u>, 844 F.2d 1261, 1264 (6th Cir. 1988); <u>see also</u> <u>Wyatt v. Cole</u>, 504 U.S. 158, 167 (1992) (private parties are not "principally concerned with enhancing the public good"). The profit-driven nature of a private corporation directly informs the immunity analysis:

> In the case of a private for-profit corporation hired to perform a public function, there is an increased risk that the corporation's actions will diverge from the public interest. Unlike public officials, corporate officers and employees are hired to serve the interests of the corporation, and, more specifically, its stockholders, whose principal interest is earning a financial return on their investment. Indeed, corporate officers owe a fiduciary duty to advance stockholders' interests, but they owe no such fiduciary duty to the public at large. Thus, unlike public officials, corporate employees always are compelled to make decisions that will benefit their shareholders, without any direct consideration for the best interest of the public.

<u>Manis v. Corr. Corp. of Am.</u>, 859 F. Supp. 302, 305 (M.D. Tenn. 1994); <u>see also</u> <u>McKnight v. Rees</u>, 88 F.3d 417, 424 (6th Cir. 1996) (engaging in a similar discussion).

Although those cases relate to qualified immunity, not quasi-judicial immunity, the Court finds the logic in <u>Manis</u> and <u>McKnight</u> persuasive. Quasi-judicial immunity is a deliberately cabined doctrine that is only extended when it would further the public interest. Here, the public interest would be disserved by immunizing a profit-driven corporation because such immunity

would enable the corporation to prioritize pennies over probationers without fear of accountability. The gravity of this risk simply does not accord with the underpinnings of quasi-judicial immunity.

The perverse policy incentives attendant to immunizing private for-profit ventures is alone enough to deny the application of quasi-judicial immunity. Still, the Court finds it useful to point out that PCC, a corporation, does not itself perform any tasks integral to the judicial process. PCC is a distinct legal entity that exists to benefit its shareholders. According to the Complaint, PCC is one of the architects of the allegedly unconstitutional probation scheme. Like the County, Plaintiffs seek to hold PCC liable for its policies and practices. However, the Complaint does not include any allegations regarding specific actions or functions of PCC, as a corporation, that could be construed as integral to the judicial process. Of Defendants, only the Individual Defendants could conceivably argue that they are being held liable "for tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune." Bush, 38 F.3d at 847. The Court does not now hold that the actions performed by PCC's employees are indeed the types of actions that would give rise to quasi-judicial immunity because, again, the fact that they interact with criminal proceedings as employees of a private for-profit venture bars immunity anyway. In sum, not one of the Defendants qualifies for immunity from suit.

C. Notifying/Joining Necessary Parties

Defendants also seek dismissal of the Complaint on the grounds that Plaintiffs have not properly notified and joined all necessary parties. According to Defendants, Plaintiffs effectively seek to invalidate as unconstitutional Tennessee state law and were therefore required to comply with Federal Rule of Civil Procedure 5.1. Defendants' portrayal of Plaintiffs' claims as a

backdoor attack on the constitutional validity of Tennessee laws amounts to either a misapprehension or a purposeful mischaracterization of the allegations. The Court rejects application of Rule 5.1, but finds that even if Rule 5.1 did apply, which it does not, Plaintiffs have adequately complied with the rule.

The County points to numerous state law provisions that, it argues, sanction PCC's probation scheme. Specifically, the County notes that: trial judges have the authority to issue arrest warrants for probation violations, Tenn. Code Ann. § 40-35-311(a); revocation hearings occur "at the earliest practicable time," id. at § 40-35-311(b); and the decision to release probationers or set bail is discretionary, Tenn. R. Crim. Pro. 32(g). The County says that these statutes clearly cover the conduct listed in the Complaint. Therefore, the County argues, "Plaintiffs must actually intend to contest the constitutionality of state law." (Docket No. 60 at 10). Taking a similar tack, the Private Defendants rely on state law provisions that permit counties to contract with private companies for the provision of probation services. Tenn. Code Ann. §§ 40-35-302 & -303. The Private Defendants assert that their probation scheme is "expressly permitted—and in some instances required—by state statute." (Docket No. 62 at 10). To find Defendants' conduct unconstitutional, the Private Defendants contend, would be equivalent to "declaring the state statutes that permit or require such conduct to be unconstitutional, too." (Id.). Rule 5.1 requires a party that is "drawing into question the constitutionality" of a state statute to file a certain kind of notice and to serve that notice and the relevant pleadings on the state's attorney general. Fed. R. Civ. P. 5.1(a). Defendants argue that the case must be dismissed because Plaintiffs did not provide the Tennessee Attorney General with the proper notice and Complaint at the outset of the litigation.

