## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

| | |
|---|---|
| CINDY RODRIGUEZ, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | )     Case No. 3:15-cv-01048 |
| v. | )     (Class Action) |
| | )     (JURY DEMAND) |
| PCC, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Misdemeanor probationers in Rutherford County are subjected to a practice antithetical to due process: supervision by a probation officer who has a financial interest in every decision that the probation officer makes. Plaintiffs move for summary judgment on Count Two of their eight-count complaint concerning Defendants' use of a for-profit "user funded" entity as a probation officer. Count Two alleges that the Due Process Clause prohibits the use of a probation officer with a direct financial interest in the outcome of each case and every supervision-related decision.

Plaintiffs seek a declaration that Defendants' "user-funded," for-profit probation arrangement violates the Due Process Clause; injunctive relief prohibiting the County from operating a system in which the probation officer has a direct financial interest in every decision in a person's supervision; and a finding that Defendants are liable for injuries caused to Plaintiffs as a result of the due process violations.[1] These claims rest on the principle that due process "entitles a person to an impartial and disinterested tribunal in both civil and criminal cases."

---

[1] The damages question can be addressed at a separate stage after appropriate discovery and after litigation concerning Defendants' liability on those of Plaintiffs' other claims that rely on disputed facts. Plaintiffs seek in this Motion only a ruling on equitable relief and on Defendants' liability for Count Two.

1

*Marshall v. Jerrico*, 446 U.S. 238, 242 (1980). The for-profit, "user funded" probation arrangement enshrined in Defendants' Contract gave birth to a species of probation officer that is so thoroughly infected by financial interest in every case that it violates the Due Process Clause's neutrality requirement.

There are no disputes of fact necessary to resolving Count Two in favor of Plaintiffs.[2] Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008). At the appropriate time, Plaintiffs will present overwhelming tangible and testimonial evidence of the ways in which PCC, Inc. violated the Constitution and unlawfully used jail and the threat of jail to extort money from impoverished and vulnerable human beings for years. Plaintiffs will also show how the financial incentives inherent in the Company's user-funded model *in fact* caused Defendants to behave in financially-interested and outrageous ways. For purposes of this motion, however, the existence of the Contract and its unambiguous terms — which created a for-profit probation officer with conflicting loyalties to money and justice — are the only material facts necessary to this Motion. Defendants do not dispute the terms of the Contract, nor can they reasonably do so. It is therefore appropriate for this Court to decide the purely legal question of first impression that is at the heart of this motion: Does the Due Process Clause prohibit the use of a for-profit "user funded" probation officer with a financial interest in every decision in every case?

---

[2] For the purpose of illustrating the financial incentives that pervade every aspect of Rutherford County's probation system, Plaintiffs have included with this Motion a number of exhibits, all of which are either County court documents or documents issued by the Company (with the exception of the drug test results in Ex. 20, the money orders in Ex. 23, and Exs 25–26, which were not produced by the Defendants). *See* Ex. 25 (declaration of Elizabeth Rossi). Although the documents cannot be genuinely disputed, Plaintiffs do not submit them because any one of them is necessary to resolve this Motion. As demonstrated *infra*, due process prohibits a financial conflict of interest and does not require proof of any particular incident of misconduct.

# I.    Factual Background Based on Uncontested Material Facts

## A.    The Contract's Terms Create Inherent Financial Incentives

The Mayor of Rutherford County signed a contract with PCC, Inc., a subsidiary of a publicly-traded for-profit company, that establishes PCC, Inc. as the probation officer in misdemeanor cases.[3] Ex. 1. The Contract created "a user-based fee program," *id.* at 9, in which the County pays nothing for PCC, Inc.'s services, *id.* at 2. Instead, PCC, Inc.'s "compensation and method of payment . . . shall be according" to the Cost and Fee Schedule set forth in the Contract. *Id.* This Contract creates a probation officer with a direct financial interest in every adjudicatory, supervisory, investigatory, and rehabilitative decision that is made in every probationer's case. In Rutherford County, a private company depends directly on the decisions it makes about the probationers it supervises to make a profit.

The Contract gives PCC, Inc. significant power. It authorizes the Company to determine the frequency with which a probationer reports and the method by which she reports, *id.* at 7, and to establish a payment schedule in each case for court debts and for its own fees, *id.* at 9. It requires PCC, Inc. to: "Monitor and collect payments for fines, court costs and restitution" and to "Monitor compliance with conditions" of probation. *Id.* at 7. It further allows the Company to conduct "random drug testing as ordered by the court, with the expense to be borne by the Probationer" and to "provide staff to attend Court to perform case intake on referred cases." *Id.* at 7–8. The Contract also gives the Company the power to report to the court any probationer who the Company believes to be "materially in violation" of any probation condition and to "[f]ile petitions, warrants, and orders as directed by the Court." *Id.* at 7.

---

[3] The duties of a probation officer are set forth in Tennessee law. *See* Tenn. Code Ann. § 40-28-605 ("The duties of probation and parole officers shall be to supervise, investigate and check on the conduct, behavior and progress of . . . persons placed on probation by the courts . . . and assigned to them for supervision and shall make to the director or court, as appropriate, a report of the investigations, and shall perform other duties and functions as the director of probation and parole may direct.").

The Contract further establishes that the Company will "make recommendations for revocation of probation" and "confer with the Court staff, the District Attorney's/Solicitor's office and Judges on cases as appropriate." *Id.* The Company will consult with officials on "alternative dispositions." *Id.* In addition to its role in conferring with County prosecutors and judges to make reports and recommendations, the Contract requires the Company to "provide testimony and supporting documentation as may be required by the Court." *Id.*

In return for PCC, Inc.'s no-cost probation supervision, the County promises to: "Refer all appropriate cases to PCC for the provision of those services indicated by this Agreement," *id.* at 8; "Order each probationer to remit to PCC payment for the services ordered by the Court," *id.*; *see also id.* at 7 ("[T]he Agency (or Court) agrees to order the payment for the Services to be paid by probationers. . . ."); "[O]rder and enforce Probationers . . . to pay for services based upon" the Cost and Fee Schedule, *id.* at 9; "Hold each referred case accountable for all payment of services, fines, restitution or other court-ordered fees and obligations," *id.* at 8; and "Create appropriate sanctions for failure to pay as well as other court-ordered conditions as determined by the Court." *Id.* at 8. As these provisions illustrate, the County contracted to make misdemeanor probationers' freedom contingent on increasing the Company's profits; it agreed to condition probation on the payment of the Company and then agreed to revoke and sanction any person who the Company claims has not paid the Company's fees.

A list of standard probation conditions used in traffic and misdemeanor cases is printed on every violation of probation warrant the County issues, *see, e.g.*, Exs. 2, 3, 16, and is included with the orientation packets distributed to new probationers.[4] The conditions grant the Company the right to visit any probationer's "home, employment site, or elsewhere" and to demand that

---

[4] Ex. 3 ("Rules of Probation" excerpted from an orientation packet provided to a probationer).

4

probationers "carry out" any "lawful instructions" made by PCC, Inc. Exs. 2, 3, 16. The Company is empowered to monitor the lives of probationers by, for example, enforcing a requirement that they "work at a lawful occupation" and "support" their "dependents." *Id.* It also makes sure that they do not "enter an establishment whose prime purpose is to sell alcohol beverages." The Company is permitted to require a probationer to be tested for alcohol or drug use at any time. *Id.* The arrangement further allows the Company to "search, without a warrant" the "person, vehicle, property, or place of residence" of any probationer "at any time."[5]

### B. Financial Assessments, Fee Waivers, and Revocations for Non-Payment Are All Based on the Profit Motive

The Contract allows — indeed, it requires — probation revocations and extensions based solely on non-payment. Ex. 1 (stating that the County agrees to "[o]rder each probationer to remit to PCC payment for the services. . . .," to "[h]old each referred case accountable for all payment of services. . . .," and to "[c]reate appropriate sanctions for failure to pay. . . ."). Each year, hundreds of PCC, Inc.'s supervisees are arrested, and their for-profit probation terms revoked and extended, based solely on the Company's affidavit to the court that the individual failed to pay all court costs and PCC, Inc. fees. Doc. 70 at 95–96 (Judge McFarlin testifying that four violations of probation for non-payment alone was a "typical" day and that there were approximately 50–100 violations of PCC, Inc. probation every month based solely on non-payment). The Company has an incentive to create specific policies that advance its money-

---

[5] The ability to implement and interpret these terms gives enormous power to the probation officer. The Seventh Circuit recently vacated conditions much like these after concluding that they were unlawfully vague. *United States v. Sewell*, 780 F.3d 839, 842 (7th Cir. 2015); *United States v. Thompson*, 777 F.3d 368, 382 (7th Cir. 2015); *see also United States v. Siegel*, 753 F.3d 705, 714 (7th Cir. 2014) (vacating conditions that required payment to complete and noting that the judge said "nothing" about what would happen if the defendant "can't pay the entire cost"; holding that "[r]evoking a defendant's supervised release and recommitting him to prison for mere inability to pay would constitute imprisonment for debt" and ordering the court to make clear on remand that the government will pay for the conditions if the defendant cannot afford them); *United States v. Inman*, 666 F.3d 1001, 1004-5 (6th Cir. 2012) (vacating broad supervised release conditions, including those requiring drug testing and prohibiting alcohol consumption, for lack of individualized assessment); *United States v. Smith*, 2013 WL 1150909 (C.D. Ill. Mar. 19, 2013) (stating that probationer would only be required to pay for condition of probation if she were able to pay).

5

making goals, including revoking probation solely for non-payment in order to extend the time during which the Company can collect supervision fees.

One of the Company's policies is to take its own fees first before applying any payments to outstanding court debts. PCC, Inc. highlights this policy in its orientation materials.[6]  This policy ensures that many low-income probationers' payments will not even touch their court costs, and it means that they can remain on PCC, Inc. probation indefinitely for years even after paying far more money than what they initially owed the court.

