## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| CINDY RODRIGUEZ, STEPHEN GIBBS, PAULA PULLUM, YOLANDA CARNEY, JACQUELINE BRINKLEY, CURTIS JOHNSON, FRED ROBINSON, et al. | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:15-CV-01048 |
| PROVIDENCE COMMUNITY CORRECTIONS, INC., | ) ) ) | (Class Action) |
| RUTHERFORD COUNTY, TENNESSEE, | ) ) | |
| JASMINE JACKSON, BRIANA WOODLEE, AMANDA ROBERTS, TIARA SMITH, KELLY HALEY, AMANDA SCHEXNAYDER, KAYLA BANKS, KELLY MCCALL, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## UNOPPOSED MOTION AND MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

Plaintiffs Cindy Rodriguez, Stephen Gibbs, Paula Pullum, Yolanda Carney, Jacqueline Brinkley, Curtis Johnson and Fred Robinson (collectively, "Named Plaintiffs"), by and through their counsel, respectfully submit this Unopposed Motion and Memorandum of Law in Support of their Unopposed Motion for Preliminary Approval of a Class Action Settlement. Plaintiffs incorporate all of the arguments made in Plaintiffs' previously filed motion and memorandum of law in support thereof (Dkt. 190). Plaintiffs believe the settlement, which was originally proposed by three mediators, is fair, adequate and reasonable as required under Federal Rule of Civil Procedure 23(e) for the following reasons.

- Based on projections prepared by the Parties from data provided by PCC, the Settlement Fund of $14.3 million is sufficient to compensate all Class Members for the full amount of the proposed settlement even if 100% of the Class Members submitted claims (with the Class bearing the costs for administration and Class counsel).

- Prior settlements have suggested that a realistic response rate for Class Members is around 20%. Thus, the Settlement Fund has more than sufficient funds to finance the entire damage award for the anticipated participating Class Members, as well as all administrative and legal costs, and it is very likely that participating Class Members will receive a multiple of their damage award.

- The compensation provided – full reimbursement of funds paid plus additional amounts for those having viable Section 1983 claims – is fair, adequate, and reasonable in the view of three mediators and the Parties, all of whom agreed upon the Settlement Amount.

After extensive negotiations, the Parties settled on the formula to be paid to the Class Members based on the following rationale. Certain Class Members only had viable RICO claims because their probation periods ended more than one year prior to the filing of the lawsuit (RICO has a four-year statute of limitations). Other Class Members had in addition to RICO claims, a viable Section 1983 claim (Section 1983 has a one-year statute of limitations). The Parties therefore agreed to the following formula:

- For Class Members who were on probation with PCC and have viable RICO claims (i.e., Class Members who were on supervised probation from October 1,

2011, which reflects the statute of limitations for RICO claims), payment of 125% of the fees they paid.

- For Class Members who were on probation with PCC and have viable Civil Rights claims (i.e., Class Members who were on supervised probation from October 1, 2014, which reflects the statute of limitations for Section 1983 claims), an additional $50 for each month the Class Member was on supervised probation with PCC.

- Class Members who were on probation with Rutherford County's Probation Department (a) for the sole purpose of paying court-imposed financial obligations, or (b) because they were unable to pay a court-imposed financial obligation that would have allowed them to be removed from probation, are also entitled to the same payments as described above for the same time period. At the present time the Parties believe that there are few if any such individuals.

The Parties settled on these amounts through extensive negotiations, input from three Mediators (each of whom recommended and proposed the final amount of the Settlement), and taking into account many different factors, including but not limited to the following: RICO claims provide for treble damages; Section 1983 claims provide for exemplary damages; Plaintiffs claimed to be entitled to these as well as other consequential damages, such as lost profits and business opportunities; the substantial litigation risk for both sides in pursuing this matter; the financial and other costs associated with pursuing the lawsuit; and the availability of insurance and indemnification claims.

The Settlement Fund is sufficient to make these payments. Settlement Fund amount is $14.3 million. The Parties estimate $1,381,115 to be paid for attorney's fees, less than $25,000

3

to be paid for out-of-pocket expenses incurred by Plaintiffs' counsel in the litigation, $10,000 to be paid for each Named Plaintiff for the time and effort they contributed to the lawsuit ($70,000 total), and $80,570 to be paid for settlement administrative fees, leaving $12,743,315 for the payments directly to the class members.