The Court rejects Defendants' reflexive reading of the Complaint as an attempt to invalidate as unconstitutional Tennessee law. Defendants completely ignore the obvious scenario in which a state law that is facially constitutional is being effectuated in such a way that violates the Constitution. Put another way, the scope of conduct permitted by state law may be broader than the scope of what the Constitution permits. The fact that state law protections are not always coextensive with the protections afforded by the Constitution does not automatically invalidate the state law. Rather, it imposes a burden on state actors to ensure that their conduct comports with both. Here, the constitutional challenges stem not from Tennessee law *qua* Tennessee law but from Defendants' failure to abide by the Constitution when effectuating state law.

The Court now turns to Defendants' specific misreadings of Plaintiffs' allegations. Regarding § 40-35-311(a), Plaintiffs do not dispute that trial judges have the authority to issue arrest warrants for probation violations. As this Court has previously noted, Plaintiffs instead "argue that where nonpayment is the only violation alleged, the probationer cannot be jailed after arrest—the functional equivalent of probation revocation—without an inquiry into whether the nonpayment was willful." (Docket No. 68 at 8). This argument does not call into question the statute that endows trial judges with the authority to issue arrest warrants. Rather, it insists that any such arrests and detentions comport with certain due process minimums. In the same vein, Plaintiffs do not challenge § 40-35-311(b) or argue that the Constitution imposes a mandatory timeline for revocation hearings. They instead argue that the timing of a hearing becomes problematic when probationers are arrested and detained indefinitely solely for nonpayment. Plaintiffs also do not argue that counties may never rely on private corporations for the provision of probation services, as set forth in Tenn. Code Ann. §§ 40-35-302 & -303. Instead, they argue

that Defendants' probation scheme presents problems because the private entity relies on a user-funded model that depends on probationers for profits. The Court does not read Plaintiffs' Complaint as calling into question the constitutionality of any Tennessee laws. Rather, the Complaint calls into question the various mechanisms by which Defendants chose to effectuate Tennessee law. Rule 5.1 is therefore inapplicable.

Even if Rule 5.1 did apply, Plaintiffs have satisfied it at this point. On March 8, 2016, Plaintiffs hand delivered notice of the lawsuit to the Tennessee Attorney General. (Docket No. 94-1). More than sixty days have passed since this delivery and the Attorney General has not sought to intervene. Thus, even if Rule 5.1 did apply, it would not create grounds for dismissal.

## IV.   Legal Analysis—The Private Defendants' Arguments

The Private Defendants assert several other grounds for dismissal. The Private Defendants argue that the expiration of the contract between PCC and the County moots Plaintiffs' claims against them, that Plaintiffs' pleadings against the Individual Defendants are insufficient, that the group pleading format is inappropriate, and that Counts IV through VII do not apply to them. The Court will address each argument in turn.

### A.  Mootness

The Private Defendants contend that the expiration of the contract between PCC and the County "renders moot Count III of the Complaint, which seeks a declaratory judgment that the PCC-Rutherford County contract is void, as well as all of the declaratory and injunctive relief sought by Plaintiffs in the remaining counts." (Docket No. 90 at 2). Plaintiffs do not believe that Defendants have shouldered their "heavy burden" in showing that voluntary cessation has mooted a claim for declaratory and injunctive relief. (Docket No. 94 at 5).

Count III of the Complaint seeks "declaratory and injunctive relief voiding the Contract between PCC, Inc. and Rutherford County as contrary to Tennessee law." (Docket No. 1 at ¶ 288). As noted above, the contract expired at the end of March 2016 and, as of April 1, 2016, was no longer in effect. After a contract has expired, injunctive relief based upon that contract is moot. Carbon Fuel Co. v. United Mine Workers of Am., 444 U.S. 212, 214 n. 2 (1979) ("The contracts have expired, and the question of injunctive relief is out of the case."); Planned Parenthood v. Steinhaus, 60 F.3d 122, 125 (2d Cir. 1995) (noting that a request for injunctive relief is moot after a contract has expired).

Despite the contract's expiration, Plaintiffs seek shelter under the exception to mootness for conduct that is capable of repetition yet evading review. "The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." Knox v. Serv. Emps. Int'l Union, Local 1000, 132 S. Ct. 2277, 2287 (2012); see also Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 724 n. 3 (2010) (Alito, J., dissenting) (collecting cases). Ordinarily, "[v]oluntary cessation does not moot a case or controversy unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 719 (2007) (quoting Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000)) (second alteration in original).

The Supreme Court has stated that "the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." Laidlaw, 528 U.S. at 189; See also Already, LLC v. Nike, Inc., 133 S. Ct. 721, 727 (2013). Indeed, courts are to "view voluntary cessation 'with a critical eye,' lest defendants

manipulate jurisdiction to 'insulate' their conduct from judicial review." Brown v. Buhman, ——

F.3d ——, ——, 2016 WL 2848510, at *11 (10th Cir. May 13, 2016) (citing Knox, 132 S. Ct. at

2287).