Because the Contract requires the County to condition probation on payment of both the Company's fees and outstanding court debts, the Defendants' system allows people to be revoked and kept on supervised for-profit probation solely because of their inability to pay the amounts set by the Company.[7]  The Company has developed its own policies with respect to how much money to require, when to require it,[8] and what action to take when money is not paid.[9] For example, PCC, Inc. sends out letters to its probationers threatening them with arrest if they do not pay the Company.  Those letters include, in capital letters, the following sentences: "YOU ARE CURRENTLY DELINQUENT $___ IN PROBATION FEES.  YOU MUST MAKE A PAYMENT TOWARDS THIS BALANCE NO LATER THAN ___.  FAILURE TO MAKE A PAYMENT TOWARD THIS BALANCE MAY RESULT IN A WARRANT BEING ISSUED FOR VIOLATION OF PROBATION.  DO NOT CONTACT OFFICE REGARDING THIS LETTER.  DO NOT COME INTO THE OFFICE TO MAKE THIS PAYMENT.  IT MUST BE

---

[6] Ex. 4 (excerpt from orientation packets, which state: "Please understand that paying as directed is a condition of probation.  When you mail in your scheduled payment, it is applied first to current probation fees owed, then to court costs, and finally towards any restitution owed.").

[7]  Ex. 5 (letters from PCC, Inc. threatening probationers with violation, although they owed no court costs). Probationers who owe court costs only because their payments were diverted to the Company also face revocation.

[8] Ex. 4, Ex. 6 (documents indicating the amount demanded and how frequently an individual must report).

[9] Ex. 7 (non-payment warrants filed at various times within period of probation), Exs. 4, 5, 8, 9, 10, 11.

6

MAILED."[10]  The Company uses its discretion to decide: (1) what amount of delinquent money owed to the Company will result in the Company seeking a person's arrest and revocation; and (2) by what arbitrary date the Company will require its money before it decides to seek the person's arrest.  The letter also warns probationers not even to attempt to discuss the letter with the Company and instructs them simply to pay the Company's fees by mail.  *Id.*[11]

The Company uses alternative versions of this letter.  For example, the Company threatens some probationers that if they "cannot" pay a certain amount of probation fees by a certain date (with both the amount and the date chosen by the Company) then they will have to *serve their entire sentence in jail:*

> Probation is a choice.  When you commit a crime and are convicted and plead guilty to that crime, you are given a choice to either serve the sentence or be placed on probation.  If you cannot comply with the rules and terms of probation, you will be advised by the courts to serve your sentence and you will no longer be eligible for probation.[12]

Other probationers are told that: "[i]f your financial obligation is not met by the date mentioned above, you will leave me no choice but to have a warrant for your arrest issued."[13]

Another policy that leads to revocations for non-payment is charging for rehabilitative classes, such as anger management or DUI school, and also to perform community service.  Doc. 70 at 84–85; Ex. 1 at 9, 13.  When individuals are unable to pay for these conditions, PCC, Inc. secures arrest warrants and recommends pre-revocation detention on money bonds.[14]  Neither the

---

[10] Ex. 8 (letter sent to Kenneth Hubbard on October 17, 2014).

[11] *See also* Ex. 11 at 1 ("YOU ARE CURRENTLY DELINQUENT $228.OO IN PROBATION FEES. YOU MUST MAKE A PAYMENT TOWARDS THIS BALANCE NO LATER THAN 1/28/2016. UNLESS YOU ARE MAKING A CREDIT CARD PAYMENT DO NOT CALL THE OFFICE REGARDING THIS LETTER.").

[12] Ex. 9 (letter sent to Carol Hall on June 11, 2012).

[13] Ex. 10 (letter sent to Sonya Clemmons on October 18, 2012); *see also* Ex. 11 (additional threatening letters).

[14] Ex. 12 (Jacob Tomberlain warrant for non-payment and failure to complete community service and attend alcohol/drug safety school; admitted at the preliminary injunction hearing as an exhibit to Doc. 49; also in the record as Doc. 45-4).

7

Company nor the County makes any inquiry into whether a person's inability to pay caused her failure to complete that condition of probation. Doc. 70. at 97–101. As the County Judge put it: "Money makes the world go round." *Id*. at 101. By creating financial barriers to satisfying probation conditions, the Company makes it more likely that someone will violate probation, and thus more likely that her probation can be revoked and extended.

Fourth, the Company has a policy of erecting barriers to fee reductions and waivers. For example, PCC, Inc. has distributed a document entitled, "PROCESS TO HAVE FINES & COSTS REDUCED," which discourages probationers from seeking the assistance of counsel. Ex. 13 ("*You do not need an attorney to complete this process.*"). It informs probationers that they must complete "several continuous months of reporting and making payments" before even asking a probation officer "to perform a Financial Assessment." *Id*. The form then tells probationers: "PCC will most likely deny your request to reduce costs and fines after assessment is complete."[15] *Id*. This is not surprising given that the entity determining waiver depends on the non-waiver of those fees for its entire business. Nevertheless, the Company admonishes them in bold lettering, "***Do not get discouraged by this.***" *Id*. The form next advises, "Continue to make payments on every report date." *Id*. Probationers are then told that they can try to file a motion to reduce costs and fines, but it will cost $25 to file. *Id*. Finally, and "[m]ost importantly," the Company tells probationers that the judge will want to know if the individual "ha[s] been making an attempt to pay your costs and fines." *Id*.

In addition to that process, the Company decided to create a policy of telling probationers in writing that it will not even consider a request to waive or reduce required payments unless a person submits a complete documentary record to support every piece of information that she

---

[15] Ex. 14 (denials of financial assessment applications submitted by four probationers).

8

provides; unless she submits to a drug test (which she must pay for); and unless she provides "[p]roof of all income/checks" including "[c]opies of current" checks, "[p]roof of all assets," "[c]opies" of bank statements, "[p]roof of all expenses," "[c]opies of all bills," "[a]ll medical documentation" of her inability to work, and "a letter advising of the status of your disability." *See* Ex. 14. As the Company knows, it can virtually ensure that impoverished people's applications are "incomplete" by requiring the kind of meticulous paperwork that few are able to marshal before the Company will even entertain a claim of poverty.

These policies result in the Company rejecting fee waivers for Kafkaesque or irrelevant reasons, including denying indigence because the person: had not paid enough; had previously "agreed" to pay even though the person knew that she was poor; "failed to provide proof of inability to work"; "failed to provide proof of expenses listed"; or tested positive for drugs. *Id.*

### C. All of the Company's Probation-Related Decisions Involve Financial Incentives

Every one of PCC, Inc.'s supervision and enforcement decisions, as well as all of PCC, Inc.'s conduct in judicial proceedings, directly affect how much profit it makes. Thus, the Company has a financial incentive to perform each of its functions in a way that maximizes its profit. To take just a few examples, the Company has a financial incentive:

- To report violations and seek revocations and extensions of supervised probation for as many renewed terms as possible, because extended probation means more fees for the Company;[16]
- To make all case-related decisions about when and how often to require in-person reporting, what counts as valid reporting, whether alternatives to in-person reporting are allowed, how to advise probationers about their

---

[16] Doc. 70 at 50, 53-55; Ex. 15 (sample violation-of-probation warrants for non-payment alone that were submitted at the preliminary injunction hearing as an exhibit to Doc. 49; also in the record as Doc. 45-2); Ex. 16 (sample violation-of-probation warrants for alleged violations other than non-payment that were submitted at the preliminary injunction hearing as an exhibit to Doc. 49; also in the record as Doc. 45-5).

rights, when to report violations, and how to report those violations with the goal of maximizing profit;[17]

- To file for arrest warrants instead of other forms of notifying the court in order to coerce jailed defendants to agree to probation extensions without a lawyer and to create a threat to current probationers who are otherwise not able to pay without substantial hardship;[18]

- To develop policies and practices concerning debt collection from probationers to maximize its profits. For example, the Company uses its discretion under the Contract to determine particular payment deadlines and payment amounts and to tell probationers that if they do not pay those amounts by those deadlines, then they will be arrested. The Company routinely sends letters to probationers announcing that they are more than "30 days" late in paying and more than "$200 behind in payments." Probationers are then given dates set by the Company to pay up or else it will result in "a warrant being issued" and the supposed "violation" being reported to the court.[19] As described above, these letters require that a certain amount of "probation fees" be paid by a certain date to avoid arrest and instruct probationers not to call or come to PCC, Inc. to ask about the letter.[20] They also wrongly and illegally inform probationers that they will have to serve their entire jail sentence if they "cannot" comply.[21]

- To "work with" and not to recommend lengthy jail terms for someone who is committing violations but paying what the Company wants, while seeking lengthy jail terms instead of renewed probation terms for destitute people who cannot pay the Company but cost it money to supervise;

- To apply payments to its own fees first and sometimes exclusively, thus preventing a probationer from paying down her court debts and keeping her on probation indefinitely;[22]

- To charge extra for the completion of probation conditions, such as classes or community service that the Company offers;

- To create onerous reporting conditions that lead to technical violations that PCC, Inc. can hold over the heads of probationers in order to coerce payments that constitute serious hardship;

- To interpret what constitutes a "material violation of probation" and to determine when a probationer is "materially in violation" of a condition in a way that increases revenue;[23]

---

[17] The company has an incentive to withhold notification to the court of technical violations as long as a probationer is paying but to inform probationers that PCC, Inc. will seek revocation based on a single non-appearance or late appearance (as determined by the Company) at the PCC, Inc. office if the person stops making payments.

[18] *See* Exs. 12, 15, 16, 17. (Exhibit 17 as admitted as an exhibit to Doc. 49 at the preliminary injunction hearing. It is also in the record as Doc. 45-3.)

[19] Exs. 5, 8, 9, 10, 11.

[20] *Id.*

[21] Ex. 9.

[22] Ex. 18 (receipts of payments).