Estimating the amounts that may be payable to Class Members as a whole is complex due to the volume of probationers and the unique characteristics of each probationer (for example, some may have been on supervised probation for multiple offenses over different periods of time). PCC has a database of probationers that includes several fields of data. Based on a database query conducted on or about August 24, 2017, the following figures were obtained:

- 27,016 probationers were identified as on probation with PCC during the class period;

- The total fees collected for these individuals from October 1, 2011 to March 28, 2016 was $7,734,776.25; and

- For individuals who were on probation from October 1, 2014 to March 28, 2016 (and thus entitled to $50 per month), the total number of months for which these individuals were on probation during that time period was 79,835.

Using these estimates, the amount that would be paid under the Settlement Agreement would be approximately:  ($7,734,776.25*125%) + (79,835*$50) = $13,660,220.31, which is well within the Settlement Fund (assuming Class Members bore responsibility for administrative and legal fees).  We note, however, that the estimates may vary based on methodology for estimating the Class Members, but the variation will not risk leaving participating Class Members uncompensated because none of the Parties expect anywhere near 100% response rate.

4

As set forth below, the Parties believe a 20% response rate is more likely in light of other precedent in similar cases. This is what led the Parties to include the 5x multiplier in the event that there are excess funds in the Settlement Fund. Thus, the Parties believe the Settlement Fund is adequate to compensate the entire class and that the settlement is fair, adequate, and reasonable.

## I.    BACKGROUND OF LITIGATION

On October 1, 2015, Named Plaintiffs filed a putative class action complaint against Defendants Providence Community Corrections, Inc. ("PCC") and several of its employees (collectively, "PCC Defendants") and Rutherford County in the United States District Court for the Middle District of Tennessee. In this case (the "Litigation"), Named Plaintiffs purport to represent a class of persons who have at any time owed or who will incur debts to Rutherford County and/or PCC from fines, fees, costs, or surcharges arising from traffic and misdemeanor cases in the County courts and who have been or will be placed on probation with any public or private entity. Named Plaintiffs allege claims for, *inter alia*, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d), predicated on extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, the Travel Act, 18 U.S.C. § 1952, and Tennessee Code § 39-14-112; violations of due process and equal protection rights under the U.S. Constitution; violations of the Fourth Amendment to the U.S. Constitution; and abuse of process.

Named Plaintiffs and Class Counsel have conducted an extensive examination of the facts and documents relating to the Litigation, including, among other things, the following conduct prior to filing the Litigation: (a) conducting interviews of hundreds of probationers over the course of seven months; (b) demanding documents from Rutherford County and PCC in

writing and orally; (c) observing court proceedings; (d) reviewing court records; (e) reviewing records obtained through Tennessee open records requests; (f) reviewing PCC documents and recordings of PCC probation officers; and (g) representing probationers in probation proceedings. Since filing the Litigation, Named Plaintiffs and Class Counsel have continued to vigorously pursue this case, including by: (a) seeking and obtaining preliminary injunctive relief; (b) successfully defeating motions to dismiss; (c) producing 1,331 documents to Defendants; (d) reviewing 6,747 pages of documents produced by defendants; (e) filing a motion for partial summary judgment and seeking an expedited hearing date; (f) engaging in multiple days of in-person mediation over several months; (g) preparing and filing merits briefs in the Sixth Circuit; and (h) continuing to interview dozens of probationers by phone and in person during numerous trips to Rutherford County.

On May 23, 2016, the Court ordered the parties to engage in good-faith mediation over a 90-day period before mediator Carlos Gonzalez, which period the Court subsequently extended by mutual request of the parties. At the beginning of August 2016, the PCC Defendants, Rutherford County, and Named Plaintiffs engaged in multiple in-person and telephonic meetings with Mr. Gonzalez, followed by a two-day arm's-length mediation in Tennessee on August 8 and 9, 2016. On September 2, 2016, Named Plaintiffs and the PCC Defendants attended another in-person mediation session in Washington, D.C., in which Rutherford County participated telephonically. The parties also communicated and met with Mr. Gonzalez numerous times in separate meetings.