The Sixth Circuit has found the expiration of a contract sufficient to meet this burden and

defeat a voluntary cessation argument.   In Appalachian Reg'l Healthcare, Inc. v. Coventry

Health & Life Ins. Co, the Sixth Circuit found a claim moot because the underlying contract had

expired and the party opposing mootness—i.e., the party asserting the voluntary cessation

exception—instead feared the possibility of *other parties* engaging in the same objectionable

conduct.   714 F.3d 424, 430 (6th Cir. 2013) ("[O]ur precedents require Coventry to show that

Appalachian—not just any other healthcare provider—will subject Coventry to the same

objectionable action.") (citing Chirco v. Gateway Oaks, LLC, 384 F.3d 307, 309 (6th Cir. 2004)

("When the suit involves two private parties . . . the complaining party must show a reasonable

expectation that he would again be subjected to the same action by the same defendant.").   In

Appalachian, the Sixth Circuit found that the lack of a contract sufficiently demonstrated that

there was "no realistic possibility" that the same party would resume the same objectionable

conduct.

The Court notes that both Parties have given short shrift to this topic in their briefing.[5]

Defendants cite Appalachian yet fail to address how that factual development squares with the

"voluntary cessation" exception.  Plaintiffs place the burden to show mootness on Defendants yet

fail to reckon with the practical effects of the contract's expiration.  With respect to at least

Count III, the cause of action to void the contract, the Court agrees with Defendants that the

expiration of the contract moots the claim.   Whether the contract's expiration also moots

---

[5] The Parties have submitted a combined total of just two pages of briefing on the issue of mootness.

Plaintiffs' other claims for equitable relief against the Private Defendants is a closer question. Although the Court is hesitant to find that merely pointing to an expired contract is enough to support the "heavy burden" a defendant is required to shoulder when claiming mootness in a voluntary cessation case, Appalachian seems to mandate that result for the Private Defendants. The contract's expiration means that the Private Defendants no longer play any part in the provision of probation services in Rutherford County. Plaintiffs have presented no evidence that would indicate that the same party (PCC) is likely to return to engage in the same conduct. In this Circuit, that is enough for a finding of mootness.

This is not so when it comes to Plaintiffs' equitable claims against the County. As the Private Defendants note in their briefing, "[t]he County intends to take over the supervision of misdemeanor probationers, rather than hire a different private probation services company." (Docket No. 90 at 10). The possibility that the County could resume the constitutionally infirm conduct looms large over probationers. Under these circumstances, the expiration of the contract does not alone circumvent the voluntary cessation exception. Plaintiffs' equitable relief claims against the County remain viable.

In sum, Count III and Plaintiffs' claims for equitable relief against the Private Defendants will be dismissed as moot. This result does little to affect the trajectory of this litigation. Because the Court finds Defendants' immunity arguments unavailing, see Section III.B.3, supra, all Defendants remain liable for any past harm inflicted on Plaintiffs. Moreover, nominal damages remain available and would serve essentially the same purpose as a declaratory judgment. See Utah Animal Rights Coal. v. Salt Lake City Corp., 371 F.3d 1248, 1265 (10th Cir. 2004) (collecting scholarly resources affirming that nominal damages function like declaratory judgments and "were originally sought as a means of obtaining declaratory relief

before passage of declaratory judgment statutes."). Thus, even if injunctive relief is no longer available from the Private Defendants, the controversy against them lives on.

B. Group Pleading/Claims Against the Individual Defendants

*1. Individual Defendants*

The Private Defendants argue that Plaintiffs' allegations against the Individual Defendants are too sparse to support a claim. However, the Complaint alleges a conspiracy to deprive Plaintiffs of their rights and argues that all Defendants acted in concert to effectuate this scheme. Regarding the Individual Defendants, the Complaint alleges:

> Defendants Jasmine Jackson, Briana Woodlee, Amanda Roberts, Tiara Smith, Kelly Haley, Amanda Schexnayder, Kayla Banks, Nisha Hyde, and Kelly McCall are "probation officers" employed by PCC, Inc. at its main Rutherford County office in downtown Murfreesboro, Tennessee. Each of them supervised one or more of the named Plaintiffs and made oral or written threats to the named Plaintiffs to "violate" their probation and to jail them if they did not pay enough money to PCC, Inc. Each of them used their discretion as "probation officers" to apply PCC, Inc. policies and practices in order to determine how much money was owed, how much money was taken by PCC, Inc., how frequently to subject the named Plaintiffs to profitable drug tests, when to report, when to "violate" them, what disposition to recommend, and every other discretionary probationary decision discussed in this Complaint.

(Docket No. 1 at ¶ 13). Numerous other allegations in the Complaint describe the role of probation officers and are applicable to the Individual Defendants. (Id. at ¶¶ 19-23, ¶ 25, ¶¶ 31-32, ¶ 36, ¶¶ 41-42, ¶ 48).