10

- To withhold information about fee waivers and other legal rights from supervisees;[24]
- To deny fee waiver applications;[25]
- To order and charge for more drug tests;
- To use the timing of the drug testing and reporting process to coerce payments;
- To falsify drug tests, employ knowingly inaccurate drug testing procedures that result in false positives, or ignore probationers' medications which may cause positive screens in order to create probation revocations and extensions;[26]
- To tell probationers that they will be revoked if they do not pay what the Company demands;[27]
- To seek revocation and extension on a new term of probation for non-payment even when the Company knows the probationer is unable to pay;[28]
- To seek revocation for non-payment without investigating the person's inability to pay, and to use arrests and revocations for non-payments to send a message to the probationer and other probationers about what happens when PCC, Inc. does not get its money;
- To withhold information from the court when seeking warrants and during revocation hearings about the person's inability to pay;
- To negotiate higher supervision and other fees with the County to increase profits;

---

[23] Ex. 1 at 7.

[24] The Company has an incentive to misrepresent or withhold basic legal facts and principles from probationers, such as that they cannot be put in jail solely because of their inability to pay. A neutral official would have the role of helping to explain basic rights and helping probationers understand that their ability to pay was a constitutionally critical question and that the probationer could not be put in jail simply for being poor. Instead, a private actor with a financial interest has an incentive to conduct its interactions in a manner that does anything possible to collect money, not to explain legal protections in a neutral way. Thus, PCC, Inc. has an incentive never to help probationers seek modification of their conditions if the person is indigent or even to inform probationers of their right to do so. If a probationer who has difficulties meeting the basic necessities of life comes to PCC, Inc., the company has an incentive to avoid informing that person that she can seek reduction or waiver of the costs and payments. The Contract therefore incentivizes PCC, Inc. to misrepresent the law.

[25] Ex. 14 (denials of financial assessment applications for improper or irrelevant reasons).

[26] Ex. 19 (warrant with $10,000 predetermined bond for failing a drug test and non-payment, and a violation of probation order showing that Ms. Scardina provided proof of a prescription that caused the drug test to be positive; because she was able to bond out, Ms. Scardina contested the drug test in court without suffering prolonged jailing); Ex. 20 (a violation of probation warrant for Named Plaintiff Steven Gibbs for allegedly failing a drug test and drug test results showing that Mr. Gibbs tested negative for all illegal substances; these documents were admitted at the preliminary injunction hearing and are in the record as part of Doc. 49).

[27] Exs. 5, 8, 9, 10, 11 (threatening letters).

[28] Ex. 14 at 3–4, 7–8 (denials of financial assessment applications for Raychel Kemp and Amber Lyle); Ex. 21 (warrants issued for Raychel Kemp and Amber Lyle, though they had previously informed PCC, Inc. of their indigence).

11

- To add additional fees not authorized by law, such as a picture fee and a postage fee;[29] to demand that probationers pay profitable "transaction fees" for certain methods of payment;[30]
- To make recommendations to the judge concerning revocation and sentencing based on a motive to collect more fees;
- To testify as the probation officer concerning the person's conduct while on probation in order to ensure the finding of a probation violation leading to renewed terms of PCC, Inc. probation;
- To require probationers to report more frequently and charge money for each reporting day;
- To use its access to and influence over the judge to intimidate probationers by informing probationers that it will provide or withhold certain information from the court when it meets privately with the court;
- To use the violation process to threaten and extort payments and to use the pre-revocation money bond and jailing process to obtain agreements to extend probation for additional profitable terms;[31]
- To inaccurately record whether and how much people have actually paid, thus forcing people to double pay.[32]

Perhaps most importantly, the Company makes enforcement decisions about whom to target, what investigation to make, and when to report what the Contract calls "material" violations. Ex. 1 at 7. This is a significant power because probationers are told that they must obey their PCC, Inc. officer by "carrying out" all of the officer's "lawful instructions" under penalty of revocation. Exs. 2, 3, 16. Then, the Company meets in private with the judge to recommend bail amounts, Doc. 70 at 75, and testifies at hearings, Ex. 1 at 7, meaning that a financially-interested probation officer *is the main witness* offered in support of alleged technical violations. Pursuant to the Contract, PCC, Inc. then meets with the judge and recommends sanctions, sentences, and "alternative dispositions," Ex. 1 at 7, after a finding of revocation.

---

[29] Ex. 22 (documents showing picture, postage, and transaction fees not authorized by law or the Contract).

[30] Ex. 4 at 2.

[31] Exs. 15, 16, 17 (violation of probation warrants, which show that many revocations and extensions are "agreed" to); Doc. 70 at 87-88, 98 (Judge Ben Hall McFarlin discussing the "10-day rule"; explaining that, after a minimum of 10 days, detained probationers are taken to a "court" inside the jail, where they meet with a DA without a defense attorney and "[m]any times . . . they go ahead and work it out right there.").

[32] Ex. 23 (money orders dated August 20, 2015, made out to the General Sessions court totaling $1,183.85; a receipt dated August 21, 2015, from the General Sessions court for $1,158.85; and a letter dated January 4, 2016, from PCC, Inc. demanding payment of $1,183.85 in court costs).

All of these examples illustrate that the Contract enshrines a particular compensation arrangement. If the "users" are not made to pay, the Company does not profit. If the "users" pay less, the Company profits less. If the "users" pay more and for longer, the Company profits more. The Company has a direct financial incentive to make supervision and revocation-related decisions in a way that extracts more payments from probationers.

## II.   Due Process Requires a Neutral Probation Officer Free From Financial Conflicts of Interest in the Outcome of Probation Cases

The use of a probation officer with a direct pecuniary interest in every supervision and revocation-related decision violates the neutrality requirement of the Due Process Clause.

### A.   Because Probation Officers Perform Quasi-Judicial and Law Enforcement Functions, They Must Be Free from Financial Conflicts of Interest

PCC, Inc. has characterized its role as "an arm of the judge" so integral to and connected with judicial proceedings that PCC, Inc. officers are entitled to absolute quasi-judicial immunity. Doc. 62 at 2–7; Doc. 87-1 at 2–8.

The Company is correct that the probation officer is a special creature in our justice system: some of its functions are quasi-judicial[33] or otherwise intimately connected with judicial proceedings (such as testifying in court at violation hearings, meeting privately with the judge to discuss the amount of money bail, and making *ex parte* recommendations and reports to the judge concerning progress, revocation, or sentencing dispositions, Ex. 1 at 7–8). Other functions of the probation officer are more akin to a prosecutorial role; others are more like that of an investigating police officer; and others see them function more as a social worker to advise and assist in rehabilitation. *See* Doc. 75 at 1–10; Doc. 94 at 1–3; *Swift v. California*, 384 F.3d 1184,

---

[33] Plaintiffs disagree that the Company and its employees are entitled to absolute immunity for a variety of reasons, *see* Doc. 75 at 1–15; Doc. 94 at 1–5, including that most of the conduct alleged in the Complaint relates to the Company's non-judicial functions, that no court has ever granted absolute immunity for conduct that a private company makes a business decision to engage in for profit, and that the Company is liable for its own policy choices, such as those negotiated with the County Mayor in the Contract.

1189–91 (9th Cir. 2004) (explaining that parole officers are hybrid creatures who perform both adjudicative tasks that are "functionally comparable to tasks performed by judges" and "investigatory or law enforcement functions" like those performed by police); *United States v. Davis*, 151 F.3d 1304, 1306-07 (10th Cir. 1998) (discussing the "unique role" of the probation officer); *United States v. Belgard*, 894 F.2d 1092, 1097–99 (9th Cir. 1990) (discussing the probation officer's role in rehabilitation, investigation, and sentencing).

### i. Judicial and Quasi-Judicial Actors Must Be Free from Conflicts of Interest

The Supreme Court has long held that judges and other neutral decisionmakers must be free from financial conflicts of interest. *Caperton v. A.T. Massey Coal*, 556 U.S. 868, 876-78, 781 (2009); *Tumey v. Ohio*, 273 U.S. 510, 522 (1927) (holding that "officers acting in a judicial or quasi-judicial capacity are disqualified by their interest in the controversy"); *id.* ("[I]t certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case."); *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) (applying this principle to an administrative board because "those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes"); *see also Connally v. Georgia*, 429 U.S. 245, 251 (1977) (finding due process violation when a justice of the peace charged with issuing search warrants was paid only when he issued a warrant and not when he denied one).

The due process test does not require proof that any particular decision or action was rendered out of bias. *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972) (holding that the test is whether the institutional arrangement created a "possible temptation" that "might lead [the judge] not to hold the balance nice, clear, and true between the state and the accused. . . .")

14

(quotes removed); *Tumey*, 273 U.S. at 535 (holding that, notwithstanding overwhelming evidence of guilt, the defendant "had the right to have an impartial judge" and that due process prohibited the structural incentive itself). Thus, "[t]he inquiry is an objective one," *Caperton*, 556 U.S. at 881, and courts must "ask[] not whether the judge is actually, subjectively biased, but whether the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Id.* at 881 (quotations omitted); *id.* at 878 (noting the Court's concern in *Tumey* "with a more general concept of interests that tempt adjudicators to disregard neutrality"); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986) (explaining that the constitutional question is not "whether in fact" the decision-maker "was influenced" by a conflict, but simply whether the conflict "'would offer a possible temptation'") (quoting *Ward*, 409 U.S. at 60); *In re Murchison*, 349 U.S. 133, 136 (1955) (noting that, because "'justice must satisfy the appearance of justice,'" due process may "sometimes bar trial by judges who have no actual bias and who would do their best to weigh the scales of justice equally between contending parties") (quotes removed).[34]

Due process also prohibits even indirect conflicts of interest. The Court explained in *Ward* that, for people performing judicial functions, due process is offended even when there is no direct personal financial conflict because even the indirect institutional incentive in that case was unconstitutional. 409 U.S. at 60. Thus, the Court found a due process violation even though the judge did not have a personal stake in the outcome because the judge was responsible for the city's finances, and conviction would result in greater revenue for the city. *Id.* (*"*Plainly that 'possible temptation' may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's

---

[34] *See also, e.g., Withrow v. Larkin*, 421 U.S. 35, 47 (1975) ("Not only is a biased decisionmaker constitutionally unacceptable but our system of law has always endeavored to prevent even the probability of unfairness.") (citation and quotation marks omitted).