The mediation process initially resulted in a settlement in principle between Named Plaintiffs and the PCC Defendants. Rutherford County and Named Plaintiffs continued negotiations with the assistance of the mediator, and thereafter Named Plaintiffs reached an

agreement in principle with Rutherford County. Rutherford County and the PCC Defendants also reached an agreement in principle. Finally, all parties agreed to a complete resolution whose terms are reflected in the attached Settlement Agreement.

The parties have concluded that settlement is desirable in order to avoid the time, expense, and inherent uncertainties of litigation and to resolve finally and completely all pending and potential claims relating to the alleged conduct involved in this Litigation. The parties further believe that this Settlement Agreement offers significant benefits to Class Members and is fair, reasonable, adequate and in the best interest of all Class Members, defined as:

> All persons who, at any time from October 1, 2011 to October 5, 2017, (1) incurred court-imposed financial obligations arising from a traffic or misdemeanor case in Rutherford County General Sessions or Circuit Court; and (2) were supervised on probation in that case by PCC or Rutherford County's Probation Department.

## II. THE TERMS OF THE SETTLEMENT

In the interest of avoiding protracted and costly litigation, the parties have agreed to a proposed settlement with the following basic terms:

1. PCC has agreed to create and fund a Settlement Fund in the amount of $14,000,000.

2. PCC will pay $350,000 to Rutherford County, which will immediately deposit $300,000 of that money into the Settlement Fund, resulting in a Settlement Fund total (described in the Settlement Agreement as the "Settlement Fund Payment") of $14,300,000.

3. Rutherford County agrees to the entry of the proposed agreed injunction filed contemporaneously with this motion to resolve Plaintiffs' claims for prospective relief.

Payments out of the Settlement Fund will be allocated as follows:

1. First, costs for the Settlement Fund Administrator, and any other administrative expenses associated with the settlement, will be paid out of the Settlement Fund.

2. Second, after final approval and any appeals process is completed, the award of attorneys' fees and costs (the "Attorneys' Fee Award"), calculated using the hours and reasonable hourly rates described in the Settlement Agreement, and subject to court approval, shall be paid from the Settlement Fund.

3. Third, an additional $10,000 will be distributed to each of the Named Plaintiffs as incentive awards, subject to court approval.

4. Fourth, the following payments will be made to Settlement Class Members who submit a Valid Claim:

    a. Each Settlement Class Member whose probation ended prior to October 1, 2014, will be entitled to receive a Cash Award equal to 125% of the amount that he or she actually paid to PCC for PCC Fees beginning October 1, 2011, except that if any such Settlement Class Member paid PCC Fees to PCC prior to October 1, 2011 for an offense for which he or she continued to pay PCC Fees to PCC on or after October 1, 2011, the Cash Award will also include one hundred twenty-five percent (125%) of the amount that he or she actually paid to PCC for PCC Fees for such offenses before October 1, 2011.

    b. Each Settlement Class Member whose probation ended on or after October 1, 2014, will be entitled to receive a Cash Award equal to $50 for each month that he or she was on probation with PCC after October 1, 2014, plus 125% of the amount that he or she actually paid to PCC for PCC Fees

8

beginning October 1, 2011, except that if any such Settlement Class Member paid PCC Fees to PCC prior to October 1, 2011 for an offense for which he or she continued to pay PCC Fees to PCC on or after October 1, 2011, the Cash Award will also include one hundred twenty-five percent (125%) of the amount that he or she actually paid to PCC for PCC Fees for such offenses before October 1, 2011.

c.    Each Settlement Class Member who was on probation with Rutherford County's Probation Department in or after March 2016 and (a) was on supervised probation for the sole purpose of paying court-imposed financial obligations or (b) would have been removed from supervised probation but for the payment of a court-imposed financial obligation, will be entitled to receive a Cash Award equal to fifty dollars ($50) for each month that he or she was on supervised probation with Rutherford County's Probation Department in or after March 2016 through the Preliminary Approval Order, plus one hundred twenty-five percent (125%) of the amount that he or she actually paid to Rutherford County's Probation Department for probation fees from March 2016 through the Preliminary Approval Order. In determining the Cash Award under this section, the qualifications in subsections (a) and (b) shall be applied to each month during the period from March 2016 through the Preliminary Approval Order and to the probation fees paid to Rutherford County's Probation Department.