Moreover, Plaintiffs include specific allegations regarding most of the Individual Defendants in their roles as probation officers. For example, Defendant Jackson supervised Plaintiffs Gibbs, (Docket No. 1 at ¶ 124), and Carney, (Id. at ¶¶ 161-63, ¶166, ¶¶ 169-70). Defendant Woodlee supervised Plaintiffs Rodriguez, (Id. at ¶¶ 85-86, ¶ 88, 99), and Pullum (Id. at ¶¶ 146-47, ¶ 150). Defendant Smith supervised Plaintiff Johnson, (Id. at ¶ 198, ¶ 200, ¶ 204). Defendants Schexnayder and Hyde supervised Plaintiff Robinson (Id. at ¶ 210, ¶ 214, ¶ 219).

These specific allegations about the Individual Defendants' conduct with respect to Plaintiffs, in combination with the plentiful allegations about PCC probation officers' general involvement in effectuating the probation scheme, are sufficient.

However, Defendants are correct that the Complaint lacks any specific allegations regarding Defendants Banks, Bunge (formerly McCall), and Haley. A complaint that "fails to 'impute concrete acts to specific litigants,' fails to state a plausible claim." Zola H. v. Snyder, No. 12-14073, 2013 WL 4718343, at *7 (E.D. Mich. Sept. 3, 2013) (citing Bank of America, N.A. v. Knight, 725 F.3d 815, 819 (7th Cir. Aug. 8, 2013)). Accordingly, the claims against Defendants Banks, Bunge, and Haley will be dismissed. The claims against all other Individual Defendants survive.

### 2. Group Pleading

The Private Defendants also argue that the Complaint is fatally deficient insofar as it relies on "collective and conclusory references" to "Defendants" broadly without adequately specifying the conduct attributable to each separate Defendant. (Docket No. 62 at 20). Plaintiffs respond by noting that their claims allege that "all of the Defendants knew about and joined in the open and flagrant system because of their financial stake in the enterprise." (Docket No. 75 at 45). They maintain that the Complaint clearly alleges that role that each Defendant played in perpetrating the probation scheme and that given the nature of their claims, "it is appropriate for the allegation to be lodged against them collectively." (Id.).

Plaintiffs allege an overarching conspiracy that unites the Defendants. In addition, they levy many specific allegations regarding PCC and the Individual Defendants, save for Defendants Banks, Bunge, and Haley. See Sections III.B.3 & IV.B.1, supra. The fact that they "lump" Defendants together at other points in the Complaint does not negate or undermine the

numerous specific allegations. Indeed, importing a maxim of statutory interpretation, one might read Plaintiffs' decision to distinguish between the Defendants at various points in the Complaint but not at others to indicate that when they do use the term "Defendants," they intend to impute that allegation to all Defendants. The Private Defendants group pleading arguments do not warrant dismissal.

    C.  <u>Specific Counts</u>

        *1.  Count IV: Unduly Harsh Treatment of Government Debtors*

Count IV of the Complaint argues that Defendants violate the Equal Protection Clause of the Fourteenth Amendment by imposing "unduly harsh and punitive restrictions on debtors whose creditor is the government" compared to civil debtors who owe money to private collectors. (Docket No. 1 at ¶¶ 292-94). The Private Defendants seek dismissal of this claim on the ground that Plaintiffs are not similar to non-government debtors and therefore cannot state a claim under the Equal Protection Clause.

The Supreme Court has clarified that a state may not "impose unduly harsh or discriminatory terms merely because the obligation is to the public treasury rather than a private creditor." <u>James v. Strange</u>, 407 U.S. 128, 138 (1972). The Supreme Court later clarified that the issue with the statute in <u>Strange</u> was "its provision that in an action to compel repayment of counsel fees '(n)one of the exemptions provided for in the code of civil procedure (for collection of other judgment debts) shall apply to any such judgment . . .'" <u>Fuller v. Oregon</u>, 417 U.S. 40, 47 (1974) (quoting <u>Strange</u>, 407 U.S. at 135). The elimination of exemptions "embodie(d) elements of punitiveness and discrimination which violate the rights of citizens to equal treatment under the law." <u>Strange</u>, 407 U.S. at 142. <u>Strange</u> and <u>Fuller</u> confirm that the Fourteenth Amendment protects government debtors from unduly harsh treatment as compared

to those individuals who are indebted to private creditors. As with all equal protection claims, Plaintiffs must demonstrate that apart from this unduly harsh treatment, they are otherwise similarly situated to other non-government debtors. See City of Cleburne v. Cleburne Living Ctr, Inc., 473 U.S. 432, 442 (1985) (the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike").