15

court."); *see also Caperton*, 556 U.S. at 878 ("The Court held that the fact that the mayor in *Tumey* shared directly in the fees and costs did not define the limits of the principle.") (alterations omitted). The same neutrality must also apply to probation officers when they function in a quasi-judicial capacity.

These principles of neutrality have been applied in criminal, civil, and administrative contexts because the American legal system protects due process through robust procedural safeguards. Although the nature and extent of the procedural protections due in any given context are subject to a careful due process balancing test that weighs the individual liberty interest against the government's interests, *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976), a hallmark of due process in *every* context is that the procedures be fundamentally fair. *Lassiter v. Dep't of Soc. Servs. of Durham Cty., N.C.*, 452 U.S. 18, 24–25 (1981). In the probation revocation context, part of what due process requires is both a preliminary hearing after the execution of an arrest warrant and a subsequent, more comprehensive adversarial hearing with a number of protections before a final revocation decision. *Gagnon v. Scarpelli*, 411 U.S. 778, 781–82 (1973). These procedural safeguards do not satisfy the Constitution, however, if they are not neutrally applied: "Fairness also dictates that the procedure itself not be abused or misused. No matter how complete the panoply of procedural devices which protect a particular liberty or property interest, due process also requires that those procedures be neutrally applied." *Ciechon v. City of Chicago*, 686 F.2d 511, 517 (7th Cir. 1982) (citing *Murchison*, 349 U.S. at 136) (footnote omitted); *Ali v. Mukasey*, 529 F.3d 478, 493 (2d Cir. 2008) (quoting *Ciechon*, 686 F.2d at 517); *see also Caperton*, 556 U.S. at 887 (holding that the Constitution enshrines the "basic right to a fair trial in a fair tribunal.").

   ii.    **Law Enforcement Actors Must Be Free from Financial Conflicts of Interest**

Although due process protections against actual or perceived conflicts of interest are at their peak when an official is performing judicial and quasi-judicial functions, the due process principle of neutrality also applies to all government officials whose job it is to enforce the law. *Marshall v. Jerrico*, 446 U.S. 238 (1980) (holding that the due process neutrality requirement applies to civil enforcement actors but finding no due process violation because no government officials would remotely profit from their enforcement decisions in that case). Probation officers fall squarely within the class of government officials who enforce the law.

In *Jerrico*, the Supreme Court explained that the neutrality requirement of the Due Process Clause constrains even federal administrators who enforce *civil* laws and regulations. *Id.* at 250. *Jerrico* described how serious due process problems would be implicated if there were "a realistic possibility that the assistant regional administrator's judgment will be distorted by the prospect of institutional gain as a result of zealous enforcement efforts." *Id.* at 250. Thus, even in the civil context, where fundamental liberty is not at stake, the Supreme Court explained:

> [T]he decision to enforce — or not to enforce — may itself result in significant burdens on a defendant . . . even if he is ultimately vindicated in an adjudication. A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions.

*Id.* at 249–50 (citations omitted).

The Court's reasoning in *Jerrico* reveals why probation officers must be free from financial conflicts of interest. The issue in *Jerrico* was whether a section of the Fair Labor Standards Act — which provided that the money collected from a company as a civil penalty for violating child labor laws must be returned to the agency enforcing those laws as reimbursement for the costs of enforcement — violated due process. *Id.* at 239. The Court found that the due process threshold had not been crossed because "[n]o governmental official stands to profit

17

economically from vigorous enforcement of the child labor provisions of the Act"; the money collected "amounted to substantially less than 1% of the [agency's] budget"; the agency "did not spend the full amount appropriated to it"; the sums not spent were returned to the Treasury"; and the amount of money remitted depended on the expense of prosecution, not the outcome of any enforcement action. *Id.* at 245-46, 250–51 (explaining that the money was not profit that might affect decisions because the office would not benefit from getting more money from those against whom it enforced the law). The federal scheme therefore conferred no direct benefit to enforcement officials, and "the influence alleged to impose bias" — an indirect institutional benefit to the Employment Standards Administration — was so "exceptionally remote," *id.* at 250, that it could not possibly play any role in any official's enforcement decisions, *id.* at 250-52. Because of this structure, the Court held that the financial benefit was "too remote and insubstantial to violate the constitutional constraints" when "the enforcing agent is in no sense financially dependent on" its enforcement decisions. *Id.* at 251. There was no "realistic possibility" that any official's decision was influenced by any financial incentive. *Id.*

In *Young v. United States ex rel. Vuitton*, 481 U.S. 787, 807–8 (1987), the Court relied on *Jerrico* to condemn a prosecution in which the prosecutor had a financial interest in the outcome of the case. *Young* involved a criminal contempt proceeding in which the specially appointed prosecutor was also the plaintiff's attorney in a civil suit against the same defendant. *Id.* at 790. The Supreme Court found structural error and overturned the conviction because of the "*potential* for private interest to influence the discharge of public duty" in such a situation. *Id.* at 806 (emphasis in the original); *see also id.* at 807 (quoting *Jerrico*, 446 U.S. at 249–50); *id.* at 808 n.19 (citing *Bhd. of Locomotive Firemen & Enginemen v. United States*, 411 F.2d 312, 319 (5th Cir. 1969) (holding that appointment of an interested prosecutor violates due process)).

*Young* first emphasized the importance of a financially neutral prosecutor. *Young*, 481 U.S. at 803–05. The Court then identified numerous ways in which enforcement decisions could be influenced if the enforcement agent had a financial interest in the outcome. *Id*. at 805–06. The Court explained how a financial interest meant that the case could be "shaped" at every turn in subtle ways that are not easily reviewable. *Id*. at 806, 813. The Court's discussion, *id*. at 807, is seamlessly applicable to the discretion PCC, Inc. possesses under the Contract:

> As should be apparent, the fact that the judge makes the initial decision that a contempt prosecution should proceed is not sufficient to quell concern that prosecution by an interested party may be influenced by improper motives. A prosecutor exercises considerable discretion in matters such as the determination of which persons should be targets of investigation, what methods of investigation should be used, what information will be sought as evidence, which persons should be charged with what offenses, which persons should be utilized as witnesses, whether to enter into plea bargains and the terms on which they will be established, and whether any individuals should be granted immunity. These decisions, critical to the conduct of a prosecution, are all made outside the supervision of the court.[35]

*Young* concluded that, "as will generally be the case, the appointment of counsel for an interested party to bring the contempt prosecution in this case at a minimum created *opportunities* for conflicts to arise, and created at least the *appearance* of impropriety." *Id*. at 806 (emphases in the original).

The Court explained that it need not make a constitutional holding when its supervisory powers sufficed to bar prosecutors with financial conflicts of interest from federal court cases.

---

[35] *See also, e.g.*, *Polo Fashions v. Stock Buyers*, 760 F.2d 698, 704 (6th Cir. 1985) (finding abuse of discretion in district court's decision to permit an interested prosecutor to bring a contempt proceeding); *Fed. Trade Comm'n v. Am. Nat'l Cellular*, 868 F.2d 315, 319 (9th Cir. 1989) (discussing *Young* and the Supreme Court's prohibition on financially interested prosecutors and explaining that prosecutors must "be both impartial in fact and appear to be so" in order to ensure "public confidence"); *In re Yanks*, 882 F.2d 497, 497-98 (11th Cir. 1989) (invalidating contempt prosecution relating to bankruptcy debt when prosecutor had a potential financial interest).

However, in *Dick v. Scroggy*, 882 F.2d 192, 197 (6th Cir. 1989), although the court assumed "that the prosecutor would have been disqualified had the court been informed" that the prosecutor had agreed later to represent a person injured in an alcohol-related crash caused by the criminal defendant being prosecuted, it declined to grant habeas relief because, unlike probation officers, "[p]rosecutors are supposed to be advocates." The court concluded without analysis that such a potential tension between the role of prosecutor and the role of a lawyer representing the accident victim — which was not alleged to be a direct financial conflict of interest and which had not been raised at trial — "may be" too remote to trigger the due process clause. *Id*.

*See* 481 U.S. at 809 n.21. Nevertheless, as the Tennessee courts have explained when discussing *Young*, the Court's restraint on the constitutional issue "does not preclude and probably only foreshadows a constitutional bar with respect to the use of interested private prosecutors." *State v. Eldridge*, 951 S.W.2d 775, 782 (Tenn. Crim. App. 1997). After explaining that *Young* "condemned" the concept of a financially interested prosecutor and citing numerous cases finding that such a conflict constitutes a constitutional violation, the court held:

> We have no hesitation in concluding that the participation by special prosecutors who represent the victim in a civil matter arising from the same incident giving rise to the criminal prosecution is a violation of the defendant's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution as well as the Law of the Land provision in Article I, § 8 of the Tennessee Constitution.