9

d.      If, however, the Cash Awards exceed the Available Cash Award Total, the Cash Awards to the Settlement Class Members who have submitted Valid Claims will be reduced on a *pro rata* basis until the Cash Awards equal the Available Cash Award Total.

5.      Fifth, if money remains in the Settlement Fund, it will be distributed as follows:

a.      The payment to each Settlement Class Member who submits a Valid Claim shall be increased *pro rata* up to a maximum of five times what he or she would otherwise be entitled to;

b.      If the Settlement Fund remains unexhausted, payment may then be made to any counsel for any additional attorneys' fee award approved by the Court ("Additional Attorney's Fee Award");

c.      If the Settlement Fund remains unexhausted, the remaining money will be paid as a *cy pres* award to the No Exceptions Prison Collective of the Harriet Tubman House in Nashville, Tennessee.

## III.   PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT IS APPROPRIATE

The law favors settlement, particularly in class actions and other complex cases in which substantial resources can be conserved by avoiding the time, cost, and rigor of prolonged litigation.  *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007) (discussing "the federal policy favoring settlement of class actions" (internal citations omitted)); *Little Rock School Dist. v. Pulaski Cnty. Special School Dist. No. 1*, 921 F.2d 1371, 1383 (8th Cir. 1990) ("The law strongly favors settlements. Courts should hospitably receive them . . . . As a practical matter, a remedy that everyone agrees to is a lot more likely to succeed than one to which the defendants must be

10

dragged kicking and screaming."). Settlement agreements conserve judicial time and limit expensive litigation. 4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11:41, at 87 (4th Ed. 2002) (hereinafter "*Newberg on Class Actions*") ("The compromise of complex litigation is encouraged by the courts and favored by public policy.").

Where, as here, the parties resolve class action litigation through a class-wide settlement, they must obtain the Court's approval. *See* Fed. R. Civ. P. 23(e). Review of a proposed class action settlement generally occurs in two steps. In the first step, "[t]he judge should make a preliminary determination that the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b)." *Manual for Complex Litigation* (Fourth) § 21.632 (2004) (hereinafter "*Manual*"). Additionally, "[t]he judge must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the certification, proposed settlement, and date of the final fairness hearing." *Id.* If the proposed settlement falls "within the range of possible approval," the Court should grant preliminary approval and authorize the parties to give notice of the proposed settlement to the class members. *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982). Stated another way, preliminary approval is a "determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness." *In re Traffic Exec. Ass'n - E. Railroads*, 627 F.2d 631, 634 (2d Cir. 1980).

The proposed settlement falls well within the "range of possible approval," particularly in light of the substantial risks and costs associated with further litigation. Furthermore, the settlement is entitled to a presumption of fairness because it was reached through arm's-length bargaining between experienced counsel and does not evidence unduly preferential treatment or other obvious deficiencies. Therefore, the proposed settlement satisfies the standards for

11

preliminary approval and warrants the dissemination of notice apprising class members of their opportunity to participate in the settlement, or to opt out of or object to the settlement.

## A. Review of the Applicable Factors Favors Approval of the Settlement

At the preliminary-approval stage, the Court should "make a preliminary determination on the fairness, reasonableness and adequacy of the settlement terms . . . ." *Manual* §21.633. If the Court finds the settlement "within the range of possible approval," it should then order that the class be notified of the settlement and of a formal fairness hearing to be held on the question of settlement approval. *See Manual* §40.43 (model preliminary-approval order). Because the Settlement Agreement here far exceeds any preliminary threshold regarding fairness, reasonableness, and adequacy, the Court should preliminarily approve this class action settlement.

### 1. The Proposed Settlement Negotiated by the Parties Enjoys an Initial Presumption of Fairness

At the outset, the proposed settlement enjoys a presumption of fairness. Courts usually adopt "an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for court approval." 4 *Newberg on Class Actions* § 11:41, at 90; *see also Int'l Union*, 497 F.3d at 632; *Little Rock School Dist.*, 921 F.2d at 1391 (stating that class action settlement agreements "are presumptively valid"). After the parties' arm's-length negotiations, "judges should not substitute their own judgment as to optimal settlement terms for the judgments of the litigants and their counsel." *Petrovic,* 200 F.3d at 114–49 (internal quotation marks omitted); *see also In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 934 (8th Cir. 2005) ("We have recognized that a class action settlement is a private contract negotiated between the parties. Rule 23(e) requires the court to intrude on that private consensual agreement merely to ensure that the agreement is not the

12

product of collusion and that, taken as a whole, it is fair, adequate and reasonable to all concerned." (citation omitted)).