The question at this stage is whether Plaintiffs have sufficiently alleged that they are similar to non-government debtors but are nevertheless deprived of certain protections. The Private Defendants argue that this equal protection claim is not viable because Plaintiffs, as probationers, "occup[y] a categorically different position than a person who owes a debt to a non-governmental entity for a consumer good." (Docket No. 62 at 15). Although the Private Defendants do not say this outright, this categorical difference appears to stem from Plaintiffs' status as probationers who have been convicted of misdemeanor offenses. The Private Defendants also argue that "Plaintiffs essentially contend that it is unconstitutional to provide statutory protections to non-government debtors unless they are also extended to probationers." Id. Plaintiffs respond by arguing that Defendants cannot collect money from probationers "in a manner so wildly out of line with how state law permits judgments to be collected from other debtors." (Docket No. 75 at 34)

It appears that the most analogous case is one that neither party cites but which is also being litigated by Plaintiffs' counsel, Fant v. City of Ferguson, 107 F. Supp. 3d 1016, 1037 (E.D. Mo. 2015), on reconsideration, No. 4:15-CV-00253-AGF, 2015 WL 4232917 (E.D. Mo. July 13, 2015). The Fant Plaintiffs also challenged probation practices and included a count for alleged equal protection violations stemming from disparate and harsh treatment of those who owe money to the city as compared to those who owe money to private creditors. The district court in

_Fant_ dismissed this particular cause of action, finding that the plaintiffs had not adequately alleged that they are similarly situated to civil judgment debtors. _Fant_, 107 F. Supp. 3d at 1037. Upon the _Fant_ Plaintiffs' Motion for Reconsideration, the Court revisited the equal protection claim. Although the Court reiterated its doubt that the plaintiffs would be able to show similarity to private judgment debtors, the Court felt that the "better practice" would be allow the claim to survive so that the parties could develop a record on this issue. _Fant_, 2015 WL 4232917, at *3.

Here, the Complaint alleges that "[t]he Defendants deprive the Plaintiffs of these protections even though Tennessee law explicitly states that the debts owed to the Defendants are subject to Tennessee law on civil judgments." (Docket No. 1 at ¶ 293). In their Opposition to the Private Defendants' Motion to Dismiss, Plaintiffs refer to Tenn. Code Ann. § 40-24-105, which states that the debts at issue here, fines and the attendant administrative costs, "may be collected in the same manner as a judgment in a civil action." This Court, like the _Fant_ Court, finds this sufficiently alleges that Plaintiffs are similarly situated to other debtors, such that this cause of action withstands the Private Defendants' Motion to Dismiss. This conclusion is not affected by the Private Defendants' citation to _Bell v. Providence Cmty. Corr., Inc._, No. 3:11-CV-00203, 2011 WL 2218600, at *5 (M.D. Tenn. June 7, 2011). In that case, the Court's discussion of debt collection was limited to an interpretation of the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. § 1692 _et seq._, which is not at issue here. Plaintiffs' equal protection claim in Count IV of the Complaint survives.

> 2. _Count V: Whether PCC-Supervised Probation Is a Wealth-Based Punishment in Violation of the Fourteenth Amendment_

Count V asserts that it violates equal protection and due process to relegate indigent individuals to the onerous conditions of supervised probation while those who have the ability to pay their fines do not receive supervised probation sentences. Specifically, Plaintiffs allege:

The Defendants' policy and practice is to use supervised probation for those people who cannot afford to pay the court judgment in full. If the person can pay, the person pays and they are not supervised by PCC, Inc. If the person is too poor to pay, the County has a policy and practice of placing that person on "probation," . . . This policy and practice of altering punishment based solely on wealth status violates fundamental principles of Due Process and Equal Protection.

(Docket No. 1 at ¶ 296). To be clear, Plaintiffs' argument is not that indigent defendants receive steeper fines than those misdemeanor offenders who pay upfront. Rather, they argue that their inability to immediately pay court fines and fees channels them into PCC-supervised probation, which brings with it a set of "significant consequences" and a "host of liberty restrictions." (Docket No. 75 at 36). Those who can pay their debts are still put on probation, but theirs is unsupervised. As General Sessions Court Judge Benjamin Hall McFarlin said "you can pay everything and not be on supervised probation." (Docket No. 70, Nov. 6, 2015 Hr'g Tr. at 86:11-86:12).[6] Probationers who are not subject to supervision are not subject to the terms and conditions of PCC probation and do not constantly face the threat of arrest and detention. Thus, Plaintiffs argue that indigent probationers will suffer a materially harsher punishment, PCC-supervised probation, which is "imposed solely because [the probationers] could not afford to pay [their] court costs on the day of conviction." Id.