*Id.; see also State v. Culbreath*, 30 S.W.3d 309, 316, 318 (Tenn. 2000) (condemning "fundamentally unfair" prosecution in which prosecutor was privately compensated "hourly," which meant that he "acquired a direct financial interest in the duration and scope of the ongoing prosecution"); *Bhd. of Locomotive Firemen*, 411 F.2d at 319 (finding due process violation in interested prosecutor because "[t]he point is that those conflicting claims of undivided fidelity present subtle influences on the strongest and most noble of men. The system we prize cannot tolerate the unidentifiable influence of such appeals."); *Ganger v. Peyton*, 379 F.2d 709, 713–14 (4th Cir. 1967) (holding that a prosecutor's attempt "to serve two masters" violated Due Process; stating that a prosecutor's discretion must not be controlled "by the courts or by an interested individual") (citation and quotation marks omitted); *State ex rel. Koppers Co. v. Int'l Union*, 298 S.E.2d 827, 831–32 (W.Va. 1982) (citing cases condemning the "appearances of impropriety and of inherent conflicts of interest" that arise when prosecutors have a financial interest in the prosecution); *Cantrell v. Commonwealth*, 329 S.E.2d 22, 26–27 (Va. 1985) ("[T]he position of a private prosecutor having a civil interest in the case so infects the prosecution with the possibility

20

that private vengeance has been substituted for impartial application of the criminal law, that prejudice to the defendant need not be shown.  A conflict of interest on the part of the prosecution in itself constitutes a denial of a defendant's due process rights [under the Virginia Constitution], and cannot be held harmless error."); *People v. Zimmer*, 414 N.E.2d 705, 707–8 (Ct. App. N.Y. 1980) (explaining the due process problem of a prosecutor with a conflict of interest); *id.* at 707 ("[T]he judgmental nature of much of the District Attorney's conduct will put it beyond effective appellate review.  And, no matter how firmly and conscientiously a District Attorney may steel himself against the intrusion of a competing and disqualifying interest, he never can be certain that he has succeeded in isolating himself from the inroads on his subconscious.").[36]

Thus, in both *Jerrico* and *Young*, the Court made clear that, although the standards of neutrality are "not necessarily . . . as stringent," *Young*, 481 U.S. at 807, for prosecutors and enforcement actors as for those performing judicial functions (who must avoid even the appearance of an indirect conflict), *id.*; *Jerrico*, 446 U.S. at 243, the direct financial conflict of interest of an agent with power over enforcement and investigative decisions that affect fundamental liberty are intolerable in our system of justice:

> That state official has the power to employ the full machinery of the state in scrutinizing any given individual.  Even if a defendant is ultimately acquitted, forced immersion in criminal investigation and adjudication is a wrenching disruption of everyday life.  For this reason, we must have assurance that those who would wield this power *will be guided solely by their sense of public responsibility for the attainment of justice.*

---

[36] *See also Baca v. Padilla*, 190 P. 730, 732 (N.M. 1920) ("To permit and sanction the appearance on behalf of the state of a private prosecutor, vitally interested personally in securing the conviction of the accused, not for the purpose of upholding the laws of the state, but in order that the private purse of the prosecutor may be fattened, is abhorrent to the sense of justice and would not, we believe, be tolerated by any court."); *Merck Sharp & Dohme Corp. v. Conway*, 861 F. Supp. 2d 802, 812 (E.D. Ky. 2012) ("[T]here are certain circumstances under which a prosecutor's financial interest in the outcome of a case will violate the defendant's right to due process," including where prosecutors are compensated based on the outcome of cases).

*Young*, 481 U.S. at 814 (emphasis added); *id.* at 812 (plurality opinion of Brennan, J.) ("[A]ppointment of an interested prosecutor creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general."); *id.* at 811 ("[W]e cannot have confidence in a proceeding in which this officer plays the critical role of preparing and presenting the case for the defendant's guilt.").  Simply put, these cases have enshrined the basic wisdom that government officials seeking to enforce the law should not have a financial interest in the outcome of the enforcement proceedings in which they participate.

### iii.    Probation Officers Have A Special Obligation To Be Neutral

The Supreme Court has recognized the need for probation officers to be neutral.   In *Gagnon*, 411 U.S. 778, the Court explained:

> While the parole or probation officer recognizes his double duty to the welfare of his clients and to the safety of the general community, *by and large concern for the client dominates his professional attitude*. The parole agent ordinarily defines his role as representing his client's best interests as long as these do not constitute a threat to public safety.

> Because the probation or parole officer's function is not so much to compel conformance to a strict code of behavior as to supervise a course of rehabilitation, he has been *entrusted traditionally with broad discretion to judge the progress of rehabilitation in individual cases, and has been armed with the power to recommend or even to declare revocation*.

*Id*. at 783-84 (emphases added) (citation and quotation marks omitted).

Courts have long relied on the neutral role of probation officers in approving their exercise of discretionary and often unreviewable supervisory and enforcement powers.   In *Griffin v. Wisconsin*, 483 U.S. 868, 879 (1987), the Supreme Court relied on the special character of the neutral probation officer's supervisory role to allow home searches of probationers based on less than probable cause.   The Court held that a warrant from a judge was not needed, explaining that "the search decision should be left to the expertise of probation authorities rather

than a magistrate" because "there is an ongoing supervisory relationship — and one that is not, or at least not entirely, adversarial — between the object of the search and the decisionmaker." *Id.* at 879 & n.6.[37]   The Court would never have approved this practice if the probation officer were not neutral and could, for example, use the threat of a search to coerce additional payments from a probationer, or if the officer were paid to perform more searches as in *Connally*.   In *Williams v. People of State of N.Y.*, 337 U.S. 241 (1949), the Court discussed the importance of the role of the "modern" probation officer as a neutral information gatherer and explained that the role is "given a high value by conscientious judges who want to sentence persons on the best available information rather than on guesswork and inadequate information." *Id.* at 249.   The concept of a probation officer rests on the belief that the officer does not have a financial interest in the decisions the officer makes.   *Gagnon,* 411 U.S. at 783–84 (explaining that a probation officer's loyalties lie with "the welfare of his clients and [] the safety of the general community").   As neutral officials, acting neither as "agent[s]" for prosecutors, *United States v. Tyler*, 281 F.3d 84, 98 (3d Cir. 2002), nor as "trained advocate[s]" for a probationer, *Fare v. Michael C*, 442 U.S. 707, 719 (1979), probation officers must be beholden only to justice.

Lower federal courts have followed the Court's analysis in *Gagnon*, *Griffin*, and *Williams*, approving probation officers' close relationship to judicial proceedings and vital (and often unreviewable) supervisory and investigative functions only because a pillar of any probation system is that probation officers are "unbiased operators" who perform their functions "in a neutral manner."   *United States v. Espalin*, 350 F.3d 488, 493–94 (6th Cir. 2003) (discussing the probation officer's "obligation to remain neutral"); *see also, e.g.*, *United States v. Robinson*, 2010 WL 1459382, at *10 (E.D.N.Y. Apr. 12, 2010) (noting that a supervising

---

[37] Every Rutherford County probation order similarly puts PCC, Inc. probationers on notice that the company and its employees can search their homes (as well as their "person, vehicle, or property") at will and "without a warrant," an extraordinary power for a private company with a financial stake in the proceedings. Exs. 2, 3, 16.

probation officer is "a neutral information gatherer for the Court"); *United States v. Maury*, 530 Fed. App'x 205, 208 (3d Cir. 2013) ("In general, a probation officer acts as a confidential adviser to the court and a neutral information gatherer with loyalties to no one but the court.") (citations and quotations omitted); *United States v. Story*, 716 F.2d 1088 (6th Cir. 1983); *United States v. Bernadine*, 237 F.3d 1279, 1283 (11th Cir. 2001); *United States v. Davis*, 151 F.3d 1304, 1306 (10th Cir. 1998).

In *Story*, the Sixth Circuit held that "it is not improper for the court to hold presentence conferences with the probation staff." *Id.* at 1090. That holding makes sense only if a probation officer has no financial incentive to omit or misrepresent facts during that private meeting. *See United States v. Johnson*, 935 F.2d 47, 51 (4th Cir. 1991) ("We will not presume that a probation officer will act improperly."). If, however, a probationer officer has an incentive to present false or incomplete information about a probationer's rehabilitative progress (for example in searching for a job), to provide unreliable evidence on the probationer's ability to pay, or to present inaccurate information about a probationer's drug use, then the private, *ex parte* meetings and recommendations become a constitutionally intolerable opportunity for abuse.

To take another example, in *Warner v. Orange Cty. Dep't of Prob.*, 115 F.3d 1068 (2d Cir. 1996), the Second Circuit explained that, because a probation officer is "a neutral adviser to the court," it is "neither abnormal nor unforeseen" that the court would adopt the probation officer's recommendation of a therapy provider without conducting an independent investigation to determine the provider's qualifications. *Id.* at 1072 (citation and quotation marks omitted). Due process permits this role only on the assumption that the probation officer does not make money off of recommending a specific therapy provider. *See also id.* at 1072-73 (citing Sharon Bunzel, Note, *The Probation Officer and the Federal Sentencing Guidelines: Strange*

24

*Philosophical Bedfellows*, 104 Yale L.J. 933, 945 (1995) (describing the probation officer as "a trustworthy player in the system" who has "allegiances to no one but the court")).[38]

The liberty interests at stake in the probation context underscore the importance of neutrality. *Gagnon*, 411 U.S. at 782 (holding the "loss of liberty" resulting from the revocation of parole or probation "is a serious deprivation requiring . . . due process") (discussing *Morrissey v. Brewer*, 408 U.S. 471 (1972)). At every step of the process, probation officers wield significant discretion, often unsupervised, over decisions that affect whether and for how long a person goes to jail and other fundamental rights:

- Probation officers first recommend the initial conditions of supervision.[39]
- In everyday supervision, the probation officer is responsible for explaining the conditions of a person's probation, describing the law applicable to those conditions, and helping the person comply with or modify those conditions as necessary.[40]
- Probation officers then determine whether and how to require reporting and how much to charge in monthly or weekly payments.
- Probation officers decide what methods of investigation to employ, such as home searches, physical or medical testing, production and inspection of documents, or verbal questioning.

---

[38] *See also, e.g., United States v. Johnson*, 935 F.2d 47, 49-50 (4th Cir. 1991) (discussing presentencing procedures and stating that the probation officer is "a neutral, information-gathering agent of the court, not an agent of the prosecution"; approving *ex parte* presentence conference between probation officer and judge because rights of confrontation and counsel are not violated given the neutrality of the probation officer); *United States v. Rogers*, 921 F.2d 975, 979 (10th Cir. 1990) ("The probation officer acts as an agent of the court for the purpose of gathering and classifying information and informing the court in the exercise of its sentencing responsibility."); *Brown v. Butler*, 811 F.2d 938, 941 (5th Cir. 1987) (discussing the probation officer's role in gathering information on which the court will rely and stating that a probation officer is "an arm of the court charged with assisting the court in arriving at a fair sentence"); *United States v. Kone*, 591 F. Supp. 2d 593, 607 (S.D.N.Y. 2008) (stating that probation officers are "neutral officers of the *court*" and "are more trusted [than police officers] to provide accurate information and to make accurate assessments of what the supervision requires"); *United States v. Stegman*, 295 F. Supp. 2d 542, 550 (D. Md. 2003) (stating that probation officers are "neutral agents for the courts"); *United States v. Dixon*, 187 F. Supp. 2d 601, 605 (S.D.W.Va. 2002) ("[T]he supervising probation officer [] must always be a neutral repository of information for the prosecutor and the defendant, and yet remain the confidential agent of the Court.").