### 2. The Proposed Settlement Provides Fair and Substantial Relief to All Class Members

The settlement provides fair and substantial relief to all class members. Under the terms of the settlement, each Class Member is entitled at least 125% of the full amount of fees that she paid to PCC, and many will be entitled to an additional $50 for each month that she was on probation. The settlement amount was reached by negotiation of the parties in consideration of the following factors, among others: (a) the amount actually paid to PCC by each Class Member that purports to have a viable RICO Claim that is not barred by the applicable statute of limitations; (b) the amount charged by PCC to each Class Member that purports to have a viable RICO and § 1983 Claims that are not barred by the applicable statutes of limitations, as well as the amount actually paid, to reflect the additional potential legal claim against defendants as well as the alleged harm associated with a threatened debt during this time period; (c) prior settlements and judgments in analogous cases; and (d) the costs and risks attendant to continued litigation. The total Settlement Fund payment compares favorably to settlement and judgment amounts in analogous cases. And the proposed agreed injunction effects sweeping reforms to Rutherford County's practices that will benefit Class members. The settlement offers fair and substantial relief given the significant challenges and risks associated with pursuing such claims individually.

### 3. Response to the Court's October 5, 2017 Order

In its October 5, 2017 Order, the Court requested additional information to allow the Court to determine whether the terms of the Settlement Agreement to absent class members are

13

fair and reasonable and whether the Settlement Fund is adequate to satisfy the anticipated claims. (*See* Dkt. 191 at pp. 5-6.)  As requested, Plaintiffs provide the Court with the below information.

(i)        **The Proposed Cash Awards Are Fair and Reasonable**

The Settlement Agreement contemplates three separate categories of Cash Awards based on the RICO claims and constitutional Civil Rights claims asserted in this lawsuit.

First, a class member who was on probation with PCC beginning October 1, 2011 but whose probation ended prior to October 1, 2014, will be entitled to receive a Cash Award of 125% of the amount he or she actually paid to PCC for fees.  (*See* Settlement Agreement, Section IV.D.(i).)  The Parties structured this Cash Award to compensate class members for the alleged RICO claims based on probation fees paid to PCC, including the monthly $45 supervision fee and the $20 drug test fee.  (*See* Complaint ¶ 262.)  This Cash Award takes into account the applicable four-year statute of limitations period, and allows class members who were on probation for an offense within the relevant period that also preceded the October 1, 2011 date to also obtain 125% of the fees paid before to October 1, 2011, thus taking into account the continuing violation doctrine and not waiving fees that such class members may be entitled to under the law.

Second, a class member who was on probation with PCC on or after October 1, 2014, will be entitled to receive a Cash Award as set forth in the preceding paragraph, but also will be entitled to receive a Cash Award of $50 per month (which approximates the amount PCC typically charged Probationers for monthly supervision and other charges) that he or she was on supervised probation with PCC after October 1, 2014.  (*See* Settlement Agreement, Section IV.D.(i).)  This additional Cash Award is structured to compensate class members for the alleged constitutional Civil Rights claims, which have a one-year statute of limitations period.

14

Third, a class member who was on probation with Rutherford County's Probation Department in or after March 2016 and (a) was on supervised probation for the sole purpose of paying court-imposed financial obligations or (b) would have been removed from supervised probation but for the payment of a court-imposed financial obligation, will be entitled to receive the Cash Awards discussed above: $50 per month that he or she was on supervised probation and 125% of the probation fees paid when the conditions in (a) or (b) are met. (*See* Settlement Agreement, Section IV.D.(iii).) The Parties included this third category because PCC terminated its contract with Rutherford County and ceased providing probation services in Rutherford County in March 2016, and subsequently, Rutherford County's Probation Department took over. Thus, the Parties wanted to ensure there was an additional category for any class members who only were on probation with Rutherford County's Probation Department, not PCC, and one of the two conditions above were present.