Crucial to this claim is the fact that the County has the ability to collect outstanding debts directly from probationers, meaning that one does not have to be on supervised probation in order to pay one's fines and costs. As Plaintiffs allege, probationers may apply to be put on unsupervised payment plans and pay any outstanding fines and costs directly to the courts. Indeed, several of the Named Plaintiffs were ultimately able to obtain access to such plans and

---

[6] See also (Docket No. 70, Nov. 6, 2016 Hr'g Tr. at 28:18-29:2) ("And if the probationer enters into a payment plan with the court clerk, then their probation is terminated entirely. It's not supervised or unsupervised or anything else. They are terminating the probation. At that point the probationer has an obligation obviously under that payment plan to the court clerk, but it's not monitored by the judges or anything else. It's just a civil collection matter at that point if the probationer does not pay, and that is a system that has been in place for a period of time in Rutherford County.").

avoid future contact with PCC. (Docket No. 1 at ¶¶ 108, 177, 197). These payment plans "contemplate[] the payment in full of [probationers'] court costs," but without "incurring the additional debts, burdens, or threats associated with participation in PCC, Inc.'s illegal private probation scheme." (Id. at ¶ 108). Supervised probation is therefore not necessary to collecting monetary debts owed by misdemeanor offenders.

Plaintiffs' allegations plausibly allege a Fourteenth Amendment violation. Plaintiffs are similarly situated to those offenders who escape PCC's clutches in all respects but one: wealth. They have pleaded or been found guilty of the same offenses and sentenced to the same fines. Because Plaintiffs, who are indigent, cannot afford to pay their fines and costs immediately, they are subject to supervised probation and its attendant terms, conditions, and consequences while those who can pay receive only unsupervised probation.[7] The rationality of this wealth-based distinction is called into question by the fact that the County has alternative mechanisms for collecting outstanding fines and costs, namely, court-administered payment plans.

The Private Defendants do not dispute these allegations. Rather, they seek dismissal of Count V because it is the County, not PCC, which technically places misdemeanor offenders on probation. According to the Private Defendants, "Plaintiffs have made no showing that they can state a claim premised entirely on placing individuals on probation against an entity that cannot place individuals on probation." (Docket No. 90 at 13). Plaintiffs respond by noting that PCC is responsible for this violation insofar as the Company conspired with the County and because

---

[7] Imagine the following scenario: two individuals both plead guilty to driving under the influence. For both individuals, it is a first offense. At sentencing, both receive the same fine and owe the same amount in fees. One can pay her fine and fees immediately, while the other is indigent and therefore cannot. The one who can pay receives unsupervised probation, while the indigent individual is referred to supervised probation with PCC. Thus, one individual may start to rebuild her life while the other lives under threat of violation and arrest for a probation violation. Moreover, one owes only the amount imposed at sentencing while the indigent individual's debt grows through supervision fees and drug tests. The two are now in very different positions and the disparity arises solely because one could pay at sentencing and the other could not.

PCC keeps Plaintiffs on supervised probation rather than referring them to the County for a payment plan. The allegations in the Complaint indicate PCC's involvement in perpetuating supervised probation for the indigent. For example, Plaintiffs allege that PCC has a policy and practice of declining to inform and/or providing misinformation about indigency waivers, thereby preventing Plaintiffs from obtaining a direct payment plan from the County. (Docket No. 1 at ¶¶ 36-37, 167-171). For now, these allegations are sufficient to impute liability under the Fourteenth Amendment to PCC. Count V will survive.

        3.   *Count VI: Whether Arresting Probationers Solely for Nonpayment Violates the Fourth and Fourteenth Amendments*

Plaintiffs next claim that arresting probationers solely for nonpayment violates the Fourth and Fourteenth Amendments.[8] When a probationer violates the terms and conditions of his or her PCC-supervised probation, the supervising PCC probation officer submits an Affidavit of Complaint for Violation of Probation ("Arrest Affidavit") to the court. These Arrest Affidavits set forth the alleged violations and are signed by the probation officers. Once submitted to a court and signed by a judge, the Arrest Affidavits become active warrants, enabling law enforcement to arrest and detain probationers. According to Plaintiffs, "[t]hese warrants are regularly sought, issued, and served without any finding of probable cause that the person has committed the elements of any offense or violation and, indeed, with actual knowledge that no willful violation has occurred. The warrants therefore are procured based on the reckless and knowingly false premise that a violation of probation has occurred." (Docket No. 1 at ¶ 298).

---

[8] The Court's preliminary injunction decision was limited to Count VII of the Complaint, which is addressed in Section IV.C.4, *infra*. Count VII challenges the jailing of probationers because of the inability to make a monetary payment. The Court's preliminary injunction decision specified that its analysis addressed only "the *arrest and detention* of probationers where the only probation violation alleged is nonpayment of court costs." (Docket No. 68 at 8) (emphasis in original). Count VI, however, expressly challenges arrest due to nonpayment, regardless of any ensuing detention. The fact that Plaintiffs only sought injunctive relief with respect to Count VII did not waive or circumscribe their other causes of action. Neither does the Court's previous construal of Count VII prevent it from now addressing the allegations in Count VI.

The Arrest Affidavits also "deprive Plaintiffs of their liberty for nonpayment prior to any meaningful pre-deprivation process." (Id. at ¶ 298).