[39] For example, PCC, Inc. and the County negotiated certain conditions, such as what fees will be required and whether nonpayment of the company's fees would be a violation of probation. Ex. 1.

[40] For example, many of Rutherford County's standard probation conditions are extraordinarily broad and vague, *see* Exs. 2, 3, 16, including the requirement to "work at a lawful occupation" and to "support my dependents," or even to avoid "enter[ing]" an establishment whose "prime" purpose is serving alcohol. *Id.* As one leading scholar of probation recently pointed out: "By framing the requirements in absolute terms, the jurisdictions provide the probation officer with wide latitude in deciding how to press for compliance." Fiona Dougherty, *Obey All Laws and Be Good: Probation and the Meaning of Recidivism*, 104 GEORGETOWN L.J. 291, 313 (2016).

25

- Probation officers decide when, why, and how to petition for revocation. Officers must make experienced judgments about whether to work with someone to help bring them into compliance or whether to seek revocation after each late arrival to a scheduled meeting or each missed payment or other technical violation. The probation officer therefore plays the central role in deciding which violations are "material," Ex. 1 at 7, and should trigger enforcement proceedings (such as missing one meeting or missing three meetings, a payment that is 30 days late as opposed to 45 days late, forgetting to inform the officer about a change of address, etc.). Given probation officers' power to make these types of unreviewable discretionary decisions, after conducting the most extensive available legal study of modern high-volume probation practices, one scholar concluded: "Even more than the prosecutor, the probation officer is a hidden and unaccountable lawmaker." Dougherty, 104 GEORGETOWN L.J. at 346.[41]
- Probation officers submit sworn declarations to judicial officers asserting that a violation of probation has been committed.
- Probation officers consult privately with the judge concerning the amount of money bond to be placed on a warrant based on the probation officer's discretion and testimony concerning their history with the supervisee.[42]
- At revocation hearings initiated by the probation officer, the probation officer may be the main witness testifying on disputed issues of compliance. If there is a factual dispute about whether the person missed a payment or failed to report, the neutral probation officer must offer testimony under oath in order to establish a violation. The probation officer's testimony can be the single crucial factor in the legal proceeding determining whether a technical violation has occurred by a preponderance of the evidence.
- After revocation, the probation officer is consulted on the recommended sanction — i.e., should this person be jailed, terminated and let go, or put back on probation for an extended period? At this juncture, as contemplated by the Contract, the court inquires of the probation officer the probation officer's thoughts and observations about the character, effort, and future prospects of the probationer.

Grafting financial incentives onto this framework corrupts the entire probation process by negating the trustworthiness of the officer in all that the officer does and says. The legitimacy of

---

[41] The standard conditions require only that the person report to the probation officer "as instructed." Exs. 2, 3, 16. Therefore, a violation concerning "failure to report" could be wholly dependent on a reporting schedule itself devised by the probation officer as well as the probation officer's policies on when to move for revocation based on conduct purportedly in violation of that policy. As Dougherty explains, these conditions "give the officers the power to decide how often, if at all, the person must report in person or by some other means, such as by phone or by mail. Thus, although the fact of surveillance is imposed as a standard condition, the intensity of the surveillance mechanism is left to the discretion of the probation department." 104 GEORGETOWN L.J. at 316.

[42] Doc. 70 at 75–76 (Judge McFarlin testifying that probation officers used to write in bond amounts themselves and that probation officers now meet privately with him to recommend a bond amount).

a probation system demands that the probation officer exercise judgment to perform a host of discretionary, often unreviewable duties with scrupulous adherence to neutrality. If the officer is not neutral, then probation is converted into a tool for a private actor to generate personal gain.

**B.    The Defendants' User-Funded For-Profit Arrangement Violates Due Process Because It Requires the Use of a Probation Officer with Conflicting Loyalties to Money and Justice**

**i.    PCC, Inc.'s For-Profit "User Funded" Incentive System Violates the Neutrality Required by *Tumey*, *Ward*, and *Jerrico***

The "user funded" for-profit incentives enshrined in the Contract violate both the *Tumey-Ward* test for neutrality in executing judicial and quasi-judicial functions — which encompasses even perceived and indirect institutional conflicts — and the less stringent *Jerrico-Young* neutrality requirement for government enforcement actors — which focuses on the existence of an actual financial conflict that creates a "realistic possibility" of impacting enforcement decisions.

For some probation functions, government-employed probation officers have been deemed so intimately connected to the judicial process that they are entitled to quasi-judicial immunity. Doc. 75 at 1-13; *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994) ("Quasi-judicial immunity extends to those persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune."). If probation officers perform some functions (such as making confidential recommendations to the judge) so intimately related to the judicial process that they are entitled to absolute quasi-judicial immunity for those functions, as PCC, Inc. itself argues in this case, then it follows that the corresponding neutrality requirement applies to those "arms of the judge" performing quasi-judicial actions. Doc. 62 at 1–6 (PCC, Inc. arguing that it is so connected to the judge that it deserves judicial immunity); *see also, e.g.*, Ex. 1 at 7 (setting forth one of PCC, Inc.'s functions

as an advisor to the judge); Doc. 70 at 75–76 (Judge McFarlin explaining PCC, Inc.'s role to advise the judge *ex parte* on the amount of money bail to set in individual cases). PCC, Inc. cannot reasonably argue that it is so connected to the judge as to deserve absolute judicial immunity but that it somehow need not fulfill the due process requirement applicable to judges to be free from financial conflicts of interest.

Like all private corporations, PCC, Inc. performs all of its functions with the aim of making a financial profit. When PCC, Inc. employees exercise the power to petition to modify or revoke probation or otherwise initiate enforcement proceedings, to give binding instructions to supervisees, to determine payments and reporting schedules, to advise and assist probationers in their rehabilitation, to investigate probationers, to search probationers, to seek arrest warrants, to testify under oath, to collect and provide evidence, to privately consult with prosecutors and judges, and to recommend sentences, the Company's goal is to generate money. It is a blackletter principle of corporate law that those who direct and manage PCC, Inc. have a fiduciary duty to investors to maximize profits, *not* the public good. *See, e.g.*, *Summers v. Cherokee Children & Family Servs., Inc*., 112 S.W.3d 486, 504 (Tenn. Ct. App. 2002) ("The officers and directors of a for profit corporation are to be guided by their duty to maximize long term profit for the benefit of the corporation and the shareholders."); *Dodge v. Ford Motor Co*., 170 N.W. 668, 684 (Mich. 1919) ("A business corporation is organized and carried on primarily for the profit of the stockholders. The powers of the directors are to be employed for that end. The discretion of directors is to be exercised in the choice of means to attain that end, and does not extend to a change in the end itself, to the reduction of profits, or to the nondistribution of profits among stockholders in order to devote them to other purposes."). As the Sixth Circuit has observed, the goal of any private company is to earn profit. *McKnight v. Rees*, 88 F.3d 417, 424

(6th Cir. 1996) (rejecting qualified immunity for private prison guards because private companies "act[] for the good of the pocketbook"), *aff'd*, 521 U.S. 399 (1997). No reasonable observer could believe that the Company is guided solely by a commitment to "serve the public interest," *Jerrico*, 446 U.S. at 249, when it decides how to supervise probationers.

This profit goal not only "shape[s]," *Young*, 481 U.S. at 806, the negotiated Contract, but it is present every time the Company makes any case-related decision involving any of its "users." *Id.* at 812–13, 814 (plurality opinion of Brennan, J.) ("Appointment of an interested prosecutor is also an error whose effects are pervasive. . . . A prosecution contains a myriad of occasions for the exercise of discretion, each of which goes to *shape* the record in a case, but few of which are *part* of the record."; explaining that "harmless-error analysis is inappropriate in reviewing the appointment of an interested prosecutor" "[g]iven the fundamental and pervasive effects of such an appointment"). It is impossible to isolate, measure, or appeal any one of these decisions within each function — it is a defect in the structure of the incentives.

Rutherford County's arrangement is thus problematic in every way identified by *Jerrico* regarding the neutrality of law enforcement actors. One hundred percent of all revenue (i.e., the *entire* budget plus any proceeds) of the County's private municipal probation entity now comes directly from the probation entity's own enforcement decisions. *Cf. Jerrico*, 446 U.S. at 250 (holding that amounts totaling less than 1% of the budget and unconnected with actual enforcement decisions were too "remote"). PCC, Inc.'s decisions in each case determine every dollar of profit that it makes. All of the Court's "serious constitutional questions," *id.*, (and several more) are realized by Defendants' novel, for-profit, "user-based" probation officer incentive arrangement. Every extra dollar that PCC, Inc. is able to collect in fees from its probationers (from every extra month for which it can extend a person's probation, or every extra

drug test that it orders, to every indigency waiver that it withholds or denies) goes directly to the Company.  This incentive arrangement raises far more than "a realistic possibility," *id.*, that financial interests will shape enforcement decisions: it all but guarantees it.