The Parties settled on the above categories and amounts through extensive negotiations over months and input from three different Mediators (who each recommended and proposed the final amount of the Settlement). The Cash Awards are reasonable because they are designed to compensate class members for *more than* the amount of fees paid in response to the conduct at issue. The Cash Awards are also fair because they are tailored to each class member's time on supervised probation and the specific amounts of probation fees paid during the actionable periods. When determining the above formulas, the Parties took into account different factors, including but not limited to the following:

- The termination of PCC's contract with Rutherford County and ceasing its probation operations in Rutherford County in March 2016;

- The injunctive relief negotiated between Plaintiffs and Rutherford County;

15

- PCC's revenues during the relevant time period (the Settlement Fund is more than PCC's total revenues in Rutherford County);

- The amounts of PCC fees incurred by class members, including the $45 monthly supervision fee and $20 drug test fee;

- The estimated average length of probation for class members;

- The estimated number of class members;

- The possibility of treble damages available for RICO claims and/or exemplary damages available for Section 1983 claims;

- The potential liability for other consequential damages, such as lost profits and business opportunities;

- The recommendation of the three mediators involved in the matter; and

- The substantial litigation risk for all Parties in pursuing this matter; the financial and other costs associated with pursuing the lawsuit; and the availability of insurance and indemnification claims.

In light of these factors, the Parties believe the above payment calculations are fair and reasonable.

### (ii) The $14.3 Million Settlement Fund Is Adequate to Satisfy the Anticipated Claims

As the Court noted in its October 5, 2017 Order, the $14.3 million Settlement Fund is a gross amount. The Settlement Fund is adequate to satisfy the anticipated claims. The Parties estimate $12,743,315 of the Settlement Fund will be available for payments directly to class members after the following expenses are deducted: $1,381,115 for attorneys' fees; less than $25,000 for out-of-pocket expenses incurred by Plaintiffs' counsel in the litigation; $70,000 for

16

the incentive awards for the seven Named Plaintiff for the time and effort they contributed to the lawsuit; and $80,570 for settlement administration fees to Dahl. Thus, after payment of these initial amounts, nearly 90% of the Settlement Fund will be available to compensate the class members.

Estimating the amounts that may be payable to Class Members as a whole is complex due to the volume of probationers and the unique characteristics of each probationer (for example, some may have been on supervised probation for multiple offenses over different periods of time). PCC has a database of probationers that includes several fields of data. *See* Ex. 1, Declaration of James Redus ¶ 3. Based on a database query conducted on or about August 24, 2017, the following figures were obtained:

- 27,016 probationers were identified as on probation with PCC during the class period;
- The sum of the total fees collected for these individuals from October 1, 2011 to March 28, 2016 was $7,734,776.25; and
- For individuals who were on probation from October 1, 2014 to March 28, 2016 (and thus entitled to $50 per month), the total number of months for which these individuals were on probation during that time period was 79,835.

*Id.* at ¶ 4. Using these estimates, the amount that would be paid under the Settlement Agreement would be approximately: ($7,734,776.25*125%) + (79,835*$50) = $13,660,220.31, which is well within the Settlement Fund (assuming Class Members bore responsibility for administrative and legal fees). We note, however, that the estimates may vary based on the following: (a) the precise query made on the database to identify Class Members, fees paid, and probation terms within the relevant periods, (b) certain Class Members may be entitled to reimbursements of fees

paid prior to the class period if part of their probation is included in the class period, and (c) there may be some Class Members who were on probation solely with Rutherford County and therefore not on the PCC database (but the Parties do not expect many, if any, in this category because this court imposed an injunction which would have strongly discouraged if not prevented any order that would have added persons to this category).

Some of the variation noted above may increase the estimated total payout, while other variation may decrease the estimate. For example, on October 17, 2017 another query was run using different logic which resulted in a decrease of approximately 5% of the amount to be paid through the $50 per month formula. *See* Ex. 3, Declaration of James Redus ¶ 5. The Parties, however, do not expect this variation to affect the reasonableness of the Settlement Fund because it is not realistic to expect that 100% of the Class Members will submit claims. In fact, Dahl has estimated 25% of eligible class members will submit claims for purposes of estimating administration costs. The Parties believe a 20% response rate is more likely in light of other precedent in similar cases, including the *Jennings* matter referenced below where the response rate was 15%, and where the class size was much smaller than the proposed class here and class members were localized in a much smaller geographic area than is Rutherford County. Because a 20% response rate would likely only result in $2.7 million in Cash Awards, the Parties agreed to include up to a 5x multiplier in the event that there are excess funds in the Settlement Fund after the initial calculations. (*See* Settlement Agreement, Section IV.E.(i)(a).) In addition, assessments of payable cash awards will be made on a case-by-case basis based on individualized data for Class Members who submit valid claims forms.