The Private Defendants argue that this claim is inapplicable to them insofar as "PCC Defendants cannot issue or execute arrest warrants and it is not alleged that they do so." (Docket No. 62 at 17). Moreover, the Private Defendants note that seeking arrest warrants is required by Tennessee law, which obligates the reporting of probation violations. Plaintiffs respond that failure to pay is only a probation violation, and therefore only merits reporting via Arrest Affidavit, if it is willful. Because PCC and the Individual Defendants are aware of probationers' indigency at the time they file Arrest Affidavits, Plaintiffs contend, they are incorrectly reporting violations.

The first question under Count VI is whether the Individual Defendants' and other PCC probation officers' knowledge of the probationers' indigency compromises the arrest warrants such that Plaintiffs have stated a plausible claim under the Fourth Amendment. If so, the Court must determine whether PCC and the Individual Defendants may be held liable for such a violation.

The Court begins by looking to Tennessee law on probation violations. Plaintiffs are correct that the applicable statutory provision specifically references willful nonpayment, not nonpayment more generally, as a violation of supervised probation: "Willful failure to pay the supervision fee imposed by this subsection (i) to the supervising entity shall be grounds for revocation of probation and the supervising entity shall report all instances of nonpayment to the sentencing court." Tenn. Code Ann. § 40-35-303. Admittedly, this provision is somewhat ambiguous as to whether PCC must report all instances of willful nonpayment, or all instances of nonpayment regardless of willfulness. This ambiguity does not halt the analysis because

regardless of what PCC must report, the statute is crystal clear as to what conduct actually constitutes a probation violation: *willful* nonpayment. Thus, regardless of what PCC and its employees must report, they may only categorize willful nonpayment as a probation violation.

The record suggests that the Private Defendants make no distinction between willful nonpayment and nonpayment because of indigency when completing and submitting Arrest Affidavits. According to Judge McFarlin, PCC probation officers bring a stack of Arrest Affidavits to the court and are put under oath. (Docket No. 70, Nov. 6, 2015 Hr'g Tr. at 71:22-71:25; 72:12). The probation officers then testify to the "alleged probation violation," (Id. at 72:21-72:22), as well as any prior alleged violations, (Id. at 73:3-73:5). While probation officers may be encouraged to share relevant information with the courts, there is no indication that willfulness is addressed when probation officers report nonpayment and file Arrest Affidavits for such purported violations. Indeed, Judge McFarlin also confirmed that any indigency inquiry is saved for probationers' formal revocation hearings. (Id. at 98:3-98:7). The record supports the conclusion that arrest warrants issue for failure to pay without Defendants ever confirming a statutorily-required element of the alleged probation violation: that the nonpayment was actually willful.

The Fourth Amendment requires that arrest warrants be issued only upon a showing of probable cause. Greene v. Reeves, 80 F.3d 1101, 1105 (6th Cir. 1996). Officers who seek arrest warrants are vulnerable to civil rights claims if they improperly seek arrest warrants or contribute to a finding of probable cause:

> [I]n cases involving arrest warrants sought prior to an arrest, the law is clear that an officer may be held liable under 42 U.S.C. § 1983 for an illegal search or seizure when the officer knowingly and deliberately, or with a reckless disregard for the truth makes false statements or omissions that create a falsehood and such statements or omissions are material, or necessary, to the finding of probable cause.

Peet v. City of Detroit, 502 F.3d 557, 570 (6th Cir. 2007) (citation and internal quotation marks omitted); see also Ahlers v. Schebil, 188 F.3d 365, 373 (6th Cir. 1999); Hill v. McIntyre, 884 F.2d 271, 275 (6th Cir. 1989).

The Court finds that Plaintiffs have plausibly alleged that Defendants acted with reckless disregard for the truth when seeking and issuing arrest warrants for nonpayment. The Complaint alleges that the probation officers were well aware of Plaintiffs' indigency and therefore could have informed the courts that Plaintiffs' failure to pay was not willful. The record indicates that probation officers did not provide courts with any such information when submitting Arrest Affidavits. Because willfulness is a necessary element of the probation violation, this omission concerned information material to a finding of probable cause. Plaintiffs have also provided sufficient factual allegations to hold the Private Defendants liable under the Fourth Amendment. The Individual Defendants and other PCC probation officers initiated probation revocation proceedings via the submission of Arrest Affidavits. They provided information that formed the basis of arrest warrants but, as Plaintiffs allege, did so with reckless disregard to a material element: willfulness. Tennessee's reporting requirements do not absolve the Private Defendants because nothing required them to report nonpayment in the form of an Arrest Affidavit. They could have complied with their reporting obligations in another format in order to avoid contributing to a finding of probable cause. The Fourth Amendment claim in Count VI will survive.