Even more starkly, *Jerrico*'s due process analysis examined the more nebulous consideration of whether there was an "institutional," *id.*, budgetary incentive because the enforcement actor in *Jerrico* did not profit directly from the way it handled its cases.  Here, though, the central feature of Defendants' contract is the *direct personal financial interest of the County's probation officer*.  The money goes to the probation officer, not merely to a government budget that the probation officer is responsible for managing.  Thus, the situation is more like *Tumey* than *Ward* or *Jerrico*.  The Contract *requires* the local court to order that the Company make money in each case and to impose "sanctions" on probationers who are not paying the Company its fees.  Ex. 1 at 8.  As recently explained in an analysis of the issue by the editorial board of the *Harvard Law Review*, "When a private probation company decides which violations to enforce based on financial motives, 'a direct, personal, substantial, pecuniary interest' is the whole reason the arrangement exists."[43]  *See Developments in the Law*, 128 HARV. L. REV. 1723, (2015) (quoting *Ward*, 409 U.S. at 60, and *Tumey*, 273 U.S. at 523).  "In [the traditional] arrangement, probation officers are usually court employees, so their conduct is both protected and governed by the principles that apply to other judicial officers.  But a business whose only work is to extract fees from probationers is simply a debt collector backed by carceral power."  *Id.* at 1729; *see also id.* at 1730, 1737–39 (explaining the due process problems with the "user funded" self-interested probation officer).  The Company is therefore like the official in *Connally,* in which the Supreme Court condemned the due process violation inherent

---

[43] Rutherford County's Mayor recently acknowledged that the company "ha[s] to have a profit motive, or they wouldn't be in place."  *See* Sam Stockard, *PCC done at the end of March* (Feb. 13, 2016), http://www.murfreesboropost.com/pcc-done-at-the-end-of-march--cms-43756.

in paying a magistrate for issuing warrants, because "his financial welfare, therefore is enhanced by positive action and is not enhanced by negative action." 429 U.S. at 250.

The point of the Contract is to give a private company an incentive to collect money so that the County can collect more of its court debts.[44] Because the Contract mandates that the only income PCC, Inc. can generate is the money that it can extract from its probationers, the Contract requires a system in which the financial interests of the probation officer are opposed to the liberty interests of probationers at every turn. This runs counter not only to the requirement of a neutral probation officer but to the very purpose of probation under Tennessee law, *State v. Robinson*, 139 S.W.3d 661, 666 (Tenn. Ct. Crim. App. 2004) (citing *State v. Burdin*, 924 S.W.2d 82, 85 (Tenn. 1996)) ("The primary purpose of a sentence of probation is the rehabilitation of the defendant."),[45] and poses an intolerable threat to the integrity of the justice system.

The case is thus even stronger than in *Jerrico* or *Young* for an additional reason. As *Griffin* and *Gagnon* make clear, even when exercising their discretion in their non-judicial investigatory and supervisory roles, probation officers are not supposed to be the zealous "adversaries" that prosecutors are. *Compare Griffin*, 483 U.S. at 879 & n.6, *with Young,* 481 U.S. at 811; *see also Johnson*, 935 F.2d at 50 (stating that a probation officer is "neutral" and

---

[44] Sam Stockard, *Local attorneys weigh in on allegations against PCC*, Murfreesboro Post (Oct. 13, 2015), http://www.murfreesboropost.com/local-attorneys-weigh-in-on-allegations-against-pcc-cms-43047; Michelle Willard, *Probation violations help fill county jail* (Oct. 2, 2015), http://www.dnj.com/story/news/crime/2014/10/18/probation-violations-help-fill-county-jail/17522985/. Defendants' scheme is an effort to collect unpaid debts by using a "probation system" instead of well-established mechanisms for collecting civil judgments. The Contract even purports to change the nature of the local judicial process itself, requiring the County courts to implement "sanctions," to fully "order and enforce" the company's fees, and to require that nonpayment of probation fees be made a violation of probation. Ex. 1 at 8–9.

[45] *Stiller v. State*, 516 S.W.2d 617, 620 (Tenn. 1974) ("The entire theory of probation is that it is in the public interest that those who violate society's rules of conduct should, in proper cases, be given an opportunity to rehabilitate themselves and to be restored to useful and productive citizenship. More and more our society is coming to realize that 'warehousing' criminals on an indiscriminate basis is financially, socially and morally unacceptable."); *see also Gagnon*, 411 U.S. at 785 ("Revocation . . . is, if anything, commonly treated as a failure of supervision. While presumably it would be inappropriate for a field agent *never* to revoke, the whole thrust of the probation-parole movement is to keep men in the community, working with adjustment problems there, and using revocation only as a last resort when treatment has failed or is about to fail.") (emphasis in original).

31

"not an agent of the prosecution").  Impartial probation officers are not charged with the same adversarial role as the civil officials in *Jerrico* or the criminal prosecutor in *Young* because their underlying purpose is supposed to be neutral and rehabilitative.  *Burdin*, 924 S.W.2d at 85.

### ii.    PCC, Inc.'s Lack of Neutrality Risks Serious Violations of Liberty

All of these neutrality principles are further strengthened by the fundamental interests at stake in Rutherford County.  Even as *Jerrico* warned of serious constitutional concerns with financial conflicts of interest because of the burdens that enforcement decisions place on a defendant, only civil regulatory penalties were at stake in that case.  Here, fundamental liberty is at stake, and the probation revocation decisions of PCC, Inc. result in people going to jail.[46]  Any person arrested pursuant to a decision by PCC, Inc. to seek revocation and held on a secured money bond she cannot afford is assigned a court date 30 to 60 days from booking.  Doc. 70 at 78.  Probationers held on money bond typically spend ten days in jail before even seeing a judge, who comes to the jail to conduct a jailhouse "ten-day hearing."  Doc. 70 at 87–88.  There are no defense attorneys at these hearings, so if a person wishes to confront the self-interested probation officer in open court about the allegation or seek the advice of counsel, she must wait in jail, typically for the already-assigned court date that could be two months away.  *Id.*

The consequences of PCC, Inc.'s actions are significant.  The County has common jail punishments depending on whether the person was convicted of a first, second, or third violation.  First-time misdemeanor probation violators "just need a taste," and are typically sentenced to "7 days to 30 days" in jail.  Doc. 70 at 78.  On a second PCC, Inc. violation, the "starting point" is between 60 and 90 days.  For the third violation alleged by PCC, Inc., "we're feeling we don't

---

[46] *E.g.*, Ex. 9 (letter demanding payment of supervision fees and stating that "[i]f you can not comply with the rules and terms of probation, you will be advised by the courts to serve your sentence. . . ."); Ex. 10 (letter demanding payment of $623.01 within five weeks and stating, "If your financial obligation is not met by the date mentioned above, you will leave me no choice but to have a warrant for your arrest issued.").

know what else to do, their chances of probation just really aren't that good, so their starting point is to serve your sentence," which for most people is 11 months and 29 days. Doc. 70 at 78–79. Thus, when a prosecutor and PCC, Inc. offer an individual who has languished in jail for 10 days the opportunity to be released and placed back on extended "user funded" probation, a reasonable person might take that offer rather than waiting another month to contest the alleged violation.[47] The system is, too put it mildly, coercive.[48]

The imbalance of power in these jailhouse meetings creates additional opportunities for PCC, Inc. to maximize its profits at the expense of justice. It incentivizes the Company to impose onerous reporting conditions or to create violations through drug testing or by charging fees for classes that will result in arrest warrants with money bonds attached, leading to the person's arrest and lengthy detention. The Company can then use the person's confinement to negotiate an extension of her probation term, ensuring more fees for the Company (including the warrant fee that is added for every PCC, Inc. revocation warrant).[49] Even at the eventual hearing, if one occurs, if the testimony of PCC, Inc. is believed on disputed issues of fact, and revocation is imposed, the person can be sent back to jail or placed on an extended periods of supervised probation in which other basic liberties are diminished by the standard conditions.

---

[47] The vast majority of probation revocations in Rutherford County are purported to be "agreed-to," meaning that the probationer pleaded guilty to the violation, and there was never a hearing of any kind. Many of these pleas take place in jail, while probationers are held on money bonds they cannot afford. Doc. 70 at 88 (Judge McFarlin discussing the jailhouse hearings and stating, "There's a DA there. Many times . . . they go ahead and work it out right there."). PCC, Inc. has a financial incentive to advise probationers that, if they contest the alleged violation and the judge finds them guilty, the judge could impose the full "11/29" jail sentence, and that the probationer would be better off taking minimal or no jail time and agreeing to an extension of probation.

[48] As Justice Brennan explained, neutrality attains heightened importance when "liberty itself" is at stake. *Young*, 481 U.S. at 810 (plurality opinion of Brennan, J.) ("It is a fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion, for liberty itself may be at stake in such matters. We have always been sensitive to the possibility that important actors in the criminal justice system may be influenced by factors that threaten to compromise the performance of their duty.")

[49] After a warrant has been obtained by PCC, Inc., a "warrant fee" is added to the probationer's balance. *E.g.*, Ex. 24 (documents showing extra charges for warrant fees).

### iii. Probation Officers with a Financial Conflict of Interest Undermine the Public's Confidence in the Justice System

It is the task of our legal system to be guided by justice, not money. The Due Process Clause demands that our courts be one place in which money does not "make the world go round." Doc. 70 at 101. As United States Attorney General Loretta Lynch explained in a speech at the White House two weeks before this Court issued its preliminary injunction, the kind of for-profit "user funded" probation model operated by Defendants is antithetical to this country's ideal of a fundamentally fair justice system:

> And many of these companies will supervise individuals who can't afford to immediately pay the final amount of their fines and fees. You might say, a laudable goal: private industry stepping in to relieve a burden on a challenged government agency. But what happens is, those who can't pay those fees and fines get charged additional probation fees on top of them. Only the people who can't pay are put on this type of probation. And people who can afford to pay walk out of court without any supervision. That is not probation; that's Wal-Mart: money talks and people walk? That is not our criminal justice system. It's not the one we wrote over 200 years ago. It's not the one that we fought for in the years since then. It's not the one that those of us who work in the system today intend to see go forward.[50]

On March 14, 2016, the Department of Justice issued a letter to every State Supreme Court Chief Justice condemning for-profit probation: "The appointment of a private probation company with a pecuniary interest in the outcome of its cases raises similarly fundamental concerns about fairness and due process."[51] The public perception of our judicial system's fairness and neutrality is central to the due process inquiry because it "preserves both the appearance and reality of fairness, 'generating the feeling, so important to a popular government, that justice has been done.'" *Jerrico*, 446 U.S. at 242 (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S.

---

[50] Attorney General Loretta E. Lynch Delivers Remarks at White House Convening on Incarceration and Poverty, Dec. 3, 2015, available at, https://www.justice.gov/opa/speech/attorney-general-loretta-e-lynch-delivers-remarks-white-house-convening-incarceration-and.

[51] Letter from Vanita Gupta, Principal Deputy Assistant Attorney General Civil Rights Division, and Lisa Foster, Director, Office for Access to Justice, to all state chief justices and state court administrators, Mar. 14, 2016, available at https://www.justice.gov/crt/file/832461/download.

123, 172 (1951)).  No reasonable observer of Defendants' incentive arrangement could conclude that it assures justice.  *The County's own sheriff* describes it as a "ratwheel," Doc. 57 at 1–2, and this Court observed that it allows PCC, Inc. to make huge profits while "trap[ing] probationers in a pernicious cycle for years on end."  Doc. 68 at 5.

The incentives that pervade Defendants' probation system further undermine the public's confidence in an impartial judicial system because experience has shown that the appearance of financial conflicts in the for-profit probation context reflects actual conflicts.  Examples from elsewhere in Tennessee and from other states prove the Supreme Court's common sense assumption that proceedings shaped by a financially interested actor "cannot provide [the] assurance" that state "power will be guided solely by [the] sense of public responsibility for the attainment of justice."  *Young*, 481 U.S. at 814.  For example, in Carter County, Tennessee, where a different for-profit company operates a similar user-funded system, a County General Sessions Judge stated: "We're the cash cow (court system), the one that brings the money in.  And if that were to stop, the only place they're going to have to go is with property taxes.  And [the probation company] is the one that enforces the payment.  They encourage it, because they're not going to get off probation unless they have paid everything."[52]

In Georgia and Alabama, it emerged publicly in recent years that for-profit companies with similar "user funded" contracts had been illegally extending probationers on "pay only" probation for years even though state law limited probation periods.[53]  The largest for-profit

---

[52] Kylie McGivern, *Poor probationers in debt too deep; penalties pile on* (Aug. 18, 2015), available at http://wjhl.com/2014/07/21/poor-probationers-in-debt-too-deep-penalties-pile-on/.

[53] Human Rights Watch, *Profiting from Probation, America's "Offender-Funded" Probation Industry* (2014), available at https://www.hrw.org/report/2014/02/05/profiting-probation/americas-offender-funded-probation-industry#7175ed; Ga. Code Ann. § 42-8-34(c) (setting forth maximum probation terms ignored by private probation companies); Ala. Code § 15-22-54(a) ("[I]n no case shall the maximum probation period of a defendant guilty of a misdemeanor exceed two years. . . ."); *see also* Sarah Hoye, *Pay Up Or Pay Time: Alabama's Private Probation Industry*, Aug. 12, 2014, available at http://america.aljazeera.com/watch/shows/america-tonight/articles/2014/8/12/alabama-private-probation.html; Georgia Office of Audits and Accounts, *Private*

probation company in the United States was caught offering a "March Madness" cash bonus to its employees for those who could bring in the most money from probationers in a competition for cash collections.[54] After lawsuits uncovering constitutional and statutory violations, racketeering, and fraud were filed in Alabama against the cities of Childersburg,[55] Clanton,[56] and Montgomery,[57] each city ended for-profit "user funded" probation. Similarly, a state Circuit Court shut down the municipal court of Harpersville, Alabama, after similar debt-collection practices involving "user funded" for-profit probation contract came to light. *See Burdette v. Town of Harpersville*, et al., 2010-cv-900183 at *1 (Shelby Co. Cir. Ct. July 11, 2012).[58] Confronted with some of the same contractual practices that exist in Murfreesboro, the Circuit Court concluded that the City and the company were operating what amounted to a "judicially sanctioned extortion racket" and violating "almost every safeguard afforded by the United States Constitution." *Id.* at *1-2. As of late 2015, every one of the more than 100 municipalities in

Probation Operations (2014), available at http://chronicle.augusta.com/images/2014/auditMisdemeanorProbation.pdf.

Numerous cases in Georgia have exposed egregious, profit-seeking behavior of for-profit probation companies based on these incentives. In the most recent example, on February 26, 2016, a Georgia jury issued $175,000 verdict in a single-plaintiff case alleging false imprisonment against the largest for-profit probation provider in Georgia, who repeatedly jailed a woman when she could not pay its fees (but not when she tested positive for drugs). Terry Carter, *Jury awards $175K in false imprisonment case against private probation company* (Feb. 29, 2016), available at http://www.abajournal.com/news/article/jury_awards_175k_in_false_imprisonment_case_against_private_probation_compa/?utm_source=maestro&utm_medium=email&utm_campaign=weekly_email.

[54] Carimah Townes, *Georgia Company's March Madness Tournament Drained Probationers' Pockets* (Mar. 9, 2016), available at http://thinkprogress.org/justice/2016/03/09/3758132/georgia-march-madness-scheme/.

[55] *Ray v. Judicial Corr. Servs.*, 2013 WL 5428360 (N.D. Ala. Sept. 26, 2013).

[56] *Reynolds et al. v. Judicial Corr. Servs.*, Inc., 2:15-cv-00161; https://www.splcenter.org/seeking-justice/case-docket/roxanne-reynolds-et-al-v-judicial-correction-services-inc-et-al.

[57] *Mitchell et al. v. City of Montgomery*, 2014 WL 11099432, at *2 (M.D. Ala. 2014).

[58] Available at http://www.clearinghouse.net/chDocs/public/CJ-AL-0005-0001.pdf. *See also* video of the Honorable Hub Harrington, who presided over the Shelby County case, speaking at a recent conference convened by the White House, discussing a private probation racket in Alabama, https://www.youtube.com/watch?v=0XUWdvwAzR0 ("Everybody knows that they're breaking the law. They're still doing it because they want the money. We're only solving them one case at a time. Nobody's lost one yet [be]cause it's so egregious. . . . They're getting away with it. There is no individual culpability, responsibility. . . . The insurance companies are . . . writing a check. . . . I can't tell you the egregious violations. . . . When you turn the courts into a profit center, this is what you get.").

Alabama that had contracts with the private probation company Judicial Corrections Services, Inc. had canceled its contract and ended its experiment with the "user funded" model.[59]

It is important to note that the issue in this case is not whether using a private probation company is illegal *per se*. Plaintiffs are not challenging the concept of privatized probation generally. It might be possible for a County to contract with a company to provide probation supervision without giving the company a financial interest in each individual case and without enshrining a "user funded" payment mechanism in which the probation officer depends on the outcome of each case and on each supervision-related decision for its profit. The problem here is with the specific terms of the Contract that the County's Mayor negotiated with PCC, Inc.

That Contract ensures not a neutral agent standing in for a state-employed probation officer, but a self-interested decision-maker with a personal financial interest in every decision in every case. Rather than ensuring that probation officers are neutral "arms of the court," the County and the Company chose to create a "user funded" model. Unlike other government contracts, in which a private entity is hired to house all prisoners or bids to handle all of a county's probation services for a fixed sum not tied to any individual's case, in this model, PCC, Inc. depends *directly on what happens to each probationer that it supervises* to make a profit. Furthermore, unlike a classic debt-collection arrangement in which a county contracts with collection agencies to go after old court debts, providing collection agents with percentages of the money that they bring in or permitting those agencies to buy the debts at a reduced price, the Contract creates an arrangement in which the debt-collector itself, financial incentives included, takes over critical law enforcement, investigative, prosecutorial, and judicial functions. This

---

[59] Kent Faulk, *Private probation once called "judicially sanctioned extortion racket" leaving Alabama* (Oct. 19, 2015), http://www.al.com/news/birmingham/index.ssf/2015/10/judicial_correction_services_i.html.

arrangement cannot be squared with the way American courts operate.  Paying a probation officer based on the outcome of cases has no place in a fair and impartial judicial system.

This Court should hold that the solemn power to send someone to jail may not rest with an entity that has a financial incentive to exercise it, and that a "user-funded" for-profit probation officer who has that incentive offends the neutrality requirement of the Due Process Clause.

Respectfully submitted,

*/s/ Alec Karakatsanis*
Alec Karakatsanis (D.C. #999294) (admitted *Pro Hac Vice*)
Phil Telfeyan (Cal. #258270) (admitted *Pro Hac Vice*)
Elizabeth Rossi (admitted *Pro Hac Vice*)
Equal Justice Under Law
601 Pennsylvania Avenue NW
South Building, Suite 900
Washington, DC 20004
Telephone: (202) 670-1004
alec@equaljusticeunderlaw.org
ptelfeyan@equaljusticeunderlaw.org
erossi@equaljusticeunderlaw.org

*/s/ Claire V. Thomas*
Claire V. Thomas, BPR No. 30598
Lewis, Thomason, King, Krieg & Waldrop, P.C.
424 Church Street, Suite 2500
P.O. Box 198615
Nashville, TN 37219
cthomas@lewisthomason.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of June, 2016, a true and correct copy of the foregoing was filed using the CM/ECF system which sent notice to counsel of record, listed below, who are registered with the CM/ECF system:

*Attorneys for Rutherford County*
James C. Cope
Josh A. McCreary
E.Evan Cope
Blake Allan Garner

Cope, Hudson, Reed & McCreary
16 Public Square N.
Mufreesboro, TN 37133
ecope@mborolaw.com
jcope@mborolaw.com
jmccreary@mborolaw.com
bgarner@mborolaw.com

*Attorneys for the PCC, Inc. Defendants*
Lisa S. Rivera
Kathryn H. Walker
David R. Esquivel
BASS, BERRY & SIMS PLC
150 Third Avenue South
Suite 2800
Nashville, TN 37201-3001
T: (615) 742-6200
F: (615) 742-2868
lrivera@bassberry.com
kwalker@bassberry.com
desquivel@bassberry.com

/s/ *Elizabeth Rossi*