In sum, even accounting for variation in estimates, the Settlement Fund and the Cash Awards are structured to fully compensate all Class Members for eligible out-of-pocket expenses

by returning fees collected during the Class Period that Plaintiffs contend violate the law.  In addition, the Settlement Fund is designed to provide additional compensation for the time spent on supervised probation for the Civil Rights claims.  Based on typical claim submission rates, the Settlement Fund is more than adequate to cover such awards and likely will require use of the multiplier in Section IV.E.(i)(a) to exhaust the Settlement Fund.

### (iii)  The Proposed Settlement Administrator Has Significant Experience Administering Class Settlements

As more fully set forth in Exhibit 2 attached hereto, the proposed settlement administrator, Dahl Administration ("Dahl"), has more than adequate experience to administer this class settlement.  Dahl's founder, Jeff Dahl, has over 22 years of experience in class action notice and claims administration.  Below are just three examples of complex matters where Dahl was the settlement administrator:

- Dahl provided class notice and distribution services for the *Bower v. MetLife* class action, including mailing notices to over 900,000 potential class members and distributing checks to nearly one million eligible class members and handling requests for re-issued checks;

- Dahl provided class notice and distribution services for the *Janoka v. Veolia Environmental Services* class action, including mailing notice to over 900,000 potential class members, managing complex claims processing procedures that required a detailed analysis of class member invoices and other supporting documentation, and distributing settlement funds to eligible class members; and

- Dahl provided class notice and claims processing for the Urban Active Fitness class action, including mailing notices to more than 600,000 class members, implementing

19

a published notice campaign, and administering online claims submission and processing services.

Recently, Dahl was the settlement administrator in another matter with Plaintiffs' counsel, *Jenkins et al. v. City of Jennings*, 4:15-cv-00252 (E.D. Mo. 2015) regarding individuals who were incarcerated because of the inability to pay debts owed from traffic and other minor offenses. Dahl performed its services well, and Plaintiffs' counsel were satisfied with the company's services.

### (iv) The Attorneys' Fees Provisions in the Settlement Agreement Are Not "Quick-Pay" Provisions.

The Settlement Agreement provides that all attorneys' fees and incentive awards are to be paid within 21 days of the "Effective Date." (*See* Section VI.C. ("The Attorneys' Fee Award and any Incentive Award awarded by the Court will be paid by the Settlement Administrator from the Settlement Fund within twenty-one (21) Days after the Effective Date.").) The Settlement Agreement further provides that the "Effective Date" does not occur until the "Court has entered a Final Order and Judgment finally approving this Agreement" (Section XI.A.iv.) and the "Final Order and Judgment has become Final as defined in Paragraph B below" (Section XI.A.v.). Paragraph B defines "final" as follows:

> "Final," when referring to a judgment or order, means that: (i) the judgment is a final, appealable judgment; and (ii) either (a) no appeal has been taken from the judgment as of the date on which all times to appeal therefrom have expired, or (b) an appeal or other review proceeding of the judgment having been commenced, the date by which such appeal or other review is finally concluded and no longer is subject to review by any court, whether by appeal, petitions or rehearing or re-argument, petitions for rehearing *en banc*, petitions for writ of *certiorari*, or otherwise, and such appeal or other review has been finally resolved in a manner that affirms the Final Order and Judgment in all material respects.

20

(Section XI.B.)  Thus, the Settlement Agreement not does not contemplate that any attorneys'

fees awards or incentive awards will be paid until <u>after</u> the Court holds a fairness hearing,

considers any objectors, and issues a final order approval, <u>and after</u> the appeals process is

exhausted and any appeal is no longer subject to review by any court.  *Cf. Pelzer v. Vassalle*, 655

Fed. Appx. 352, 357, 365 (6th Cir. 2016) (finding $1.5 million "quick-pay" provision reasonable

where class counsel received fees but had to repay the money if the settlement was rejected on

appeal, noting that "quick-pay" provisions are common); Brian T. Fitzpatrick, The End of

Objector Blackmail?, 62 Vand. L. Rev. 1623, 1643 (2009) (defining "quick pay" provisions as

those that "permit class counsel to receive the fees awarded to them by district courts as soon as

those courts approve the class action settlements, regardless of whether the settlements or fees

are appealed").  The amount of Attorneys' Fees awarded is ultimately left to the Court's

discretion.  Because the attorneys' fees here will not be paid until any appeals process is

finalized, the Settlement Agreement does not include a quick-pay attorneys' fees provision.

### (v)    The Parties Have Revised Provisions in the Settlement
### Agreement in Response to the Court's Order

The Parties have agreed to a new Settlement Agreement submitted with this motion that

supersedes the proposed agreement submitted to the Court on September 18, 2017 (Dkt. 190-1

through 190-8).[1]  The Parties have revised the Settlement Agreement and pertinent exhibits to

provide that the Court has discretion to permit a Settlement Class Member who does not opt out

to appear at the Fairness Hearing even if he or she has failed to timely file and serve a written

objection and notice of his or her intent to appear at the Fairness Hearing in accordance with the

terms set forth in the Settlement Agreement.  Such revisions can be found in the following:

---

[1]    The Parties have consented to the revised Settlement Agreement and accompanying
exhibits, and their respective counsel are in the process of collecting signatures.

- Settlement Agreement, Sections VII.C. and VIII.L.;

- Exhibit B-1 (Long Notice), Questions 14, 20, and 21;

- Exhibit B-2 (Short Notice); and

- Exhibit D (Proposed Preliminary Approval Order), Sections 18 and 21.

Attached hereto as Exhibit 3 are redlines of the above documents for the convenience of the Court.

## V. THE PROPOSED NOTICE TO PUTATIVE CLASS MEMBERS IS APPROPRIATE

This Court has wide discretion in determining what constitutes reasonable notice of a class settlement under Rule 23(e), in form as well as method. *See Franks v. Kroger Co.*, 649 F.2d 1216, 1222–23 (6th Cir. 1981), *modified on other grounds on rehearing,* 670 F.2d 71 (6th Cir. 1982); 7B Fed. Prac. & Proc. § 1797.6. The notice should "inform class members of the terms of the settlement and of the steps required to be taken to file claims or to object to or exclude themselves from the settlement." *EEOC v. Fairbault Foods, Inc.,* 2008 WL 879999, at *1 (D. Minn. Mar. 28, 2008).

As for the content of the Notice, Rule 23(c)(2)(B) provides:

The notice [to a Rule 23(b)(3) class] must concisely and clearly state in plain, easily understood language: the nature of the action, the definition of the class certified, the class claims, issues or defenses, that a class member may enter an appearance through counsel if the class member so desires, that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded, and the binding effect of a class judgment on class members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).

The parties have jointly crafted a notice that complies with the requirements of Rule 23(c)(2)(B) and provides clear information to putative class members in plain language.

## V. CONCLUSION

For all of the foregoing reasons, Named Plaintiffs respectfully request that the Court (1) grant preliminary approval of the proposed class action settlement; (2) authorize the publication of Class Notice; and (3) schedule a final approval hearing approximately one hundred eighty (180) days after the date of preliminary approval.

Respectfully submitted,

*/s/ Alec Karakatsanis*

Alec Karakatsanis
(D.C. Bar 999294, Admitted Pro Hac Vice)
Elizabeth Rossi[2]
Civil Rights Corps
910 17th Street NW, Fifth Floor
Washington, DC 20006
alec@civilrightscorps.org
elizabeth@civilrightscorps.org

Kyle F. Mothershead
Law Office of Kyle Mothershead
414 Union Street, Suite 900
Nashville, TN 37219
Telephone:  (615) 982-8002
Facsimile:  (615) 229-6387

Attorneys for Plaintiffs

---

[2] Admitted solely to practice law in Maryland; not admitted in the District of Columbia. Practice is limited pursuant to D.C. App. R. 49(c)(3).