Count VI also includes a Fourteenth Amendment claim for "deprivation of fundamental liberty without adequate due process" stemming from the arrest of probationers solely for nonpayment. Notably, this cause of action is limited to the actual arrest of probationers and does not extend to the detention of probationers. Claims arising from allegedly unconstitutional

arrests find their home in the Fourth Amendment, not in the Due Process Clause of the Fourteenth Amendment. When an alleged constitutional violation "arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." Graham v. Connor, 490 U.S. 386, 394 (1989) (quoting U.S. Const. amend IV). Accordingly, Plaintiffs cannot state a Fourteenth Amendment claim based on their arrests. Count VI will be dismissed to the extent it attempts to state a Fourteenth Amendment Due Process Clause violation.[9]

### 4. Count VII: Jailing Probationers Based on Preset Money Bonds

Count VII of the Complaint challenges Defendants' practice of jailing probationers using preset money bonds "without any inquiry into their indigence and ability to pay." Throughout the preliminary injunction proceedings, the Court construed the term "preset money bond" or "preset secured money bond" to "refer to secured money bonds that are assigned without an inquiry into the individual's ability to pay the bond and whether alternative methods of ensuring attendance at revocation hearings would be adequate." (Docket No. 68 at 13 n.10). The Court continues to rely on that definition of the term.

This Court has already found Plaintiffs likely to succeed on the merits of Count VII, (Docket No. 68 at 12-18), and the Private Defendants have not presented any persuasive arguments that merit a change in course at this juncture. Plaintiffs have plausibly alleged that the practice of jailing probationers solely for nonpayment and keeping probationers on preset

---

[9] This holding is not in tension with the Court's preliminary injunction decision and order (Docket Nos. 68 and 69). Arresting and releasing probationers on their own recognizance ("ROR" warrants) remains a viable option *when the underlying arrest is properly based on probable cause, i.e., willful nonpayment.* Today's decision merely builds on the preliminary injunction decision by holding that Plaintiffs have plausibly alleged that all arrests, regardless of whether the warrant calls for ROR or relies on a bond, require an indigency inquiry to make sure that an actual probation violation has occurred.

secured money bonds violate the Fourteenth Amendment. The Private Defendants nevertheless argue that they cannot be liable under Count VII because the Private Defendants do not actually "jail people." (Docket No. 90 at 13). However, the record reveals that PCC probation officers actively participated in the setting of secured money bonds. (Docket No. 70, Nov. 6, 2015 Hr'g Tr. at 74:21-75:13; 89:15-89:25). At this juncture, the Court finds the allegations and testimony sufficient to state a claim against the Private Defendants. Accordingly, Count VII will survive.

## V.      **Plaintiffs' Motion to Amend the Complaint**

In a two-page Motion, Plaintiffs seek leave to amend the Complaint in order "to correct typographical errors in the original Complaint, to clarify the class definition given all of the factual allegations in the original Complaint, and to remove Baker Donelson as class counsel." (Docket No. 114 at 1). As part of their request to amend, they ask the Court to incorporate "all previously-filed motions and other responsive filings . . . so that the parties need not re-fill all such motions, responses, and replies." (Id.). Defendants oppose the proposed amendments on the grounds that the amendments are "unnecessary and unduly complicated because of pending motions." (Docket No. 120 at 2).

The Complaint could be amended to correct errors and remove Baker Donelson as class counsel without plunging the case into a state of confusion. However, the proposed amendments to the class definition give the Court pause, (Docket No. 114-2 at ¶ 226), and Plaintiffs say nothing about these changes in their Motion. The Court believes further briefing is necessary before the class definition is broadened to the extent Plaintiffs now propose. Moreover, it would be most useful for any amended pleadings to be consistent with this decision, which cannot be said for the Proposed First Amended Complaint now on file. (Docket No. 114-1). Accordingly, the Court will deny the Motion to Amend and give Plaintiffs an opportunity to refile such a

motion with an updated Proposed First Amended Complaint.  To the extent Plaintiffs again seek the proposed changes to Paragraph 226, the Court urges them to include additional grounds for such an amendment.

**VI.** <u>**Conclusion**</u>

The Court has thoroughly considered the arguments regarding dismissal raised by all Parties.  Defendants cannot shield themselves from suit with abstention, immunity, or Rule 5.1.  Neither does the "group pleading" format of the Complaint undermine the allegations.  However, the allegations against three of the Individual Defendants are insufficient to state a plausible claim for relief.  Additionally, the change in posture since the Court's entry of a preliminary injunction—namely, the expiration of the contract between the County and PCC—does affect the viability of some of Plaintiffs' claims.  Count III and Plaintiffs' claims for injunctive and declaratory relief against the Private Defendants have been rendered moot.  Finally, Count VI, which challenges arrest based solely on nonpayment, will be limited to the Fourth Amendment.  Plaintiffs' claims remain otherwise intact.  For now, the Court will deny Plaintiffs' request to amend the Complaint.  A separate order will enter.

_____

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE