**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| CINDY RODRIGUEZ, STEVEN GIBBS, CHRISTINA ALALNA AS ADMINISTRATOR OF THE ESTATE OF PAULA PULLUM, YOLANDA CARNEY, JACQUELINE BRINKLEY, CURTIS JOHNSON, FRED ROBINSON, <br><br> On behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PROVIDENCE COMMUNITY CORRECTIONS, INC., <br><br> RUTHERFORD COUNTY, TENNESSEE, <br><br> JASMINE JACKSON, BRIANA WOODLEE, AMANDA ROBERTS, TIARA SMITH, AMANDA SCHEXNAYDER, NISHA HYDE, <br><br> Defendants. | Case No. 3:15-cv-01048 <br><br> (Complaint — Class Action) <br> JURY DEMAND |

## FIRST AMENDED CLASS ACTION COMPLAINT

### Introduction

This lawsuit is about constitutional violations and corruption in the Rutherford County probation supervision system. The Plaintiffs in this case are all people living in poverty who are victims of an extortion scheme in which the Defendants have conspired to extract as much money as possible from misdemeanor probationers through a pattern of illegal and shocking behavior. The crux of this scheme is a conspiracy to funnel misdemeanor probation cases in which court

debts are owed to a private company, which then extorts money out of individuals who have no ability to pay court costs, let alone private fees. The private company, whose goal is to maximize its own profits, acts as a "probation officer" to collect those debts—as well as to assess and collect its own additional and substantial fees and surcharges—through repeated and continuous threats to arrest, revoke, and imprison individuals who are indigent and disabled if they do not pay.

As a result of this extortion enterprise, the Plaintiffs and others similarly situated have lost their housing, lost jobs, lost cars, undergone humiliating physical intrusions on their bodies, suffered severe medical injuries, sold their own blood plasma, sacrificed food and clothing for their vulnerable children, and/or diverted their low-income disability checks—all in order to pay private "supervision fees." They have languished year after year on recurring terms of "user-funded" probation under constant threats to their physical well-being, and they have been repeatedly jailed because of their poverty. This cycle of ever-increasing debts, threats, and imprisonment has left the Plaintiffs and thousands of people like them in Rutherford County trapped in a culture of fear and panic.[1]

This civil rights action is brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the United States Constitution, and Tennessee law to stop the Defendants from continuing to operate a racketeering enterprise that is extorting money from some

---

[1] Poverty is widespread in Rutherford County. The United States Census Bureau reports that more than one in eight people in Rutherford County (13% of the population) lives below the federal poverty rate, which amounts to surviving on $981 per month or less. According to the Economic Policy Institute, however, one adult with no children needs $2,300 per month for a "secure yet modest" standard of living in Rutherford County. Though many people work full-time and are still struggling to subsist below the federal poverty line, many more people are living in extreme poverty: national statistics show that over 1.5 million families get by on less than $2 a day. Moreover, roughly 3,500 individuals in Rutherford County receive Social Security income for blindness or other disabilities. In Murfreesboro, about one in every five poor adult men is disabled. And yet, impoverished people represent the vast majority of people who owe debts to PCC, Inc. The burden of court debts increases recidivism, blocks productive reentry, devastates families who have to make hard choices about debt payments or food, inhibits mental health care, and makes it harder for people to obtain housing and employment. It is from those among us who are least able to pay that PCC, Inc. profits through jailing and threats of jailing for nonpayment.

of the most impoverished people in Rutherford County under constant threat of jail and to prevent the Defendants from misusing the probation supervision process for profit.

The treatment of named Plaintiffs Cindy Rodriguez, Steven Gibbs, Paula Pullum, Yolanda Carney, Jacqueline Brinkley, Curtis Johnson, Fred Robinson, and each of the other Plaintiff Class members reveals systemic illegality perpetrated as a matter of ongoing design, policy, and practice by Rutherford County and Providence Community Corrections, Inc. ("PCC, Inc."), the private company with whom the County has conspired.

By and through their attorneys and on behalf of themselves and all others similarly situated, the Plaintiffs seek in this civil rights action the vindication of their fundamental rights, compensation for the violations that they suffered, punitive damages to punish the Defendants and to deter similar misconduct in the future, and injunctive relief assuring that their rights will not be violated again. In the year 2015, these practices have no place in our society.

### Nature of the Action[2]

1. Rutherford County and PCC, Inc. entered into a contractual agreement, *see* Exhibit 1 ("The Contract"), to hand control of the misdemeanor probation system of Rutherford County to the private, for-profit company. Pursuant to the specific terms of the Contract, PCC, Inc. must earn its profit solely and directly from the people that it supervises by operating a "user-funded" model in which probationers are ordered to pay, under threat of arrest and revocation of their probation, a variety of fees and surcharges to PCC, Inc., as well as their court costs. According to the agreement, the County will pay PCC, Inc. nothing, and PCC, Inc. will make no profit unless it is able to get money from the people that it supervises. *Id*. at 1.

2. This agreement gives birth to a creature previously unknown in American law: a

---

[2] Plaintiffs make the allegations in this Complaint based on personal knowledge as to matters in which they have had personal involvement and on information and belief as to all other matters.

Case 3:15-cv-01048   Document 215   Filed 04/16/18   Page 3 of 71 PageID #: 3465

supposedly neutral "probation officer" who has a direct financial stake in every decision and outcome in any individual's probation case. This specific contractual arrangement violates the basic notions of due process, neutrality, and fairness as those concepts have been understood throughout American legal history.

3. Misdemeanor and traffic probationers are repeatedly threatened that failure to pay PCC, Inc. will result in PCC, Inc.'s "violating" them, which they are told will result in a warrant for their arrest and probation revocation proceedings at which they will be jailed and then placed on another extended period of payment-based probation, during which they will accrue more fees. The contractual arrangement provides that PCC, Inc. will act as the main witness at those proceedings and that PCC, Inc. will advise the County on dispositions and extensions. In most instances, this additional period is 11 months and 29 days, which the Defendants call "11/29." PCC, Inc. has instituted debt-collection and revocation practices as a private probation company that would be abhorrent if perpetrated by any public probation officer.

4. PCC, Inc. is given the discretion to pay itself first from the money that it extorts, allowing PCC, Inc. routinely to revoke, arrest, jail, and petition for the extension of probation of Rutherford County residents *who have already paid enough money to cover the entirety of their original court debts*.

5. These proceedings are initiated and conducted without any inquiry into a probationer's ability to pay—even though the vast majority of PCC, Inc. probationers are indigent—and they result in the imposition of further costs, fees, and surcharges, thus trapping probationers in a cycle of debts, arrest, extended supervision, jail, and more debts.

6. PCC, Inc. and the County have conspired to make good on these threats by jailing probationers who do not pay in order to create an environment of desperation that has made each

4

of them millions of dollars every year from this illegal scheme.

7.     The Plaintiffs seek declaratory, injunctive, compensatory, and punitive relief for themselves and all others similarly situated.

**Jurisdiction and Venue**

8.     This is a civil rights action arising under 42 U.S.C. § 1983, 18 U.S.C. § 1964(c) (RICO), and 28 U.S.C. § 2201, *et seq*., and the Fourth and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  The Court has supplemental jurisdiction over the state law causes of action asserted in this Complaint pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as the federal law claims.

9.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

**Parties**

10.     Plaintiff Cindy Rodriguez is a 51-year-old resident of Rutherford County.  Plaintiff Steven Gibbs is a 61-year-old resident of Rutherford County.  Plaintiff Paula Pullum is a 48-year-old resident of Rutherford County.[3]  Plaintiff Yolanda Carney is a 44-year-old resident of Rutherford County.  Plaintiff Jacqueline Brinkley is a 31-year-old resident of Rutherford County. Plaintiff Curtis Johnson is a 56-year-old resident of Rutherford County.  Plaintiff Fred Robinson is a 30-year-old resident of Rutherford County.

11.     Defendant Providence Community Corrections, Inc. (PCC, Inc.) is a corporation formed in Delaware and registered to do business in Tennessee.  At times relevant to this case, PCC, Inc. was a wholly-owned subsidiary of Providence Service Corporation, a publicly traded multinational company incorporated in Delaware, headquartered in Tucson, Arizona, and

---

[3] Subsequent to the filing of this action, Ms. Pullum passed away.  This Second Amended Complaint raises her claims on behalf of her estate, as noted in the amended case caption.

5

operating a variety of services in different industries in 44 states and the District of Columbia. PCC, Inc. profits by charging its supervisees for "probation supervision" and other related "services" in Rutherford County pursuant to a Contract with Rutherford County—which was signed by the Mayor of Rutherford County—granting PCC, Inc. an exclusive monopoly controlling misdemeanor probation services in the County. *See* Exhibit 1 at 5-8. The Contract provides that PCC, Inc. will not charge Rutherford County for its services but will instead make its profit by charging additional fees to its probationers. *Id.* at 1, 8. The Contract purports to require Rutherford County and its court to ensure the full and total collection of PCC, Inc.'s profits. *Id.* at 7, 11.

12.      Defendant Rutherford County is a municipal government entity organized under the laws of the State of Tennessee. Its officials are responsible for operating the County jail, prosecuting criminal and traffic offenses, providing for a lawful probation supervision system, and supplying adequate indigent defense services.

13.      Defendants Jasmine Jackson, Briana Woodlee, Amanda Roberts, Tiara Smith, Amanda Schexnayder, Nisha Hyde, and are "probation officers" employed by PCC, Inc. at its main Rutherford County office in downtown Murfreesboro, Tennessee. Each of them supervised one or more of the named Plaintiffs and made oral or written threats to the named Plaintiffs to "violate" their probation and to jail them if they did not pay enough money to PCC, Inc. Each of them used their discretion as "probation officers" to apply PCC, Inc. policies and practices in order to determine how much money was owed, how much money was taken by PCC, Inc., how frequently to subject the named Plaintiffs to profitable drug tests, when to report, when to "violate" them, what disposition to recommend, and every other discretionary probationary decision discussed in this Complaint. Together with PCC, Inc., these individual defendants will occasionally be referred

6

to as the "Private Probation Defendants."

**Factual Background**

**A.**    **The Private Probation Scheme in Rutherford County**

14.    The treatment of the Plaintiffs was caused by and is representative of the policies and practices employed by the County and PCC, Inc. to collect debts from the fines, costs, fees, and surcharges that they arrange and assess after the completion of a misdemeanor or traffic case.

15.    The experiences of the named Plaintiffs have been corroborated through written policy documents and interviews with approximately 100 other witnesses, lawyers, court staff, and current and former probationers who have been subjected to PCC, Inc.'s threats and extortion scheme.  Many of the current and former probationers break down crying when they recount the basic necessities of life that they and their families have had to forego under threat of having their probation revoked and being arrested by PCC, Inc. for not being able to pay what PCC, Inc. probation officers demanded.  When they are jailed for probation violations at the request of PCC, Inc., they are forced to endure deplorable conditions and physical and verbal abuse at the County jail.

**i.**    **How People Are Assigned To PCC, Inc.**

16.    When a person is convicted of a traffic or misdemeanor offense in Rutherford County, the County assesses fines and court costs without regard to a person's ability to pay.  Those amounts become part of a judgment that Tennessee law provides can be collected in the same manner as any other civil judgment.  *See* Tenn. Code Ann. § 40-24-105(a).

17.    The County has an incentive to maximize the collection of these costs because the money collected funds the County budget.

18.    As a matter of policy and practice for most offenses, those who can afford to pay

7

in full are generally placed on unsupervised probation. Those people are not required to report to PCC, Inc., pay additional fees, or suffer additional restraints on their liberty. Those who cannot afford to pay in full are placed on supervised probation and assigned to PCC, Inc. as their "probation officer."[4]

19.     PCC, Inc. employees, referred to as "probation officers," sit in the courtroom next to the judges and engage in private *ex parte* conversations with judges and County prosecutors concerning probationers (including discussing recommendations and evidence).

20.     All probationers assigned to PCC, Inc. as their "probation officer" are told that they are required to pay a number of additional fees and surcharges. Every probationer is required to pay $45 per month to PCC, Inc. for as long as they are on probation. PCC, Inc. also charges probationers approximately $20 for every drug test that PCC, Inc. probation officers decide in their discretion to administer. PCC, Inc. makes a profit off of each drug test that it chooses to administer. PCC, Inc. also charges various setup fees, community service fees, and fees for each class and other service coordinated by PCC, Inc., profiting on each and every fee. PCC, Inc. has also been caught in the past charging additional unlawful fees (and then demanding payment of them), such as a "picture fee."

21.     Indigent people placed on "supervised probation" are told that they can convert their probation to unsupervised probation if they pay their debts in full. If they cannot afford to pay in full, they are forced to sign a standard document, *see* Exhibit 2, prepared jointly by PCC, Inc. and the County, purporting to require them, among other things:

---

[4] As in the cases of Ms. Pullum and Ms. Rodriguez, a materially similar process often occurs prior to trial because PCC, Inc. has contracted with the County to provide pretrial supervision services. All of the same unlawful practices, threats, additional fees, and revocations occur prior to trial or for those seeking "retirement," a procedure akin to pretrial diversion. In this Complaint, the term "probationer" is intended also to include supervisees in each PCC, Inc. program. The only meaningful difference is that PCC, Inc. charges $35 per month for "retirement" supervision as opposed to $45 per month for supervision after a monetary judgment.

- To allow PCC, Inc. employees and law enforcement to search their homes, vehicles, property, and person at any time without a warrant.
- To obey all orders of PCC, Inc. officers.
- To avoid consuming any "intoxicant" and to avoid even entering places that serve alcohol.
- To work at a job.
- To allow PCC, Inc. randomly to drug test them at its discretion (and to charge them for every drug test that PCC, Inc. administers).
- To pay all court and PCC, Inc. debts and fees.

Probationers are told by PCC, Inc. probation officers that any violation of these "conditions," no matter what the person's history and no matter what the traffic or misdemeanor offense of conviction, will result in PCC, Inc.'s petitioning for their probation to be revoked and a warrant issuing for their arrest.

22.     PCC, Inc. "probation officers" do not inform probationers that it is unlawful to revoke and jail them for nonpayment if they do not have the ability to pay, nor that it is illegal under Tennessee law to revoke probation for the nonpayment of court costs.[5]

      **ii.**        **"Supervision" By PCC, Inc.**

23.     PCC, Inc. informs probationers that its probation officers have the power to testify about the facts of any violation that they allege (such as a violation for nonpayment) and the power to recommend sentences to the County prosecutors and judges and that the County officials have

---

[5] The Tennessee Attorney General has, through formal opinions over the past 15 years, repeatedly made clear that the Defendants' actions are illegal under Tennessee law.

    A criminal defendant may not have his probation revoked through a violation warrant for failing to pay costs assessed in a criminal action. Op. Tenn. Atty. Gen. 00-162 (October 18, 2000). Tenn. Code Ann. § 40-24-105(a) provides that costs "shall not be deemed part of the penalty, and no person shall be imprisoned ... in default of payment of costs ...." Instead, costs may be collected in the same manner as a judgment in a civil action.

Tenn. Op. Atty. Gen. No. 03-106 (2003); Tenn. Op. Atty. Gen. No. 03-072 (2003) ("A criminal defendant may not have his probation revoked through a violation warrant for failing to pay costs assessed in a criminal action."); Tenn. Op. Atty. Gen. No. 00-162 (2000, 2000 WL 1616911, ("[A] criminal defendant may not have his probation revoked through a violation warrant for failing to pay costs assessed in a criminal action."); Tenn. Op. Atty. Gen. Nos. 03-106; 03-072; 00-162 (accord); Tenn. Op. Atty. Gen. No. 06-062 (2006), 2006 WL 1197456 (same).

the power to jail them for an amount of time that spans the entire length of their probation. PCC, Inc. routinely informs probationers that single violations of the standard conditions of probation (including the condition that its own fees and costs be paid) jointly created by PCC, Inc. and the County regularly result in months in the County jail.

24.     The County, in conjunction and consultation with PCC, Inc., seeks enormously harsh jail terms for technical violations of misdemeanor probation This practice is incorporated through the Contract between the County and PCC, Inc., in which the County promised to enforce full collection of PCC, Inc.'s profits through the creation of "sanctions" that would ensure its collection. These punishments are routinely imposed, as are the onerous conditions, on people solely because they could not afford to pay in full and were therefore placed on supervised probation. These punishments are thus routinely imposed solely on the indigent and without the provision of adequate counsel in either the original proceeding or in what the County calls a "probation revocation" proceeding.

25.     PCC, Inc. employees decide in their discretion what monthly payments to require of any probationer under threat of revocation. Company probation officers make this decision without regard to indigence. They then purport to demand that probationers make those payments in the dollar amount determined by PCC, Inc. outside of any formal legal process and under the threat that PCC, Inc. will "violate" the probationers who do not pay.

26.     PCC, Inc. employees determine in their discretion what portion of each payment is to be applied to court debts as opposed to PCC, Inc.'s own fees. Because it relies solely on these fees to make its profit, PCC, Inc. has a direct financial incentive to take money for itself first and in disproportionate amounts. This incentive is magnified by the policy of the County to terminate supervised probation when court debts are paid in full and to extend supervised probation

10

repeatedly and indefinitely if they are not paid.

27. PCC, Inc. has a direct pecuniary incentive to ensure that its probationers are on probation for as long as possible. Therefore, an examination of PCC, Inc. receipts of the named Plaintiffs and others similarly situated frequently shows that the entire amount of whatever weekly payments they could scrape together under threat of arrest was diverted to PCC, Inc. instead of to the County. *See, e.g.*, Exhibit 3, Receipts of Cindy Rodriguez and Yolanda Carney. Weekly payments thus regularly result in little or no reduction in the amount of money owed to the County.

28. PCC, Inc. also levies enhanced fees in addition to those fees agreed upon in the Contract. Receipts given by PCC, Inc. to probationers often include fees in addition to those set by Contract with no explanation.

29. PCC, Inc.'s practice is to not inform probationers, even probationers that PCC, Inc. knows to be indigent (such as those receiving means tested Social Security benefits (SSI) and food stamps), that they can have their payments waived or reduced due to indigence. PCC, Inc. also trains its employees not to inform probationers that their probation cannot be violated and that they cannot be jailed simply for non-payment without any inquiry into their ability to pay. PCC, Inc. employees instead threaten probationers that they will be "violated" and jailed, which is a direct violation of the Constitution and flagrant violation of Tennessee law.

30. PCC, Inc. has a direct financial incentive not to inform probationers of these rights and to ensure that probationers erroneously believe that they will be arrested and "violated" unless they pay PCC, Inc. As a result, PCC, Inc.'s practice is to demand payment and to tell probationers that PCC, Inc. will "violate" them if they do not pay.

31. Although PCC, Inc. probation officers purport to have the same authority as traditional and current state probation officers, collecting money from supervisees is the primary

Case 3:15-cv-01048   Document 215   Filed 04/16/18   Page 11 of 71 PageID #: 3473

duty of PCC, Inc. employees. As a matter of everyday routine, employees threaten probationers with jail and revocation in order to ensure larger collection by probation officers.[6]

32. To take one of many examples, PCC, Inc. currently supervises an amputee who is undergoing life-threatening cancer treatments. Even though PCC, Inc. is aware that he is indigent, destitute, and unable to work, PCC, Inc. probation officers have been threatening him with revocation and arrest for non-payment.

33. As a result, many local lawyers who interact with PCC, Inc. refer to PCC, Inc. as the "collection agency" and state that it provides no legitimate supervision services other than illegally threatening people into paying money.

34. PCC, Inc. has a policy and practice of disallowing or not petitioning for early termination of probation if money has not been paid. If the money has been paid in full, PCC, Inc. does not object to early termination.

35. PCC, Inc.'s practice is specifically to target those people receiving means-tested Social Security disability income because, unlike other destitute probationers, they have a regular source of income that arrives at the beginning of each month. PCC, Inc.'s practice is to threaten SSI recipients that they will have their probation revoked if they do not use their monthly check to obtain a money order to pay PCC, Inc. shortly after receiving the check. Notably, benefits received from social security are exempt from execution, seizure, or attachment under Tennessee law for the payment of judgments. *See* Tenn. Code Ann. § 26-2-111.

36. As a matter of policy, pattern, and practice, PCC, Inc. attempts to hide from probationers that they have any lawful means of reducing or waiving their debts or fees due to

---

[6] Upon information and belief, private probation companies like PCC, Inc. also make hiring, firing, and promotions decisions—and determine compensation based on—the performance of probation officers in increasing payment rates among supervisees.

indigence. PCC, Inc. employees are trained not to volunteer information concerning how a person might move to waive or reduce those fees. If a person finds out about that mechanism through another probationer or a lawyer, PCC, Inc. probation officers are trained to erect a number of successive barriers:

- PCC, Inc. probation officers will first discourage indigence applications by claiming that they do not have an indigency form available, that they need to speak to a supervisor before giving out any forms, and that the probationer should ask again some other time.
- If the probationer persists, PCC, Inc. probation officers will then inform probationers through a written document that they have to take a number of steps prior to applying for indigence. *See* Exhibit 4. These steps include making payments to PCC, Inc. for "several months" before any indigence application will be considered. PCC, Inc. has a policy of rejecting indigence requests if the person has not yet paid what PCC, Inc. probation officers consider to be enough money.
- PCC, Inc. then informs probationers that it will "most likely deny" any applications for indigence. It tells them in writing, however, that they must still continue to pay PCC, Inc.: "***Do not be discouraged by this.*** Continue to make payments on every report date."
- After PCC, Inc. denies their indigence request, probationers are often told that they must take and pay roughly $20 for a drug test prior to applying for indigence with the Court.
- Every probationer is told orally and in writing that she must pay $25 for the right to be heard by the Court on their indigence.
- On occasion and after significant delay caused by PCC, Inc.'s own policies, PCC, Inc. probation officers have told probationers that it is "too late" or "impossible" to have their payments and fees reduced or waived because of indigence. Thus, PCC, Inc. enforces a policy of telling probationers to wait and to make payments before they may apply for indigence waivers but then, as in the case of Ms. Rodriguez, tells probationers who make payments and wait before applying that it is "too late" to obtain a waiver.

37. As a result, although most of PCC, Inc.'s threats and extortion scheme is communicated orally by its employees, PCC, Inc.'s written policy is to refuse to consider indigence unless and until a person *pays PCC, Inc. enough money* in the sole discretion of PCC, Inc.

38. County officials are aware of and complicit in each of these PCC, Inc. policies and practices. These policies and practices are also consistent with the Contract requiring the County to take every step to collect the profits accrued to PCC, Inc. for its probation services. *See* Exhibit

13

1.

39.     County Court clerks refuse as a matter of policy to consider indigence motions unless PCC, Inc. has reviewed and rejected the indigency request first (and, therefore, unless the probationer complies with PCC, Inc.'s rules and barriers to filing such a request).

40.     PCC, Inc. regularly procures false and inaccurate drug test results. Numerous probationers have been told by PCC, Inc. that they have tested positive for drugs when they have not used drugs. Some who have been able to afford independent lab testing arranged by their lawyers have immediately been retested and confirmed the erroneous nature of the PCC, Inc. results. This has led to a belief among local lawyers that PCC, Inc.'s drug tests are, at best, unreliable and, at worst, occasionally fabricated.

41.     For example, as discussed later in this Complaint, Mr. Gibbs was told by his PCC, Inc. probation officer in August 2015 that PCC, Inc. would drug test him after his probation officer told him that he was not bringing enough money for PCC, Inc. The PCC, Inc. probation officer told him that he tested positive for marijuana and threatened to revoke his probation. Undersigned counsel immediately arranged for Mr. Gibbs to be tested at an independent laboratory in Murfreesboro. The independent laboratory reported that Mr. Gibbs tested negative for marijuana.

42.     Although any drug testing is supposed to be "random," PCC, Inc. does not conduct drug testing in a random fashion and instead trains its probation officers to use drug testing and threats of drug testing as often as possible and in a way that maximizes profits.

43.     In addition, PCC, Inc. and Rutherford County require all probationers who have been summoned to appear at a revocation hearing to take—and pass—a drug test at PCC, Inc. before they will be allowed to appear in Court. This standard policy applies to all probationers, whether or not their offense or their alleged violation of probation had anything to do with drugs.

14

Each probationer is charged $20 dollars by PCC, Inc. for this test.

44. Thus, the County and PCC, Inc. require probationers to take a drug test, and to pay $20, for the right to appear in Court to defend themselves at their revocation hearing, all of which was initiated in the first place by PCC, Inc. This practice is enforced by the County District Attorney's Office, which will not meet with a probationer, or provide a probationer (or their counsel) with a copy of a revocation warrant without proof that the probationer has taken, and passed, a drug test that day at PCC, Inc.

45. PCC, Inc. routinely conveys to probationers that PCC, Inc. has the authority to "violate" their probation for non-reporting, failed drug tests, or other technical violations if they are not paying. PCC, Inc. has a policy and practice familiar to its probationers of using the timing of PCC, Inc. probation violation petitions to extort additional payments, using any previously alleged technical violations as leverage to gain future payments under threat of lodging a probation violation petition.

46. PCC, Inc. also has a direct financial incentive to delay notification of the Court of any violation for as long as possible so that it can collect more monthly fees before asking the Court to take action and jail a person and extend their probation term further.

47. Because PCC, Inc. controls the entire system of when it requires reporting, what it considers to constitute valid reporting, and when to file revocation petitions, it has the power to manufacture "probation violations" by setting rules and then claiming that a probationer broke those rules. Because PCC, Inc. has a financial stake in using alleged rule violations to extract more payments and in obtaining sanctions from the Court (such as extended probation) for rule violations, it has an additional direct financial conflict of interest. PCC, Inc. uses this control to overlook some reporting violations if a person is paying PCC, Inc. and to threaten other people

15

that it may, if they do not pay, choose to use its discretion to petition the Court for revocation for the technical violation if they do not come up with money. Like every other aspect of probation, PCC, Inc.'s financial incentives thus influence the timing of when and whether it chooses to notify the Court of technical violations of its rules.

48.     If a person reports to PCC, Inc. offices with insufficient money and tells PCC, Inc. probation officers that he or she could not afford to bring more money, the person is told that she has to bring extra money to the following visit or PCC, Inc. may decide to "violate" her.

49.     PCC, Inc. routinely "violates" people and seeks revocation of their probation or pretrial supervision for not completing conditions for which PCC, Inc. charges money. PCC, Inc. performs no indigency inquiry and instead threatens and seeks revocation for the failure to perform actions that the person had no ability to perform (such as paying for a PCC, Inc. class or paying to perform community service).

50.     PCC, Inc. has a long history in Rutherford County of assessing and demanding additional fees not authorized by law or the Contract.

51.     PCC, Inc. receipts sometimes do not reflect the total actual amount paid by probationers. Many people have made payments to PCC, Inc. only to learn later that there was no record of those payments and to be told to make them again. PCC, Inc. also frequently changes and manipulates the amounts of money allegedly owed in order fraudulently to increase the amount of money collected.

52.     Because of the additional PCC, Inc. fees and surcharges, the amount of money owed to PCC, Inc. over the course of its supervision often exceeds the amount of money originally owed to the County, and many probationers find themselves owing just as much money as they initially owed even after a full year of payments made to PCC, Inc. under threat of jailing. In this

way, the cycle repeats itself year after year when the probationers' probation is extended due to their continued debts.

### iii.    The Defendants' Contract and the "User-Funded" Model

53.    PCC, Inc. and the County agreed nearly a decade ago to enter into an arrangement in which PCC, Inc., would operate a relatively novel "offender-funded" or "user-funded" model in which all of its revenues would be extracted from the people that it supervised. The County agreed to enter into the arrangement implementing this model because PCC, Inc. promised the County that its methods would not only produce a profit for PCC, Inc., but would also result in coercing probationers to pay a larger amount of the County's court debts. The two parties entered into the Contract that is still in effect. *See* Exhibit 1.

54.    There are many troubling aspects of the Contract between PCC, Inc. and Rutherford County. Some of those features include that the agreement:

- Grants PCC, Inc. a monopoly in Rutherford County and purports to require the County Court to refer all misdemeanor probation cases for PCC, Inc.
- Binds the County Court judges to order probationers to pay PCC, Inc. pursuant to a pre-agreed payment schedule.
- Requires the County and the Court to "hold [each probationer] accountable" for "all payment" for all PCC, Inc. fees and to create "appropriate sanctions for failure to pay."
- Delegates to PCC, Inc. the authority to set whatever payment plan it chooses for probationers.
- Purports to bind Rutherford County and the Court to order payment to PCC, Inc. in every case and to take away judicial discretion with respect to waiving those fees. The Contract calls this an "obligation" to "order and enforce" all PCC, Inc. fees according to a pre-contracted schedule set by the private company and Rutherford County officials.
- Requires that the County and the Court "fully enforce" payments to PCC, Inc. and mandates that "failure to pay shall constitute a violation."
- Establishes that PCC, Inc. is given discretion for determining how long and how often to require reporting "as necessary." Thus, PCC, Inc. can create its own rules and orders and petition for violation of those rules and orders. The Contract also provides that PCC, Inc. will then serve as the witness to those violations by providing "testimony."
- States that PCC, Inc. will "confer" with prosecutors and judges and that PCC, Inc.

will make "recommendations" for revocation or alternative disposition.

- Outlines that the County will hold each probationer "accountable" for all unpaid fees and establishes a purported "obligation" for the County and the County Court to enforce all payments to PCC, Inc.

- Does not contain any provisions for waiving or reducing payments and fees or procedures for treating the indigent.

55. The Contract further requires the County Court to order payments to PCC, Inc. in particular amounts, removing discretion from the judge. For example, the Contract purports to require the County to order probationers to pay $45 per month for supervision and $20 for every drug test.[7]

56. The Contract unlawfully delegates to PCC, Inc. employees critical decisions in the probation supervision process, including how and when to report, what counts as reporting,[8] how much to require in payments, and when, whether, and how often to drug test probationers.

### iv. PCC, Inc. Revocation Process

57. After PCC, Inc. moves to revoke a person's probation, the person can be held in jail for weeks or months prior to the PCC, Inc. probation violation petition even being heard.

58. PCC, Inc. and Rutherford County officials coordinate on post-arrest procedures for probationers that PCC, Inc. petitions to revoke. For many people arrested solely for non-payment, the Defendants have decided to release them on their own recognizance after several hours of booking and fingerprinting at the jail, so long as the person agrees to turn himself or herself in. PCC, Inc. employees and County prosecutors will then attempt to threaten the probationer to pay

---

[7] The actual judgments issued by the Court do not specify these amounts but instead simply place people on probation. The particular contractual amounts are instead enforced through orders of PCC, Inc. probation officers in conjunction with the County prosecutors, and they are constantly subject to being increased without due process based on the supervision and revocation decisions of PCC, Inc. PCC, Inc. and County officials treat these amounts (which they themselves determine and enforce) as required "conditions" of the probation judgment even though they are not specified in the actual court judgments.

[8] For example, PCC, Inc. informs probationers in writing that they will be "counted as not having reported" if they are "disrespectful" or talk on their phones.

in full prior to the court date or face revocation and further punishment. This is typically done without a lawyer, even for those threatened with jail time if they do not consent and even for those people who had no lawyer in their original case.

59. For those probationers against whom PCC, Inc. is alleging other violations and for some probationers for whom non-payment is the only violation, they are often held in custody, routinely on preset secured money bonds that they cannot afford to pay.

60. PCC, Inc. and Rutherford County acting through PCC, Inc. as its agent have a pattern and practice of requesting and threatening jail time for probation violations based on nonpayment. The Defendants use these threats to "send a message" to other probationers that they must pay and to get supervisees to agree to extended probation terms in lieu of jail time (and thereby to incur more fees and costs).

61. PCC, Inc. and Rutherford County have instituted a policy, pattern, and practice of dismissing probation violation petitions if the total amount due is paid off before the hearing. If a person is too poor to pay, the person's probation is revoked upon the motion of PCC, Inc. and the Rutherford County District Attorney. The person is then placed on probation for an additional term (usually another "11/29") and charged additional court costs, fees for the PCC, Inc. arrest warrant, and additional PCC, Inc. supervision surcharges.

62. Even after the dismissal of probation violation cases and the termination of probation, the County has a practice, consistent with the Contract, of directing individuals to call PCC, Inc. to take care of any additional PCC, Inc. fees that may have been subsequently added.

63. It is Rutherford County policy, pattern, and practice to tell individuals to sign an agreement of probation violation form admitting to violations for non-payment without informing them that their probation cannot be violated unless the nonpayment was willful and without

conducting any kind of ability to pay hearing. This procedure is followed without informing probationers that it is illegal under Tennessee law for their probation to be revoked for nonpayment of court costs. This is the practice even though the Defendants know that the vast majority of the probationers are indigent and even though many of them have already been held to be indigent for the purposes of appointment of counsel.[9] Probationers are also told to sign a waiver of their right to counsel.

64. It is the policy, pattern, and practice of PCC, Inc. and Rutherford County not to inform probationers that their ability to pay is a critical issue at any revocation proceeding concerning their non-payment. At such hearings, PCC, Inc. employees do not advise the court or testify concerning the information in their possession concerning why the person has not paid, even when PCC, Inc. officials know that the person is indigent, disabled, and destitute. PCC, Inc. employees have an incentive not to present an accurate picture of the probationer's finances.

65. As a result, Defendants obtain probation revocations without ever determining whether violations for nonpayment were willful.

66. It is the pattern, policy, and practice of PCC, Inc. to then seek to extend probation terms as long as possible as a sanction, including charging extra fees for the warrant and the probation violation proceedings that PCC, Inc. itself initiated. When PCC, Inc. successfully petitions for the extension of probation, PCC, Inc. can collect additional $45 in monthly supervision fees, as well as the other fees and surcharges that it levies for things like drug tests. As a result, PCC, Inc. routinely petitions for and successfully obtains the extension of the standard probationary period of 11 months and 29 days into several successive such periods, resulting in

---

[9] Because the typical cost of counsel in Murfreesboro for a misdemeanor offense is often less than the overall fines, court costs, and fees, an inability to afford counsel is a reasonable indicator of the inability to pay debts resulting from conviction and supervision.

people being on probation for years and owing enormous amounts in monthly supervision fees that well exceed the magnitude of any initial court debts.

67.     Routinely, PCC, Inc. will wait until just days before the end of a person's probation term to demand payment in full, despite the fact that the probationer has been unable to pay or has been making only partial payments and therefore has been delinquent in payments for several months. This practice results in the probationer's being charged several months of additional fees, only to then be extended for another 11/29 and to begin accruing even more PCC, Inc. fees.

68.     PCC, Inc. routinely extends periods of probation in increments of 11/29 for multiple years and, in at least one occasion, repeatedly extended in increments of 11/29 for more than eight years. It is not uncommon in Rutherford County to find probationers stuck on repeatedly extended terms of probation for four years or more.

69.     All of this unconstitutional conduct is performed even though it is independently illegal under Tennessee law to revoke probation for the failure to pay court costs. *See supra* note 3. The Tennessee Attorney General has issued numerous opinions to that effect for at least 15 years. The Defendants flagrantly ignore Tennessee law.

70.     Rutherford County has a policy and practice of not conducting adversarial evidentiary hearings concerning violations of probation. Rather, allegations by PCC, Inc. are routinely accepted as fact without affording an opportunity for the probationer to present evidence in his or her defense.

71.     To take one of the many typical examples witnessed in the weeks before the filing of this lawsuit: an incarcerated individual appeared in an orange jumpsuit. He appeared on a warrant for his arrest due to failure to pay. The judge was informed that there was a disagreement between the individual and PCC, Inc. concerning whether he had failed a drug test. The

21

probationer explained that he had never gone to PCC, Inc. on the day of the alleged drug screen, and so it was impossible that he had failed the test that day because he had not taken one. The probationer said he had instead gone to the Rutherford County courthouse that day because his probation officer had told him to, and that no one from PCC, Inc. was there. The judge laughed at the probationer, told him the courthouse opens at 7:30 am, and therefore he "accepted" the allegation against the person by PCC, Inc. The probationer was then given a 90-day jail sentence without any meaningful process.

72.     The Rutherford County probation system has been corrupted by the arrangement with PCC, Inc. and the pursuit of profits from court debts. Upon information and belief, local prosecutors meet with PCC, Inc. officers about how to extract as much money as possible out of individual offenders and about how to send harsh messages to other probationers that non-payment will be punished. Such decisions are based not on justice but on how to maximize revenue collection. According to PCC, Inc., local officials are bound by their Contract with PCC, Inc. to take aggressive measures to collect all money owed to PCC, Inc. and to craft "sanctions" for non-payment. *See* Exhibit 1 at 7. The Defendants' extortion enterprise has therefore corrupted the basic delivery of justice in the misdemeanor probation system of Rutherford County.

73.     The Contract contemplates that all decisions by the County and PCC, Inc. related to individuals placed on private probation be undertaken with the primary goal of raising money for the County and for PCC, Inc. rather than doing justice. These decisions are influenced and corrupted by the financial arrangement with PCC, Inc.

74.     This probation debt-collection scheme is enormously profitable, especially in extorting impoverished probationers and family members with no legal obligation to pay the debts of their loved ones to scramble to come up with money in an attempt to avoid arrest and jail.

22

Defendants PCC, Inc. and Rutherford County earn millions of dollars from this scheme every year.

75.     There has been a breakdown of both the neutrality and adversarial components of the legal system in Rutherford County with respect to its misdemeanor probation system. Basic constitutional rights and human dignity are violated rampantly on a daily basis.

76.     Law enforcement officers in Murfreesboro and judges in Tennessee have repeatedly warned about the corrupting dangers of "offender funded" private probation schemes, noting that such schemes create inherent conflicts, lead to rampant corruption, and violate basic principles of neutrality. To take just a few examples:

- A local Rutherford County Sheriff's Lieutenant spoke out publicly in July 2015 about the inherent corruption in the County's scheme with PCC, Inc.
- A judge in a different Tennessee County admitted last year to a local news station that a similar private probation contract in that County created a system that was designed as a "cash cow" for the court and the company and that they depended on making as much money as possible from probationers for their revenue.
- A prominent Tennessee judge warned the Tennessee legislature over a decade ago that such contracts had led to rampant corruption, extortion, and injustice by allowing "money making machines" to serve in supposedly neutral judicial roles. A private probation company recently demanded and received what it called a "due process" hearing when a state District Attorney and defense lawyer in another county jointly requested that a probationer be reassigned after she felt physically threatened by being ordered to report to the private home of her private probation officer. The private probation officer asserted in court that his personal business reputation and property were being deprived by the effort to remove the probationer and to have her report to (and pay) a different company. The court apparently granted the private probation officer such a "due process" hearing relating to this lost profit to the private company and subpoenaed the female probationer to give testimony at a hearing purportedly in the context of her own probation case.

**B.    The Named Plaintiffs**

**i.    Plaintiff Cindy Rodriguez**

77.     Cindy Rodriguez is a 51-year-old individual with a disability and a mother of two children, ages 28 and 17. She lives in Rutherford County with her 17-year-old daughter.

78.     Ms. Rodriguez lives in poverty and struggles to meet the basic necessities of life.

She has no bank account, no real property, and no significant assets. She has difficulty maintaining active utilities at her home.

79. Ms. Rodriguez depends on Social Security disability (SSI) income to survive. Ms. Rodriguez is physically disabled and lives in constant pain. She requires prescription medication from previous surgeries to her back and neck.

80. In 2014, Ms. Rodriguez was arrested for shoplifting from a grocery store in Murfreesboro. Because of her lack of a criminal record, the District Attorney in her case told her that her case would be dismissed and would not go on her record so long as she complied with probation and so long as she paid her court debts. She was told that, pursuant to County policy, if she could not pay, her case would not be dismissed and she would be prosecuted.

81. Ms. Rodriguez was placed on probation for 11 months and 29 days.

82. Pursuant to policy, pattern, and practice as described above, as well as the Contract between Rutherford County and PCC, Inc., Ms. Rodriguez was assigned to PCC, Inc. as her "probation officer."

83. Ms. Rodriguez was forced to sign a list of standard "probation conditions" drafted by PCC, Inc. Among these conditions, PCC, Inc. purported to require Ms. Rodriguez to allow PCC, Inc. employees to search her home and her person at any time of the day or night, without a warrant. PCC, Inc. also purported to require Ms. Rodriguez to avoid drinking alcohol or attending any location where alcohol was served despite the fact that alcohol had no relationship to her offense. PCC, Inc. also required, among other things, Ms. Rodriguez to pay all of the additional fees and costs that it would levy in its discretion for its own services as her "probation officer."[10]

---

[10] Although not listed in the standard conditions, PCC, Inc. officers also orally informed Ms. Rodriguez, pursuant to their standard practice, that she would be forced to comply with other restrictions on her liberty. For example, she was prohibited from leaving the County without permission of the company, and even with permission she could never leave the County (even to visit her elderly parents) for more than seven days.

84.     Ms. Rodriguez first reported to PCC, Inc. in August 2014.  PCC, Inc. employees, in accordance with their policy and practice, conducted an "orientation."  Ms. Rodriguez and other new probationers were told that, if they did not make their payments to PCC, Inc., then PCC, Inc. would have their probation revoked.  PCC, Inc. trains its employees to tell new probationers that the company will have probationers "violated."  PCC, Inc. uses the verb "violate" to mean that the company will obtain an arrest warrant and file a petition for the revocation of the probationer's probation.

85.     On several occasions, PCC, Inc. employees acting as probation officers pursuant to the County's Contract told Ms. Rodriguez that they would get a warrant and "violate" her if she did not pay PCC, Inc. its money.  Specifically, PCC, Inc. Defendant Briana Woodlee, who was Ms. Rodriguez's probation officer assigned by PCC, Inc., directly threatened Ms. Rodriguez with an arrest warrant and revocation if she did not pay.

86.     On at least one occasion when Defendant Woodlee was absent, Ms. Rodriguez met with a PCC, Inc. supervisor.  The supervisor told Ms. Rodriguez that she did not care about paperwork from her doctor concerning her disability and asked where her money was.  When Ms. Rodriguez said that she could not afford to bring any money that week, the supervisor threatened Ms. Rodriguez that, if she did not have money the next visit, then the supervisor would "violate" her for nonpayment.

87.     On one occasion when Ms. Rodriguez was not able to bring any money, a PCC, Inc. supervisor got mad at her for not bringing any money and told Ms. Rodriguez: "one more time of this bullshit, and I'm gonna violate you.  You'll spend 7 days in jail."

88.     PCC, Inc. probation officers never told Ms. Rodriguez that she had any legal right or legal mechanism to have her payments waived or reduced on account of her indigence.  After

25

many months on probation, Ms. Rodriguez overheard another probationer talking about getting court debts reduced or waived. As a result, Ms. Rodriguez asked her probation officer, Defendant Woodlee, about having her costs and fees reduced or waived. Defendant Woodlee told her that it was "too late in the game now." Ms. Rodriguez was told that it would "take too long" for that process to work. PCC, Inc. ordered her to keep paying.[11]

89.     Over the course of her probationary period, Ms. Rodriguez was forced on numerous occasions to be drug tested at PCC, Inc.'s discretion. The drug tests were humiliating and physically intrusive.

90.     Drug tests are typically administered by a female PCC, Inc. employee who accompanies female probationers into the bathroom, and a male security guard employed by PCC, Inc., who accompanies male probationers into the bathroom. Probationers are forced to urinate in a stall-less bathroom, while being watched, into a small plastic drinking cup that has no lid. Probationers are then forced to carry the lidless plastic drinking cup through the lobby, past the other probationers, and into an office for testing. Probationers are then instructed to return to the bathroom to empty the unused portion of the sample from the lidless plastic drinking cup into the toilet. All of this occurs in plain sight of everyone in the waiting room and without basic sanitation, such as soap, water, or hand sanitizer.

91.     Even though drugs had nothing to do with Ms. Rodriguez's offense of shoplifting from a grocery store and even though she had no documented history of drug abuse, PCC, Inc. regularly required her to undergo drug tests at its discretion because PCC, Inc. charges probationers approximately $20 per drug test.

---

[11] As discussed *supra*, PCC, Inc. has a policy and practice of requiring probationers to wait and to make several months of payments before it claims it will even consider an indigency application. In any event, it informs probationers in advance that it will likely deny that application. *See* Exhibit 4.

26

92.     PCC, Inc. earns a significant profit on each drug test transaction.

93.     On numerous occasions in PCC, Inc.'s offices, Ms. Rodriguez has overheard other PCC, Inc. probation officers threatening probationers that they will be "violated" if they do not bring sufficient amounts of money to PCC, Inc.

94.     PCC, Inc.'s repeated threats to have her arrested if she does not pay have nearly debilitated Ms. Rodriguez from the constant stress related to the continuous fear of going to jail. In addition to her fear of going to jail for the first time at age 51 because of her poverty and disability, which prevents her from working, Ms. Rodriguez is terrified of being separated from her teenage daughter.

95.     Ms. Rodriguez is so destitute that she broke a tooth months ago and has not been able to have it fixed.  Because of PCC, Inc.'s threats, she paid PCC, Inc. instead of paying her car loan, and she lost her car.  Because she has been forced to walk significant distances around Murfreesboro, she has passed out in public on two separate occasions from exhaustion.

96.     During the course of her probation supervision by PCC, Inc., PCC, Inc.'s threats were effective in extorting Ms. Rodriguez to forgo basic necessities to make payments to the company because she feared arrest and revocation.  In fact, Ms. Rodriguez even directed her disability benefits — her sole source of income — to PCC, Inc.

97.     On many occasions, receipts given to Ms. Rodriguez show that the company applied all or a significant portion of her payments to its own fees instead of to her court debts. PCC, Inc. has an incentive to do this because Rutherford County has a policy, pattern, and practice of allowing probationers to enter "unsupervised" probation (i.e., without paying PCC, Inc. and without the standard liberty restrictions) so long as they have paid off their court debts.  By choosing to apply Ms. Rodriguez's payments to its own fees, PCC, Inc. ensured that Ms. Rodriguez

27

would not move to "unsupervised" probation and that it would continue to be able to charge her fees for supervised probation. Moreover, PCC, Inc. and Rutherford County have a policy, pattern, and practice of revoking and extending probation for successive terms if a person has not paid off his or her court fines and costs by the end of the probationary period. Thus, PCC, Inc.'s decisions concerning how to apportion Ms. Rodriguez's payments were designed to have a direct effect on how long she would remain assigned to PCC, Inc. and, as a result, how long it could charge her additional fees for its own profit.

98.     By June 2015, Ms. Rodrguez had been on probation with PCC, Inc. for nearly a year. Although her original court costs were only $578, she had paid virtually all of that amount to PCC, Inc. Incredibly, PCC, Inc. chose to apply only $66 to her court costs. Thus, according to PCC, Inc., she still owed $512 in court costs despite enduring enormous hardship for an entire year to pay virtually all of her original court debts.

99.     Ms. Rodriguez's probation period ended on July 28, 2015. Defendant Woodlee told her that July 28 was the last chance that she had to make *full payment* of outstanding costs and fees. Despite her poverty, PCC, Inc. demanded a lump sum payment of $533.35. Defendant Woodlee told Ms. Rodriguez that, if she did not pay, Defendant Woodlee would ensure that an arrest warrant issued and that Ms. Rodriguez would have to go turn herself in to the County jail. She was told to report to PCC, Inc. even after her probation period was supposed to end so that PCC, Inc. could drug test her again.

100.    By the time PCC, Inc. carried out its threats to "violate" her, the company had, according to its own records, extracted enough money to pay almost all of Ms. Rodriguez's court debts. Nevertheless, it still requested that she be jailed, given additional costs and fees (including a fee for the warrant that PCC, Inc. secured), and required to serve another year on probation,

28

during which it would assess additional fees and surcharges.

101.    From the beginning of Ms. Rodriguez's probationary period, PCC, Inc. and its employees knew that she was indigent, disabled, and destitute.  PCC, Inc. and its employees knew that Ms. Rodriguez depended on SSI to survive and that she could not afford both to make payments to PCC, Inc. and to meet the basic necessities of life.

102.    PCC, Inc. knew of the availability of a legal mechanism for Ms. Rodriguez to have her costs and fees waived or reduced, but it never informed her of that mechanism.

103.    Just prior to turning herself into the jail on the warrant secured by PCC, Inc., Ms. Rodriguez passed out from a panic attack due to the stress of going to jail.  She broke her arm in three places when she fell.

104.    When Ms. Rodriguez went to turn herself in, she was humiliated and taunted by County jail officers.  Officers stuck their hands into her pants, purportedly to search her private areas even though she was being released on her own recognizance.  One officer looked at her broken arm and laughed at her, saying that he was going to make sure the fingerprinting process really hurt her.   The officer then grabbed her broken arm, which was in a sling, and moved it forcibly to take prints as Ms. Rodriguez cried.  The officer then called the disabled Ms. Rodriguez a "wussy."

105.    Near Ms. Rodriguez was another woman in a wheel chair, wearing a helmet and suffering from physical deformities that limited her movements.  The woman could not control her drooling, and she had drooled all over her face.  A jail guard went up to the woman and slapped her across the face and swore at her for drooling.  These incidents of everyday brutality and inhumanity at the Rutherford County jail are rampant and notorious among probationers, dozens of whom corroborate similar incidents of mistreatment, and are used by PCC, Inc. staff as part of

29

their threats to extort money.

106. Ms. Rodriguez was given a court date for her revocation hearing and left the jail. Afterward, Rutherford County posted a photo of her mug shot on its Facebook account, announcing her arrest to the community. She immediately received calls from her preacher and nearly ten people in the community, telling her that they saw that she had violated her probation. Ms. Rodriguez was humiliated because she had to tell numerous people in her church and her community that she was destitute and disabled and had been "violated" for not being able to pay PCC, Inc. It was deeply embarrassing for her to tell people in her community that she was too poor to pay.[12]

107. When she appeared with pro bono counsel for the revocation hearing, the County did not permit her to move forward with the revocation hearing until she took and passed a drug test at PCC, Inc., for which she was charged an additional $20. Along with many other probationers on the docket that day, Ms. Rodriguez was forced to walk from the court to PCC, Inc.'s offices for the drug test.

108. After passing the drug test, Ms. Rodriguez was able, with the assistance of counsel, to apply to the judge to be put on an unsupervised payment plan instead of an additional 11/29 of PCC, Inc. probation. Her payment plan contemplates the payment in full of her court costs, but she will not be forced to incur the additional debts, burdens, or threats associated with participation in PCC, Inc.'s illegal private probation scheme. Of course, this option was never offered to her by

---

[12] After attending all of her many reporting sessions over the course of a whole year, Ms. Rodriguez received a letter dated August 19, 2015, from PCC, Inc. stating that she had failed to report to an appointment as scheduled. Pursuant to PCC, Inc. policy, PCC, Inc. attempts fraudulently to create "failure to appear" violations for those whose only violation is non-payment. One of the ways in which PCC, Inc. does this is by alleging missed appointments that the person was never aware of. In the case of Ms. Rodriguez, these supposed non-appearances allegedly occurred *after* probation terms had already expired, and no PCC, Inc. employee had told her that she needed to keep reporting after the expiration of the probation term. The notice letter threatened Ms. Rodriguez that PCC, Inc. might notify the judge of her non-appearance and asked her to pay her outstanding costs and fees.

30

PCC, Inc., who only threatened to "violate her" if she failed to pay. As a matter of practice, this option is not offered to unrepresented probationers.

ii. **Plaintiff Steven Gibbs**

109. Steven Gibbs is a 61-year-old individual with a disability.

110. Mr. Gibbs relies on money from Social Security disability (SSI) to meet the basic necessities of life.

111. Mr. Gibbs has an intellectual disability. Prior to ceasing school attendance around age 12, by which time he had only made it to the Fourth Grade, Mr. Gibbs was enrolled in special education classes because of his disability.

112. Over the past year, Mr. Gibbs has been convicted twice of driving on a suspended license. Pursuant to Tennessee law, he is unable to get his license back because he cannot afford to pay his court costs, fines, and fees to Rutherford County. Mr. Gibbs suffers enormous hardships given the lack of adequate public transportation in the Rutherford County area. He also suffers from debilitating arthritis, which makes it difficult for him to walk distances.

113. After each conviction, Mr. Gibbs was placed on probation with PCC, Inc. Pursuant to Rutherford County's Contract with PCC, Inc., Mr. Gibbs was forced under threat of jail to sign a list of "probation conditions" drafted by PCC, Inc. and the County. Among these standard conditions, PCC, Inc. purported to require Mr. Gibbs to allow PCC, Inc. employees to search his home and his person at any time of the day or night. PCC, Inc. also purported to require Mr. Gibbs to avoid drinking alcohol or attending any location where alcohol was served despite that condition bearing no rational relationship to his offense. PCC, Inc. also required, among other things, Mr. Gibbs to pay all of the additional fees and costs that it would levy in its discretion for its own services as his "probation officer."

114.    Each time that Mr. Gibbs has been placed on probation with PCC, Inc., he has attended an orientation session at which PCC, Inc. employees threaten new probationers that they will be revoked and arrested if they do not pay.

115.    Throughout his supervision by PCC, Inc., Mr. Gibbs has been repeatedly threatened that, if he does not bring money to PCC, Inc., he will be "violated" and jailed because PCC, Inc. will seek the revocation of his probation.

116.    Even though Mr. Gibbs is living in desperate poverty and struggles to have enough money for food, clothing, shelter, and utilities, he would usually try to pay PCC, Inc. at least $5 every time that he went because he feared that they would throw him in jail.

117.    At the end of his first probationary period, he still owed significant debts, including the significant additional fees assessed by PCC, Inc.  At no point was Mr. Gibbs informed by PCC, Inc. employees that he could seek a waiver or reduction of the fines, costs, or fees.  When he had not completed payment, PCC, Inc. followed through on its threats and sought the revocation of his probation, and he was told to report to the County jail.  Mr. Gibbs was told that he would not have to go to jail if he paid the remainder of what he owed.

118.    In 2015, Mr. Gibbs was again placed on probation with PCC, Inc. for driving with a suspended license.  Mr. Gibbs was again forced to endure all of the onerous conditions (including, for example, that he pay for drug tests unrelated to his offense) and threatened that he had to pay all of the substantial PCC, Inc. fees.  Mr. Gibbs was jailed for a probation revocation at the request of PCC, Inc. in July 2015.

119.    Mr. Gibbs almost died as a result of being jailed.  He was denied the inhaler necessary for his emphysema, he was forced to sleep on a concrete floor for the first 11 days, and he was denied other necessary medical care for his severe arthritis.  Immediately after being

32

released from jail, Mr. Gibbs suffered a seizure and fell, resulting in serious injury and bruising to his head and body.

120.    Mr. Gibbs is currently on six different types of medication, mostly for recent seizures.

121.    After he hit his head, Mr. Gibbs' PCC, Inc. probation officer told him that, if he brought in $400-500, she would let him call in to the office instead of having to report in person. PCC, Inc. trains its officers to use their discretion in granting or denying perks such as call-in supervision to maximize the profit that it collects.

122.    At no point did any PCC, Inc. employee inform Mr. Gibbs that any of his costs or fees could be waived because of his indigence.  On the advice of counsel, Mr. Gibbs asked in August 2015 for an indigency form to have his costs and fees waived.  A PCC, Inc. probation officer told him that, if he brought in some money to PCC, Inc., he could have an indigency form. She refused to give it to him when he said that he did not have any money.

123.    After being released from jail, he was placed back on probation at the request of PCC, Inc.  The Tuesday after his release from jail, he went to meet his probation officer at the PCC, Inc. offices in downtown Murfreesboro.  He was told that PCC, Inc. could "violate" him if he did not bring enough money to the meeting.

124.    Mr. Gibbs asked his previous probation officer, Defendant Jasmine Jackson, if anything could be done to reduce or get rid of his fees.  Defendant Jackson falsely told Mr. Gibbs that nothing could be done and that they could not waive his fees.

125.    Mr. Gibbs was told that he would be arrested and jailed or have his PCC, Inc. probation extended if he did not pay by the end of his current probationary period.

126.    In late August 2015, Mr. Gibbs went to see his probation officer.  She told him that,

33

if he did not bring $90 to his next visit then he should not even bother reporting and that she would "violate" him. His probation officer was upset that he had brought only $5 to his previous visit, at which she taunted him and laughed at him for being too poor to afford to bring more money. She told him that she would then have to drug test him as a result of his nonpayment.

127.    When he showed up for his next supervision meeting a week later, his PCC, Inc. probation officer claimed that Mr. Gibbs had tested positive for marijuana. Mr. Gibbs knew this to be either false or a mistake because he had not used marijuana. He had been drug tested at his pain clinic and been tested clean. Nonetheless, his probation officer told him that she would make sure that the court issued a warrant for his arrest for the positive drug test.

128.    Mr. Gibbs and his wife went immediately to a private, independent clinic and, with the assistance of undersigned counsel, took a comprehensive set of drug tests designed for State of Tennessee probationers. The independent lab test was negative for marijuana and negative for every other one of the nine common controlled substances included in the standard probation drug test.

129.    On his next visit to PCC, Inc., Mr. Gibbs's PCC, Inc. officer again told him that he was behind on payments, threatened him that she was preparing to issue a warrant for his arrest, and demanded that he make a payment of at least $40. Mr. Gibbs again told her that he simply could not pay her because he needed his disability money to survive.

130.    In late September 2015, PCC, Inc. sought and obtained a warrant for Mr. Gibbs's arrest. The warrant contains a preset secured money bond of $10,000, meaning that, when Mr. Gibbs is arrested, he will languish in jail indefinitely until the Defendants decide to conduct revocation proceedings because he is unable to afford to pay $10,000.[13]

---

[13] The Defendants have repeatedly refused to provide a copy of the warrant to counsel for Mr. Gibbs or even show counsel a copy of the warrant.

34

131.    The repeated threats from PCC, Inc. probation officers have dominated Mr. Gibbs's life over the past two years.  He has lived in constant fear that if he does not divert a significant portion of his means tested federal disability benefits—his only source of income—to pay PCC, Inc., he will be jailed and his probation will be extended.

### iii.    Plaintiff Paula Pullum

132.    Paula Pullum is a 48-year-old individual with a disability.

133.    Ms. Pullum is the mother of three children, and she has nine grandchildren.

134.    Ms. Pullum suffers severe medical conditions.  She has a paralyzed bladder, which requires her to urinate through a catheter.  She is a breast cancer survivor and had a double mastectomy, enduring 36 chemotherapy and 28 radiation treatments.  She suffers from severe back and neck injuries that have each required major surgery.  She has had three hip replacement surgeries and has had her lymph nodes removed.  She has severe stomach problems that required surgery and necessitate a special diet, and she has a heart condition that requires medication.

135.    Ms. Pullum relies on federal SSI disability payments as her only source of income to survive.  She receives $767 per month, which she must use for rent, utilities, food, clothing, transportation, and all of the other basic necessities of life.

136.    In 2015, Ms. Pullum was arrested and charged with DUI.  Prior to trial, Ms. Pullum was assigned to PCC, Inc. for supervision.  Ms. Pullum was told that a condition of her pretrial release was that she wear an ankle bracelet product sold by PCC, Inc.  Pursuant to County and PCC, Inc. policy and practice, Ms. Pullum was told that she would be jailed if she did not pay approximately $12 per day for this PCC, Inc. product.

137.    Ms. Pullum told PCC, Inc. that she could not afford to survive and to pay PCC, Inc. because she relied only on a small disability check.  Her PCC, Inc. supervisory officer told her that

she had to pay, and that there were "no ifs, ands, or buts."  PCC, Inc. then charged Ms. Pullum an extra $149 "setup fee" in addition to the daily fees.

138.    The PCC, Inc. ankle product is part of a PCC, Inc. program called SCRAM, which is designed to force supervisees to pay exorbitant fees for additional supervisory conditions under the threat of pretrial detention in jail for those who cannot afford the services.  Pursuant to PCC, Inc. and County policy and practice, no supervisee is informed that the costs of those programs and products can be waived or reduced for the indigent.  PCC, Inc. and the County conspire to require these extra services in cases in which they are not necessary and are not the least restrictive condition of release required because, on information and belief, they are enormously profitable to PCC, Inc.

139.    After two-and-a-half months of paying roughly one-third of her total disability income to PCC, Inc. for SCRAM, Ms. Pullum was removed from the program at the request of a lawyer who agreed to assist her.  PCC, Inc. and Rutherford County occasionally make special accommodations for supervisees who are represented by a lawyer as opposed to those who are not.

140.    PCC, Inc. agreed to remove the bracelet but insisted that Ms. Pullum begin paying for drug tests at approximately $20 per test, even though nothing about her case involved illegal drug use and she has no history of drug use.  It is standard PCC, Inc. policy to force all probationers, regardless of their offense or history, to pay for drug tests.  As a result, Ms. Pullum eventually paid over $1,000 to PCC, Inc. before her case was resolved.

141.    During this period, PCC, Inc. repeatedly threatened Ms. Pullum with jail if she did not make payments.  PCC, Inc. also told Ms. Pullum that she was required to keep a working phone number.  Because Ms. Pullum could not afford both to pay PCC, Inc. and to keep her phone, her elderly mother was forced to take money from her own fixed income to lend Ms. Pullum money

36

to pay Ms. Pullum's phone bill.

142.     Ms. Pullum, who had never been to jail, was so frightened that she would die in jail because of her medical needs,[14] that she skipped her rent payments so that she could pay PCC, Inc. As a result, she was evicted.

143.     After Ms. Pullum pled guilty, she was placed on probation and sent to PCC, Inc., which was again to serve as her "probation officer" pursuant to its exclusive monopoly Contract with the County.

144.     On July 1, 2015, Ms. Pullum went to the PCC, Inc. "orientation," where she saw dozens of other probationers meeting with at least five PCC, Inc. employees who referred to themselves as "probation officers."   PCC, Inc. probation officers made a variety of threats, including that probationers would be "violated" if they did not pay.  None of the probationers were informed that they could not be violated and jailed if they were indigent and did not have the ability to pay.

145.     Ms. Pullum and the others were also told that if PCC, Inc. determined that any of them violated its office rules, then they would be asked to leave, and PCC, Inc. would inform the County Court that the probationer had not shown up at all.

146.     Ms. Pullum told PCC, Inc. again, as she had done prior to pleading guilty, that she was disabled and could not afford to make payments.  Her probation officer, Defendant Woodlee, told her: "I need $146 today."  Ms. Pullum told the probation officer that she would not be getting her disability check until July 3.  Her probation officer told her that, because of the July 4 holiday, Ms. Pullum would probably be getting her disability check early, on July 2.  Defendant Woodlee ordered her to come back to PCC, Inc. the next day, July 2, as soon as she got her check, with a

---

[14] Ms. Pullum spent 15 hours in jail after her DUI arrest before her elderly mother could pay for her release.  In that time, Ms. Pullum was denied the catheter that she needs to urinate by County jail officials.

money order made out to PCC, Inc. Of the $146 paid by Ms. Pullum on that occasion, PCC, Inc. chose to apply only $54 to her court debts.

147. On a later date, Defendant Woodlee told Ms. Pullum that she had to bring $400 to the next meeting. Ms. Pullum told Defendant Woodlee that she only gets one check per month and could not pay. Defendant Woodlee told her that PCC, Inc. would "violate" her if she did not perform her required community service, complete and pay PCC, Inc. for a DUI class, and pay $400.

148. Pursuant to PCC, Inc. and Rutherford County policy, all probationers are charged fees for the right to do community service and to complete required classes. Ms. Pullum was told that PCC, Inc. would "violate" her if she did not complete those requirements and that she could not complete the requirements (such as the class and community service) if she did not pay for them. PCC, Inc., as is its policy and practice, used its discretion to set dates by which Ms. Pullum had to complete these tasks and told her that they would "violate" her if she did not complete the tasks and pay for them prior to those dates.

149. No PCC, Inc. employee ever informed Ms. Pullum that any of her payments could be reduced or waived if she could not afford them. Instead, she was repeatedly threatened with jail and probation revocation if she did not pay.

150. Ms. Pullum told Ms. Woodlee that there was no way that she could bring $400 to PCC, Inc. by the next meeting. Defendant Woodlee told Ms. Pullum: "you need to bring me a big payment." Defendant Woodlee again threatened Ms. Pullum that she would "violate" her if she did not pay and told Ms. Pullum: "If I violate you, you will have to do the whole 11 months and 29 days in jail."

151. Because of PCC, Inc.'s threats, Ms. Pullum was repeatedly forced to forgo basic

38

necessities to divert money to PCC, Inc. She was also forced to borrow money from her elderly mother to make payments.

152.    Pursuant to its policies, PCC, Inc. frequently applied Ms. Pullum's payments to its own fees prior to the costs owed to the County because PCC, Inc. has an incentive to keep people like Ms. Pullum on probation under the threat of jail for as long as possible and because its arrangement with the County ensures that probationers will routinely be "extended" on PCC, Inc. probation if their debts to the County are not paid in full.

153.    On each of her reporting visits to PCC, Inc., the first thing Ms. Pullum is asked is "do you have the money?" or "do you have your payment?"

154.    PCC, Inc. has now again begun requiring Ms. Pullum to show up to its offices every Tuesday for a drug test. Because of Ms. Pullum's paralyzed bladder and catheter, a PCC, Inc. employee insists on accompanying her to the bathroom to observe her drawing urine through the catheter. Ms. Pullum is therefore forced repeatedly to endure the humiliation of a PCC, Inc. employee watching the most sensitive areas of her body to conduct unjustified drug tests (Ms. Pullum's offense involved no drugs). To complete the indignity, Ms. Pullum is charged $20 each time and told by PCC, Inc. that, if she does not pay for the drug test, PCC, Inc. will "violate" her.

155.    Ms. Pullum was ordered as part of her first-time DUI sentence to serve 20 days in the County jail. Prior to turning herself in, her lawyer prepared a letter listing out her serious medical conditions and required medications. When Ms. Pullum arrived at the jail, a jail employee took the letter out, tore it up in front of her, and said: "this letter don't mean shit." The jail employee then threw the letter in the trash. Jail staff then forced Ms. Pullum to go between 10 and 15 hours without her catheters, causing bleeding in her bladder.

156.    When Ms. Pullum was released from jail, she called PCC, Inc. A PCC, Inc.

supervisor told her that she had to make a $250 payment or PCC, Inc. would violate her and send her right back to the County jail. Ms. Pullum believed that she had almost died during her previous visit, and she was so frightened that she borrowed $250 to pay PCC, Inc.

157.     In September 2015, Ms. Pullum again told a PCC, Inc. supervisor that she was destitute and disabled and could not afford to pay PCC, Inc. The supervisor taunted her, told her to take a drug test since she had not paid, and said that there was "no chance" of Ms. Pullum having her fees waived because her offense involved alcohol. The PCC, Inc. officer then told Ms. Pullum that she could be "violated" if she did not bring "a big payment" to the next supervision meeting. She told her that "a nonpayment is not acceptable."

### iv.     Plaintiff Yolanda Carney

158.     Yolanda Carney is a 44-year-old individual with a disability.

159.     Ms. Carney depends on federal means tested disability benefits to meet the basic necessities of life.

160.     Ms. Carney was placed on probation with PCC, Inc. in the beginning of 2014. The next year-and-a-half of her life was a continuing saga of debt, extortion, and enormous stress caused by PCC, Inc.'s repeated threats to "violate" her probation.

161.     Over the course of her probation with PCC, Inc., Ms. Carney told her probation officer, Defendant Jackson, on at least half a dozen occasions that she could not afford to make the payments that PCC, Inc. was demanding. She informed Defendant Jackson that she depended only on SSI to survive. On each occasion, Defendant Jackson, pursuant to PCC, Inc.'s standard practice, ordered her that she "needed" to make the payments and told her that she would go back to jail if she did not pay.

162.     Pursuant to PCC, Inc. policy, Defendant Jackson also told Ms. Carney that, if PCC,

40

Inc. decided to "violate" her, then Ms. Carney would be charged additional fees for the arrest warrant that would be issued and court costs for the violation proceedings. According to Defendants' standard practices, probationers who are revoked are forced to pay additional costs, fees, and surcharges to the Defendants.

163. On one occasion, while Defendant Jackson was in the bathroom watching Ms. Carney urinate, Ms. Carney broke down and begged to Defendant Jackson that she could not afford to keep paying PCC, Inc. for drug tests. Defendant Jackson charged Ms. Carney approximately $20 for each drug test, which were conducted at the discretion of PCC, Inc. with whatever frequency the company felt would maximize its profits.

164. PCC, Inc. told Ms. Carney that she would be required under penalty of revocation to pay $132 for the privilege of being allowed to perform her required community service.

165. After months on probation, Ms. Carney learned from another probationer that she could file a motion with the court to ask that her costs and fees be waived or reduced on the basis of indigence. No PCC, Inc. employee had ever told her of the opportunity to have her fees and costs waived or reduced.

166. Ms. Carney asked Defendant Jackson repeatedly about how to invoke the indigency waiver process. At first, Defendant Jackson declined to provide any information. Eventually, Defendant Jackson told Ms. Carney that she would be charged $25 if she wished to file an "indigency motion."

167. Ms. Carney went directly to the County Courthouse and asked about filing an indigency motion. The clerk at the County Court told her that she was required to go back to PCC, Inc. to ask for a waiver with PCC, Inc. in the first instance. The clerk said that PCC, Inc. would deny her request and that she would then have to bring that paper back to the court. Until PCC,

41

Inc. did anything, the Court would refuse even to consider her indigency petition because that was its policy. The clerk at the court was aware of PCC, Inc.'s policy to deny all indigency waivers.

168.    Ms. Carney was given a sheet of paper drafted and disseminated by PCC, Inc. that told her that PCC, Inc. would make the first decision on indigence. *See* Exhibit 4. The document states that PCC, Inc. would decide the question of indigence before the matter would be heard in court and that PCC, Inc.'s policy would likely result in any indigence request being denied. *Id.* The document then instructs probationers not to be "discouraged" and to continue making their payments. *Id.* The document also tells probationers that they are required first to make an unspecified number of payments to PCC, Inc. before any indigency request will even be considered. *Id*.

169.    Ms. Carney brought all of her papers to the courthouse again and asked to see the judge to get her payments reduced or waived. Defendant Jackson saw her in the courtroom and went to the judge and had a private conversation with the judge. Pursuant to County and PCC, Inc. standard practice, PCC, Inc. employees are present, as a matter of routine daily practice, at revocation and other hearings involving PCC, Inc. probationers. These PCC, Inc. employees routinely engage in private *ex parte* communications with the judges concerning how to handle cases of probationers.

170.    After Defendant Jackson spoke to the judge, Mr. Carney saw Defendant Jackson walk away from the judge. The courtroom clerk then approached Ms. Carney and told her that the judge would not see her or hear her motion. The clerk refused to accept the motion, and Ms. Carney was told by the clerk to return to PCC, Inc.

171.    In late July 2015, a representative of Equal Justice Under Law spoke to a clerk in the Rutherford County courthouse and asked about the process of obtaining a waiver of fees and

costs. The clerk informed the representative that she could not give out any indigency forms until a probationer was denied by PCC, Inc. and that it would cost $25 for the right to be heard as a matter of Rutherford County policy. The clerk also reported that, pursuant to County policy, the judge was unlikely to waive PCC, Inc.'s fees even if the judge waived court costs. PCC, Inc.'s Contract with the County purports to require judges to make every effort to ensure the collection of PCC, Inc.'s profits.

172. Courthouse staff informed Ms. Carney that, consistent with courthouse policy, she could go on unsupervised probation the moment she paid her court fines and costs.

173. Numerous PCC, Inc. receipts retained by Ms. Carney demonstrate that PCC, Inc., pursuant to its policies, was deducting Ms. Carney's payments substantially from its own fees prior to deducting the payments from the debts owed by Ms. Carney to the County. Thus, PCC, Inc. attempted to keep Ms. Carney on supervised probation for a longer period in order to continue collecting fees.

174. For example, on the first nine occasions that Ms. Carney paid PCC, Inc. money that she was forced by threat of jail to take out of her disability check for her weekly visit, PCC, Inc. chose to keep all of the money for itself and did not reduce her court costs at all.

175. According to PCC, Inc.'s own receipts, by early 2015, after a year of making payments to PCC, Inc. at substantial hardship to herself, Ms. Carney had paid a total of $1,843. PCC, Inc. had chosen to take over $1,300 for itself, leaving only $460 allocated to her court costs. Incredibly, the total amount that she still owed after a year of making payments, as a result of additional PCC, Inc. surcharges, was now *nearly $200 more than her original court costs*.

176. At the end of Ms. Carney's probation term, PCC, Inc. told her that she had not completed her payments and that she should therefore sign an agreement to revoke and extend her

43

probation for another year. Pursuant to its policy, PCC, Inc. "violates" probationers and then attempts to obtain their consent (as a punishment for violation and in lieu of a longer jail term) to the extension of their probation without the advice of counsel. Ms. Carney refused to sign the document despite PCC, Inc.'s threats that it would recommend revocation.

177.    Instead, Ms. Carney demanded to speak with the judge and ultimately was placed on a payment plan directly with the Court, and she now owes the remainder of her fines, costs, and fees in monthly installments directly to the Court clerk.

### v.    Plaintiff Jacqueline Brinkley

178.    Jackie Brinkley is a 31-year old mother of four young children. Her twins are 12 years old, and her other children are six and four years old.

179.    Ms. Brinkley lives in desperate poverty and relies on SSI disability payments and her family's assistance to survive and to provide basic necessities to her children.

180.    Ms. Brinkley was placed on probation with PCC, Inc. in 2015 for driving with a suspended license. She was placed on 30 days' probation.

181.    Ms. Brinkley attended a required orientation event at the offices of PCC, Inc. She was told to pay approximately $500 in total. Her probation officer told her that if she did not pay on time then PCC, Inc. would "violate" her, that she would have a warrant out for her arrest, and that she would have to turn herself into the Rutherford County jail. She informed her probation officer that she had four children and depended on SSI, food stamps, and a small amount of child support to feed and clothe her children. She asked if anything could be done to help her.

182.    The PCC, Inc. probation officer told her that she would have to pay $25 for the right to go in front of a judge to file a motion seeking reduction of her costs.

183.    On another occasion, her probation officer told her that she had to pay or else PCC,

44

Inc. would "violate" her. The probation officer told her that, when she was "violated," she would have to turn herself into the jail but that the jail would let her out on her own recognizance in advance of her revocation hearing and that PCC, Inc. would add a "warrant fee."

184. At the end of her probationary period, she had not paid all of her fines and costs because she was indigent and could not afford to pay both PCC, Inc. and meet the basic necessities of life for herself and her children. PCC, Inc. petitioned to revoke her probation for non-payment and obtained a warrant for her arrest.

185. After PCC, Inc. filed for revocation of her probation, PCC, Inc. threatened her that they would also seek revocation for "non-reporting," even though her probationary period had ended and no one had told her that she needed to keep going to PCC, Inc. PCC, Inc. threatened that it might ask the judge to jail her for the full 30 days because their notes indicated that her probation officer claimed to have told Ms. Brinkley to report one final time after her probation ended and after she was "violated" for not paying PCC, Inc. Ms. Brinkley was told that she would not be violated if she paid in full.

186. Ms. Brinkley was so frightened by the threats of PCC, Inc. that she used almost an entire SSI check that she needed for her family to pay PCC, Inc. so that she would not be taken away from her children. She was particularly frightened because she had previously served several months in jail after her misdemeanor probation was revoked at the request of PCC, Inc.

187. On August 3, 2015, undersigned pro bono counsel represented Ms. Brinkley at her revocation hearing. Prior to the hearing, counsel was informed by the courthouse clerk that Ms. Brinkley would not be allowed to participate in her revocation hearing until she took, and paid for, another drug test at PCC, Inc.—which would cost an additional $19.85. This was required of Ms. Brinkley (as it is uniformly for all probationers before they will be permitted to appear at their

45

PCC, Inc.-initiated revocation hearings) despite the fact that her underlying offense was unrelated to drugs, and the fact that her probation period had ended.  After taking (and passing) this unnecessary drug test, the District Attorney confirmed that he would agree to dismissal of the revocation petition against Ms. Brinkley if she agreed to pay for the drug test she had just been forced to take at PCC, Inc., and if she proved that she had paid PCC, Inc. all of her court fines, costs, and fees in full.

188.    Ms. Brinkley was so frightened that her probation would be revoked and that she would be jailed that she agreed to pay for the additional drug test even though she needed the money for basic necessities for her family (and even though she was no longer on probation).  She passed the drug test, she showed the District Attorney and the judge that she had paid PCC, Inc. in full, and the revocation petition was dismissed.

189.    On August 12, 2015, Ms. Brinkley learned that, despite being told that her case was over, PCC, Inc. had made an error and that Ms. Brinkley still owed approximately $700 from a case in which PCC, Inc. had supervised her in 2008.  PCC, Inc. informed Ms. Brinkley that it had secured a warrant for her arrest and that she needed to turn herself into the County jail.  According to PCC, Inc., it had revoked her probation in 2008 for nonpayment.

190.    Despite knowledge of her indigence from the beginning of her probationary term, PCC, Inc. failed to inform her of any mechanism to have her costs and fees reduced or waived and never conducted any inquiry into her ability to pay.  Ms. Brinkley was told that she could avoid any problems and jailings only by paying what PCC, Inc. claimed that she owed.

191.    In 2008, Ms. Brinkley had served several months in jail (including 40 days prior to even being brought to court) because of a revocation petition issued by PCC, Inc.  Ms. Brinkley was sentenced to 90 days in jail at the proceedings initiated by PCC, Inc. despite not having a

lawyer to represent her. PCC, Inc. and the County court purportedly obtained a "waiver" of counsel and an "Agreed" revocation from Ms. Brinkley, although none of these actions was taken knowingly, intelligently, and voluntarily. Ms. Brinkley is now being threatened with another jailing arising out of that same incident if she does not pay.

### vi.     Plaintiff Curtis Johnson

192.    Curtis Johnson is a 56-year-old man. He lives in desperate poverty.

193.    Mr. Johnson has difficulty working after he fell while working in residential construction from scaffolding that was 45 feet high. He broke his pelvis and vertebrae. He also suffers from a hernia.

194.    Mr. Johnson survives on $129 in food stamps every month, and he is currently facing eviction from his home. His previous home burned down in November 2014, and he has no bank account, no car, and no significant assets.

195.    Mr. Johnson is currently on probation with PCC, Inc. for driving on a suspended license. He lost his license and cannot get it back because he cannot afford to pay his court and probation costs, fines, and fees.

196.    Mr. Johnson was also on probation with PCC, Inc. in 2014. PCC, Inc. routinely threatened him that it would "violate" him if he did not pay. When Mr. Johnson could not pay, PCC, Inc. filed a revocation petition and an arrest warrant was issued for Mr. Johnson. He turned himself into the jail. An extra fee was added for the arrest warrant secured by PCC, Inc.

197.    When Mr. Johnson went to court, he was placed on a payment plan directly with the court. He was told that he must pay $100 per month. On a recent visit, the clerk told him that, pursuant to their policy, if he did not start paying the $100 per month, he would be placed back on probation with PCC, Inc.

47

198.    When he was placed on probation with PCC, Inc. again in 2015 for driving on a suspended license, Mr. Johnson went to an orientation at PCC, Inc.  His probation officer told him to bring $150 to the initial meeting.  Mr. Johnson was not able to bring the money.  His probation officer told him that if he did not pay then PCC, Inc. would "violate" him again and that he would have to turn himself into the County jail again.  Defendant Tiara Smith, Mr. Johnson's probation officer, has repeatedly threatened him with probation revocation if he does not pay.

199.    At no time did any PCC, Inc. employee tell Mr. Johnson that he had a right to have his payments reduced or waived because of his indigence.

200.    Mr. Johnson heard from a friend that people can file indigency motions with the court to seek the reduction or waiver of their fines and costs.  As a result, Mr. Johnson asked his PCC, Inc. probation officer about it.  Defendant Smith told Mr. Johnson that if he wanted to apply for indigency, he would have to pay for and pass a drug test administered by PCC, Inc., which would cost approximately $20.  She told him that he would also have to pay the standard $25 indigency motion fee.  Mr. Johnson said that he could not afford to pay.  Defendant Smith said that, in any event, she could not give him an indigency application without a supervisor's approval, and she refused to give it to him during the meeting.

201.    On the advice of counsel, Mr. Johnson attempted again to seek an indigency waiver two weeks later.  This time, he was given an application, which he filled out.  Mr. Johnson estimated that his food stamps and scraping money together from odd jobs totaled an income of $429 per month, far below even half of the federal poverty line.

202.    After submitting the application, his PCC, Inc. probation officer "rejected" his application because, according to the probation officer, Mr. Johnson had not yet paid enough money to PCC, Inc. to be considered for indigency.  The probation officer also told him that he

48

had not proven to PCC, Inc. that he was not able to work.

203.    Mr. Johnson was so afraid of being jailed for not bringing any payments to PCC, Inc. that he went without food and paid $20.  PCC, Inc. decided to apply that money to itself and to not credit any of it toward his court costs.

204.    On September 29, 2015, Mr. Johnson paid PCC, Inc. $10.  Defendant Smith told Mr. Johnson that he had to "come up with" over $900 within the next two weeks or else PCC, Inc. would "violate" him.

### vii.    Fred Robinson

205.    Fred Robinson is a 30-year-old indigent individual with a disability.

206.    Mr. Robinson relies on SSI disability benefits to survive.  He suffers daily from cirrhosis of the liver.  Because of his liver malfunction, his body routinely sends toxins to his brain, rendering him periodically confused and disoriented.  He also suffers from severe internal bleeding due to chronic stomach ulcers, which render him unable to work.  His only source of income is his disability income.

207.    Mr. Robinson was convicted of misdemeanor marijuana and paraphernalia charges in December 2011.  He was assessed a $500 fine for each charge and court costs of $1,503.  Because he could not afford to pay, he was placed on supervised probation with PCC.

208.    From the very beginning of his time on PCC, Inc. probation, Mr. Robinson has been repeatedly threatened with jailing if he did not pay PCC, Inc.  At his "orientation," PCC, Inc. probation officers threatened him that if he did not pay them enough money, they would make sure that he would be arrested and "violated."  He was told that, if violated, he would eventually be put back on probation with even more fees.  Every time he reported for probation, he was threatened with jailing for nonpayment.

49

209.     Mr. Robinson informed PCC, Inc. probation officers immediately of his indigence and his disability, but PCC, Inc. officers continued to threaten him.  At no point was Mr. Robinson told of any legal mechanism that he might have to having his fees and costs waived or reduced due to indigence.

210.     Mr. Robinson persisted in pleading his indigence to PCC, Inc. probation officers. He told them repeatedly when he showed up that he couldn't pay.  His probation officers, Defendants Hyde and Schexnayder would repeatedly tell him: "that's not my problem."  When Mr. Robinson told his probation officer that he could not afford to pay both PCC, Inc. and his rent, she told him: "we don't care what other obligations you have.  You've got to pay this."

211.     PCC, Inc. made Mr. Robinson report in person every week for 2-4 hours under threat of revocation even though he had a serious medical issue that made such reporting onerous and dangerous for him.

212.     PCC, Inc. officers also refused to return Mr. Robinson's phone calls concerning procedures for drug testing and then, when he did not pay, threatened to "violate" him for not following procedures that they had never explained to him.  A fellow probationer had to explain the procedures to Mr. Robinson so that he would not break PCC, Inc. rules.

213.     Despite knowing of his severe disability and indigence, PCC, Inc. probation officers threatened him with jail if he did not pay them.  Mr. Robinson tried to pay what he could, but he was not able to pay as much as PCC, Inc. demanded.

214.     When Mr. Robinson could not come up with enough money to pay PCC, Inc., his probation officer, Defendant Schexnayder, followed through on her threats.  She submitted a sworn warrant application to the County court in November 2012 seeking Mr. Robinson's arrest and seeking a $5,000 secured bond because of his failure to pay PCC, Inc.

50

215. The sworn PCC, Inc. affidavit stated that he owed supervision fees, court costs, and "warrant fees" added by PCC, Inc. as a result of its decision to petition for his arrest. At the point of the revocation petition, PCC, Inc. had chosen not to apply any of Mr. Robinson's extorted payments to his court costs, and had taken all of the money he paid for itself.

216. Mr. Robinson was arrested and, because he was destitute, could not afford his bond. Upon motion of his lawyer, the court found him indigent and, noting his SSI disability, reduced his bond to $1,000, an amount he could still not afford. He languished in jail.[15]

217. When he was eventually brought to court for a hearing on the petition, the court ordered him, at the request of PCC, Inc. and the District Attorney, to return to PCC, Inc. probation for a term of over 23 months. The court explained, pursuant to its policy, that if he paid his court costs (which were now over $2,500), then he could be placed on unsupervised probation.

218. Mr. Robinson remains on PCC, Inc. probation. Each time his probationary period nears an end, PCC, Inc. seeks revocation, has Mr. Robinson arrested, assesses additional fees, and recommends extension of probation. Mr. Robinson lives in constant fear of continued jailing because of his inability to pay what PCC, Inc. demands.

219. On September 24, 2015, counsel for Mr. Robinson learned that Defendant Hyde had carried through on her previous threats to "violate" Mr. Robinson if he did not pay. Defendant Hyde sought and obtained a warrant for Mr. Robinson's arrest based on a sworn affidavit that he had failed to pay shortly before his probationary term was set to expire in August 2015. The warrant sought and obtained by PCC, Inc. provides that Mr. Robinson will be arrested and kept in jail unless he pays a preset $10,000 secured money bond.

---

[15] On another occasion in 2012, he languished in jail for 19 days because of a warrant sought by PCC, Inc. On each occasion, he was eventually brought to court and had his probation with PCC, Inc. extended. As a result he has been on PCC, Inc. probation for the past four years straight based on two minor misdemeanor convictions in 2011.

220.    The County Sheriff stated that Mr. Robinson would be arrested and held in jail pursuant to the $10,000 secured money bond as soon as the Sheriff's office "got their hands on him."

221.    Because Mr. Robinson is indigent and disabled, he is unable to afford the fixed secured bond and will languish in jail for weeks until the County conducts revocation proceedings and before any hearing into his ability to pay would be conducted.

## Class Action Allegations

222.    Plaintiffs bring this Class action on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

223.    A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown Class members can challenge the Defendants' unlawful probation and debt-collection scheme.

224.    This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

225.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

226.    Plaintiffs propose the following class for which they seek declaratory, injunctive, and monetary damages: All persons who currently owe or who will incur debts to Rutherford County from fines, fees, costs, or surcharges arising from traffic and misdemeanor cases in the County court and who have been placed on probation with PCC, Inc. pursuant to the Contract between the Defendants Rutherford County and PCC, Inc.[16]

---

[16] On October 5, 2017, the Court conditionally certified the following settlement class: All persons who, at any time from October 1, 2011 to October 5, 2017, (1) incurred court-imposed financial obligations from a traffic or misdemeanor case in Rutherford County General Sessions or Circuit Court; and (2) were supervised on probation in that case by Providence Community Corrections, Inc. or Rutherford County's Probation Department. Dkt. 191 at 7.

A.    **Numerosity.  Fed. R. Civ. P. 23(a)(1)**

227.    Over the past several months and years, the County has required and currently requires thousands of people to serve terms of what the Defendants call "probation" through PCC, Inc.  Pursuant to the Defendants' policy and practice, all of these people are currently being threatened with arrest and jailing if they do not make the payments in the amount or frequency demanded by the Defendants.

228.    The names, case numbers, probation documents, dates of imprisonment, financial receipts, and relevant records of the class members are in the possession of the Defendants and are easily ascertainable.[17]

229.    The Defendants have followed and continue to follow materially the same policies, practices, and procedures with respect to all of the Class members.

230.    Those who still owe debt payments or who will incur such debts will be subjected to the same ongoing policies and practices absent the relief sought in this Complaint.

B.    **Commonality.  Fed. R. Civ. P. 23(a)(2)**

231.    The relief sought is common to all members of the Class, and common questions

---

[17] Numerous efforts by Plaintiffs' counsel to obtain basic public court records relevant to this case have been met with resistance, outright denials, and various episodes of bizarre behavior by local officials.  This behavior included County clerks erroneously telling summer interns working for undersigned counsel that the only way for the clerks to look up public court records was for the students first to get case numbers from the public computer terminal and, then, when the students went to the public terminals, telling the students that no non-Tennessee resident was permitted to use the public terminals and refusing them access.  The County clerk later provided a portion of the information requested after undersigned counsel informed the clerk that conditioning access to public records based on state residency was unconstitutional.  However, after receiving a small number of records, undersigned counsel was informed that no further records would be received if requested by a non-Tennessee resident.  Armed County Sheriff's deputies then detained representatives of Plaintiffs' counsel and accused them of being members of the media before intimidating them, confiscating their identification, and threatening them with arrest after they asked at the public clerk's office for copies of court records in their clients' cases. Many additional efforts to obtain records by interns and several lawyers, including Tennessee-licensed lawyers, have been met with resistance.  Furthermore, the County clerk's office has refused to comply with a properly issued Tennessee Public Records request seeking these public court records.  As a result, only a portion of the relevant public records in Defendants' possession have been obtained to date.

     Attempts by undersigned counsel to obtain records from PCC, Inc. concerning the named Plaintiffs have also gone unanswered or been refused by the company.

53

of law and fact exist as to all members of the Class. The Plaintiffs seek relief concerning whether the Defendants' policies, practices, and procedures violated their rights and relief requiring that those policies, practices and procedures be changed to protect their rights in the future.

232. Among the most important, but not the only, common questions of fact are:

- Whether PCC, Inc. and the County contracted for the provision of probation services;
- Factual determinations concerning how PCC, Inc. earns its profit and what fees it charges pursuant to the contractual arrangement;
- All of the facts surrounding how the County and PCC, Inc. operate the probation system pursuant to the Contract, including who is placed on supervised probation; how people are placed on supervised probation; what conditions are imposed by PCC, Inc.; what policies and practices are in place for PCC, Inc. supervision; what policies and practices are in place for drug testing; what policies and practices, if any, are used to determine indigency; what policies and practices are used to initiate revocation proceedings; what policies and practices are in place for collecting money; and how revocation proceedings are conducted.

233. Among the most important common question of law are:

- Whether as a matter of federal law, a County can choose to abandon the traditional neutral probation officer function and contract to employ a probation officer with all of the same duties and powers but who has a personal financial conflict of interest in the management and outcome of every case through a "user-funded" model;
- Whether a contract creating a probation officer with such a personal financial stake is void;
- Whether a government can place people on onerous probation plans that involve extra fees and serious intrusions on liberty based on wealth status;
- Whether a government and a private company, working together, can circumvent state debt-collection protections by imposing onerous actions that no private creditor could lawfully impose;
- Whether it is lawful to issue and execute arrest warrants based solely on non-payment, especially in the case of people known or adjudged in advance to be indigent;
- Whether it is lawful to detain a person after arrest because the person cannot afford to pay a preset money bond without any inquiry into ability to pay or any other findings;
- Whether it is lawful to use legal process purportedly concerning probation violation and probation judgments with the ulterior motive to earn profit.

234. These common legal and factual questions arise from one central scheme and set

54

of policies and practices: the Defendants' enormously profitable contractual relationship governing their misdemeanor probation supervision practices. The Defendants operate this scheme openly and in materially the same manner every day. The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the relief that they seek.

### C. Typicality. Fed. R. Civ. P. 23(a)(3)

235. The named Plaintiffs' claims are typical of the claims of the members of the Class, and they have the same interests in this case as all other members of the Class that they represent. Each of them suffered injuries from the failure of the Defendants to comply with the basic constitutional and statutory provisions detailed below. The answer to whether the Defendants' scheme of policies and practices is unlawful in the ways alleged will determine the claims of the named Plaintiffs and every other Class member.

236. If the named Plaintiffs succeed in their claims that the Defendants' policies and practices concerning debt collection through misdemeanor probation for fines, fees, costs, and surcharges violate the law in the ways alleged in each claim of the Complaint, then that ruling will likewise benefit every other member of the Class.

### D. Adequacy. Fed. R. Civ. P. 23(a)(4)

237. The named Plaintiffs are adequate representatives of the Class because they are members of the Class and because their interests coincide with, and are not antagonistic to, those of the Class. There are no known conflicts of interest among Class members, all of whom have a similar interest in vindicating the constitutional and statutory rights to which they are entitled.

238.    Plaintiffs are represented by attorneys from Civil Rights Corps[18] who have experience in litigating complex civil rights matters in federal court and extensive knowledge of both the details of the Defendants' scheme and the relevant constitutional and statutory law.

239.    Counsel's efforts have so far included extensive investigation over a period of months, including numerous interviews with witnesses, probationers, County employees, former County jail inmates, families, attorneys practicing in Rutherford County, community members, statewide experts in the functioning of Tennessee misdemeanor courts, and national experts in debt collection and constitutional law.

240.    Counsel have also observed and participated in numerous courtroom hearings in Rutherford County in order to compile a detailed understanding of state law and practices as they relate to federal constitutional requirements. Counsel has studied the way that these systems function in other cities and counties in order to investigate the wide array of options in practice for municipalities.

241.    As a result, counsel has devoted enormous time and resources to becoming intimately familiar with the Defendants' scheme and with all of the relevant state and federal laws and procedures that can and should govern it.  Counsel has also developed relationships with many of the individuals and families most victimized by the Defendants' practices.

242.    The Plaintiffs are represented by attorneys from Civil Rights Corps who have experience litigating complex civil rights class action lawsuits in federal court and extensive knowledge of the relevant constitutional law. Counsel for the Plaintiff has also been lead counsel in several similar class action constitutional challenges to unlawful municipal debt-collection

---

[18] Civil Rights Corps is a non-profit civil rights organization based in Washington, D.C.  At the time this case was filed, undersigned counsel Alec Karakatsanis and Elizabeth Rossi were the co-founder and an attorney, respectively, with Equal Justice Under Law, another non-profit civil rights organization.

regimes. *See, e.g.*, *Mitchell et al, v. City of Montgomery*, 2014-cv-186 (M.D. Ala. 2014). That case involved a major investigation and landmark litigation to end widespread injustices involving the use of private probation and the jailing of impoverished people by the City of Montgomery over a period of years for their non-payment of debt from traffic tickets and other misdemeanor offenses.[19] It resulted in the cancelling of the private probation contract, the release of numerous people from the local jail, and a consent decree mandating new policies and practices. Counsel is also lead attorney in pending lawsuits challenging the treatment of indigent people with court debts in the municipal courts and jails of Jennings and Ferguson, Missouri. *See also Jenkins et al. v. City of Jennings*, 15-cv-252-CEJ (E.D. Mo. 2015); *Fant et al. v. City of Ferguson*, 15-cv-253-AGF (E.D. Mo. 2015).

243.    The interests of the members of the Class will be fairly and adequately protected by the Plaintiffs and their attorneys.

### E.    Rule 23(b)(2)

244.    Class action status is appropriate because the Defendants, through the policies, practices, and procedures that make up its probation and debt-collection scheme, have acted and/or refused to act on grounds generally applicable to the Class. Thus, a declaration that people in the Class are entitled, as a matter of federal law, to a neutral probation officer without a personal financial conflict of interest in their case would benefit every member of the proposed Class. The

---

[19] Counsel is also lead attorney in several recent class action lawsuits challenging the use of money bail to keep impoverished people in jail prior to trial. *See Jones et al. v. City of Clanton*, 15-cv-34 (M.D. Ala. 2015); *Pierce et. al. v. City of Velda City*, 15-cv-570 (E.D. Mo. 2015); *Powell et al. v. City of St. Ann*, 4:15-cv-840 (E.D. Mo. 2015); *Thompson et al. v. City of Moss Point*, 1:15-cv-00182-LG-RHW (S.D. Miss. 2015). Counsel was also previously the lead attorney in a constitutional civil rights class action against the District of Columbia in the United States District Court for the District of Columbia. *See* 1:13-cv-00686-ESH (D.D.C. 2013). In that litigation, undersigned counsel was responsible for investigating and building the complex constitutional claims against the District of Columbia, authoring the legal filings in the class action case, and negotiating a Memorandum of Understanding with the District of Columbia Attorney General that stayed the class action litigation and began to implement sweeping changes to the County's policies and practices governing the civil forfeiture of property by the District's Metropolitan Police Department—procedures that affect thousands of putative class members every year.

57

same applies to legal rulings on the other claims, including: that the Contract is void; that the arrangement and the Defendants' policies violate the Equal Protection Clause by imposing onerous probation conditions based on wealth status and by imposing debt-collection methods far more onerous than any private creditor could lawfully impose; that the scheme to issue arrest warrants based solely on non-payment violates the Fourth Amendment and procedural due process; that PCC, Inc. abuses process by commandeering specific legal processes for the ulterior motive of earning profit; that it is unlawful to detain a person after arrest because the person cannot afford to pay a preset money bond without any inquiry into ability to pay or any other findings; and that the policy, pattern, and practice of threats to jail people for nonpayment without informing them of their rights or inquiring into their ability to pay constitutes an extortion enterprise in blatant violation of racketeering laws.

245. Injunctive relief compelling the Defendants to comply with these constitutional and statutory requirements will similarly protect each member of the Class from being subjected to the Defendants' unlawful policies and practices with respect to the debts that they still owe and protect those who will incur such debts in the future from the same unconstitutional conduct. Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

**F.  Rule 23(b)(3)**

246. Class treatment under Rule 23(b)(3) is also appropriate because the common questions of law and fact overwhelmingly predominate in this case. This case turns, for every named Plaintiff, as well as for the members of the Class, on what the Defendants' policies and practices are and on whether those policies are lawful.

247. The common questions of law and fact listed above are dispositive questions in the case of every member of the Class. The question of liability can therefore be determined on a

class-wide basis.  Class-wide treatment of liability is a far superior method of determining the content and legality of the Defendants' policies and practices than individual suits by hundreds or thousands of Rutherford County residents.  To the extent that individual damages will vary, they will vary depending in large part on the amount of time that a person was subjected to the unlawful scheme and the amount of money extorted from them.  Determining damages for individual Class members can thus typically be handled in a ministerial fashion based on easily verifiable records in the Defendants' possession.  If need be, individual hearings on Class-member specific damages based on special circumstances and particular hardships endured as a result of Defendants' extortion scheme can be held after Class-wide liability is determined—a method far more efficient than the wholesale litigation of hundreds or thousands of individual lawsuits.

248.     The Plaintiffs seek the following relief and hereby demand a jury trial in this cause for all matters so appropriate.

## Claims for Relief

### Count One:  Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. § 1962 (c) and (d)

249.     The Plaintiffs incorporate by reference the allegations in paragraphs 1-249.

250.     The Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 ("RICO"), are brought against the Private Probation Defendants and not Rutherford County.

251.     The Plaintiffs are "persons" with standing to sue within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

252.     Defendant PCC, Inc. is a "RICO person" within the meaning of 18 U.S.C. § 1961(3) because it is an entity capable of holding a legal or beneficial interest in property.

253.     Defendants  Jasmine  Jackson,  Briana  Woodlee,  Amanda  Roberts,  Tiara  Smith,

59

Amanda Schexnayder, Nisha Hyde, and are each a "RICO person" within the meaning of 18 U.S.C. § 1963(1) because they are capable of holding a legal or beneficial interest in property.

### A.    The RICO Enterprise

254.    The Private Probation Defendants, together with Rutherford County and the other unnamed conspirators, constitute an association-in-fact, and therefore an enterprise within the meaning of 18 U.S.C. § 1961(4). This RICO Enterprise is an ongoing business relationship with the common purpose of maximizing the collection of court fines, costs, and fees by PCC, Inc. without consideration of the probationer's ability to pay.

255.    The RICO Enterprise is engaged in interstate commerce because its activities and transactions relating to the collection of money, and the movement of the profit received by Defendant PCC, Inc. (an out-of-state corporation incorporated in Delaware) pursuant to this operation, frequently requires movement and communications across state lines. PCC, Inc. probation officers also use the electronic communications and the United States mail to communicate with PCC, Inc. probationers, including using those means to transmit threats of incarceration and revocation for nonpayment.

256.    The members of the RICO Enterprise function as a continuing unit.

257.    The Private Probation Defendants have violated 18 U.S.C. § 1962(c) because they are associated with an enterprise that is engaged in, or the activities of which affect, interstate commerce and have, directly or indirectly, conducted or participated in the conduct of an enterprise's affairs through a pattern of racketeering activity.

258.    The Private Probation Defendants have violated 18 U.S.C. § 1962(d) because they have conspired with each other to violate 18 U.S.C. § 1962(c).

259.    Specifically, the Private Probation Defendants conducted or participated in and

conspired to conduct the affairs of the RICO Enterprise by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

> a. Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951;
>
> b. Extortion in violation of Tenn. Code § 39-14-112; and
>
> c. Extortion in violation of the Travel Act, 18 U.S.C. § 1952.

**B.**     **Predicate Acts**

260.     The Plaintiffs incorporate by reference the previously described extortion allegations.

261.     The Private Probation Defendants have, on their own and in conspiracy with the other participants in the RICO Enterprise, obtained by threat the various fees discussed in this Complaint, including (but not limited to) the $45 monthly fee and the $20 drug test fee, with intent to deprive supervisees of this money.

262.     The Private Probation Defendants, individually and in conspiracy with the other participants in the RICO Enterprise, threatened and continue to threaten Plaintiffs that if they do not agree to pay money to PCC, Inc., they: (a) will be arrested; (b) will have their probation revoked; (c) will be accused by PCC, Inc. of violating the conditions of probation; (d) will face testimony by PCC, Inc. against them regarding non-payment, but without revealing the reasons for non-payment (including an inability to pay); (e) will have their probation extended and will be charged additional fees; (f) will be subjected to intrusive and humiliating supervision, including drug testing in a bathroom observed by PCC, Inc. employees; and (g) will be sent to jail.

263.     These threats are inherently wrongful because they are motivated out of a desire to extort, because they are premised on deception concerning the facts and in knowing violation of the legal rights of the victims, and because they are demanded pursuant to an unlawful contract.

264.    Because of these unlawful threats, the Plaintiffs paid the fees demanded by PCC, Inc.

**i.      Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951**

265.    The Plaintiffs incorporate by reference the previously described extortion allegations.

266.    The Private Probation Defendants have, individually and in conspiracy with the other participants in the RICO Enterprise, obtained fees from Plaintiffs with their consent, which consent has been induced by the wrongful use of fear in violation of 18 U.S.C. § 1951 (Hobbs Act).

267.    The proceeds of Private Probation Defendants' extortionate activities were used in commerce, and therefore affected commerce or the movement of any article or commodity in commerce, as these terms are understood by 18 U.S.C. § 1951(a).

**ii.      Extortion in Violation of Tennessee Code § 39-14-112**

268.    The Plaintiffs incorporate by reference the previously described extortion allegations.

269.    The Private Probation Defendants have themselves, and in conspiracy with the other person in the RICO enterprise, obtained by threat fees from the Plaintiffs and impaired their exercise of their state and federal rights.

**iii.      Extortion in Violation of the Travel Act**

270.    The Plaintiffs incorporate by reference the previously described extortion allegations.

271.    The Private Probation Defendants have, individually and in conspiracy with the other participants in the RICO Enterprise, obtained by threat fees from Plaintiffs, with intent to

62

deprive them of this money and the enjoyment of their state and federal rights, in violation of 18 U.S.C. § 1952 (Travel Act) and Tennessee law.

272.     The Private Probation Defendants have traveled in interstate commerce, and have used the mail and facilities in interstate commerce to distribute the proceeds of the extortionate scheme and to communicate with each other and with their victims concerning the operation of the scheme, including by operating a corporate entity, PCC, Inc. that is based outside of Tennessee but is operating the extortionate activities described herein within Rutherford County, Tennessee, in violation of 18 U.S.C. § 1952(a)(1).   The Private Probation Defendants have traveled in interstate commerce, and have used the mail and facilities in interstate commerce to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, or carrying on, of an extortionate scheme, in violation of 18 U.S.C. § 1952(a)(3).

C.     **Pattern of Racketeering Activity**

273.     The Private Probation Defendants and the other participants in the RICO Enterprise have engaged in the racketeering activity described in this Complaint repeatedly since at least 2006 and continuing through the present with respect to thousands of probationers in Rutherford County. These racketeering acts are part of the enterprise's regular way of doing business.

274.     The racketeering acts of the Private Probation Defendants and the other participants in the RICO enterprise have a similar purpose: to maximize the collection of court fines, costs, and fees by PCC, Inc. without consideration of the individual's ability to pay and without informing probationers of their legal rights.

275.     The racketeering acts of the Private Probation Defendants and the other participants in the RICO Enterprise have yielded similar results and caused similar injuries to the Plaintiffs: the Plaintiffs have, inter alia, all been subjected to fees paid to Defendant PCC, Inc. as a result of

63

Private Probation Defendants' unlawful conduct. Moreover, the Plaintiffs have all also been subjected to threats of physical confinement, actual physical confinement, and physically intrusive and humiliating drug tests for the purpose of financial profit to PCC, Inc., as well as relinquishing their federal and state rights through onerous and unlawful probation conditions.

276. As set forth in the preceding paragraphs, the racketeering acts have similar participants: Private Probation Defendants, County officials, and the other participants in the RICO Enterprise.

277. As set forth in the preceding paragraphs, Private Probation Defendants and the other participants in the RICO Enterprise, through the RICO Enterprise, directed their racketeering activities at similar victims: the named Plaintiffs specifically, and also more generally all Rutherford County misdemeanor probationers (and pretrial supervisees).

278. As set forth in the preceding paragraphs, the racketeering acts of Private Probation Defendants and the other participants in the RICO Enterprise have similar methods of commission, namely: extorting the named Plaintiffs and, more generally, all Rutherford County misdemeanor probationers who cannot afford to pay their entire court debts on the date they are adjudicated or assigned, into paying additional supervision fees to PCC, Inc.

### D. <u>Injury</u>

279. As a direct and proximate result of Private Probation Defendants' and the other participants in the RICO Enterprise's willful, knowing, and intentional acts discussed in this Complaint, the Plaintiffs have suffered injuries to their property. Plaintiffs have all been subjected to probation fees and surcharges paid to Defendant PCC, Inc., and they have been forced to continue paying these fees even when they cannot afford to do so without sacrificing the basic necessities of life, resulting in economic harm to themselves and their families.

64

280.     The Plaintiffs are entitled to an award of damages in an amount to be determined at trial, including treble damages and attorneys' fees and costs associated with this action.

### Count Two: Defendants' Use of a Private Actor with a Personal Financial Stake in the Outcome of Judicial Proceedings and Probation Case Decisions as a Supposedly Neutral Probation Officer Violates Plaintiffs' Due Process Rights

281.     The Plaintiffs incorporate by reference the allegations in paragraphs 1-281 above.

282.     The Due Process Clause of the Fourteenth Amendment prohibits neutral judicial officials and neutral civil and criminal law enforcement actors from having a personal financial interest in the cases prosecuted and decided by them in our legal system.  The County has contracted with a private, for-profit corporation to perform a traditional court function—probation—and, critically, made the resolution of the Plaintiffs' cases contingent on the demands, advice, recommendations, discretionary decisions, enforcement actions, testimony, and representations of this private entity.

283.     In contrast to the traditional and longstanding role of the probation officer—such as the role performed by Tennessee State Probation Officers and United States Probation Officers—PCC, Inc. has a direct financial stake in every decision that they make regarding case supervision, enforcement, and revocation. PCC, Inc. has a personal financial interest to conduct its role as a probation officer in a way that maximizes its personal profit and not as a neutral public court officer.

284.     Because this non-neutral actor profits significantly from the decisions about whether to place people on probation, what conditions to require, what information to provide probationers about their rights and obligations, how to enforce those conditions, what testimony to provide, and what sanction to recommend, there is a clear risk that those financial interests will affect its judgment when it makes those decisions.  There is also overwhelming evidence that these

65

financial interests have and continue to have an impact on every decision of PCC, Inc. probation officers.  Because this private entity has a significant personal financial interest in how these cases are managed and resolved, unlike a traditional neutral judicial actor, prosecuting authority, or probation department, the Defendants' policies and practices violate the longstanding due process restrictions against such self-interested financial arrangements in American courts of justice.

285.    Under the Defendants' scheme, PCC, Inc. can not only decide whether to initiate revocation proceedings, but it can also influence what conditions are imposed.[20]  It can then make rules and determine whether and when to petition for revocation based on the perceived violation of those rules or other conditions.  It also controls how probationers are supervised and what information is provided to or withheld from them concerning their legal rights.  Then, PCC, Inc. serves as the main witness or, as often happens, PCC, Inc.'s allegations are treated as evidence at any violation proceeding.  Finally, PCC, Inc. then meets privately with the district attorney and the Court and recommends a resolution or sanction in the case.  These recommendations include whether the person should be placed back on probation for an extended period (and charged additional fees) and/or jailed.

### [DISMISSED as Moot] Count Three: The Contract Between PCC, Inc. and Rutherford County Is Void and Unenforceable Under Tennessee Law

### Count Four: Defendants' Use of Jail, Threats of Jail, and an Onerous Probation System to Collect Debts Owed to the County Violates Equal Protection Because It Imposes Unduly Harsh and Punitive Restrictions on Debtors Whose Creditor Is the Government Compared to Those Who Owe Money to Private Creditors

286.    Plaintiffs incorporate by reference the allegations in paragraphs 1-291 above.

287.    The United States Supreme Court has held that, when governments seek to recoup

---

[20] As noted earlier, people placed on "probation" because they cannot afford to pay their fines, fees, costs, and surcharges immediately are also forced to abide by additional restrictions on their liberty, which the Defendants call "conditions" of probation.  Those restrictions are imposed solely because of their indigency.

court costs from indigent defendants, they may not take advantage of their position to impose unduly restrictive methods of collection solely because the debt is owed to the government and not to a private creditor. Not only does the County place indigent people on standardized and overly onerous probation supervision lasting years when the cases of wealthier people would be closed or unsupervised, but by imposing imprisonment, repeated threats of imprisonment, onerous liberty-restricting probation conditions, revoked or withheld drivers' licenses,[21] intrusive drug tests, extra fees and surcharges, and other restrictions on Plaintiffs, the County takes advantage of its control over the machinery of the County jail, prosecutorial, court, and police systems to deny debtors the statutory protections that every other Tennessee debtor may invoke against a private creditor. The Defendants deprive the Plaintiffs of these protections even though Tennessee law explicitly states that the debts owed to the Defendants are subject to Tennessee law on civil judgments.

288. Many people like the Plaintiffs owing money to the County have to borrow money, ration public benefits, convert federal means tested disability checks into money orders for PCC, Inc., and go further into debt in order to pay off the County because other non-government creditors are not permitted to jail them, threaten to jail them, or compel their repeated arrest and court appearances for years for non-payment of debt. This coercive policy and practice constitutes invidious discrimination and violates the fundamental principles of equal protection of the laws.

### Count Five: Defendants' Policy and Practice of Placing People Who Owe Debts to the County on Onerous Probation Supervision Based Solely on Their Wealth Status Violates the Fourteenth Amendment

289. The Plaintiffs incorporate by reference the allegations in paragraphs 1-294 above.

---

[21] It is the policy and practice of the County to initiate the revocation and subsequently prevent the reinstatement of Tennessee driving privileges for unpaid costs and fees without informing court debtors of any legal mechanism to avoid this consequence because of their indigence and inability to pay.

67

290. The Defendants' policy and practice is to use supervised probation for those people who cannot afford to pay the court judgment in full. If the person can pay, the person pays and is not supervised by PCC, Inc. If the person is too poor to pay, the County has a policy and practice of placing that person on "probation," including forcing the person to abide by conditions agreed upon by PCC, Inc. and the County that seriously restrict the person's liberty and that purport to subject the person to punishment in jail if those conditions (including payment of extra fees to PCC, Inc.) are violated. The same is true throughout the duration of probation, which can be converted to unsupervised probation at any time if they person pays the money owed. This policy and practice of altering punishment based solely on wealth status violates fundamental principles of Due Process and Equal Protection.

### Count Six: Defendants' Policy and Practice of Issuing and Executing Arrest Warrants Solely Based on Nonpayment of Monetary Debts Violates the Fourth and Fourteenth Amendments

291. Plaintiffs incorporate by reference the allegations in paragraphs 1-296 above.

292. The Defendants' policy and practice is to seek, issue, and execute arrest warrants against those who have not paid their debt from misdemeanor judgments. These warrants are sought, issued, and served without any inquiry into the person's ability to pay even when the Defendants have prior knowledge that the person is impoverished and unable to pay the debts or possesses other valid defenses (including against people who the Court itself has found indigent and who PCC, Inc. has actual knowledge of indigence). These warrants are regularly sought, issued, and served without any finding of probable cause that the person has committed the elements of any offense or violation and, indeed, with actual knowledge that no willful violation has occurred. The warrants therefore are procured based on the reckless and knowingly false premise that a violation of probation has occurred. Indeed, the warrants are procured

notwithstanding Tennessee law that a person cannot have probation revoked for the nonpayment of court costs.

293.    The Defendants choose to pursue warrants instead of issuing summonses even when they have spoken to people on the phone or in person and have the opportunity to notify them to appear in court, thus allowing PCC, Inc. to deprive Plaintiffs of their liberty for nonpayment prior to any meaningful pre-deprivation process (and thereby to levy additional fees and costs).  Moreover, the County's policy and practice is to unreasonably delay presentment for judicial proceedings days or weeks for no legitimate reason.  These practices violate the Fourth and Fourteenth Amendments and result in a deprivation of fundamental liberty without adequate due process.

### Count Seven: Defendants Violate Plaintiffs' Rights by Jailing Them Solely Because They Cannot Afford a Preset Money Payment Prior to a Court Appearance

294.    Plaintiffs incorporate by reference the allegations in paragraphs 1-299 above.

295.    The Fourteenth Amendment's due process and equal protection clauses have long prohibited keeping a person in jail because of the person's inability to make a monetary payment. Defendants violate Plaintiffs' rights by placing and keeping them in jail pursuant to arrest warrants sought and obtained by PCC, Inc. for alleged violations of probation when the Plaintiffs cannot afford to pay the amount of money bond preset by the arrest warrant without any inquiry into their indigence and ability to pay, any pre-deprivation process, any assessment of alternatives to detention, or any inquiry into whether the Plaintiffs are a danger to the community or a risk of flight.

### Count Eight: Abuse of Process

296.    Plaintiffs incorporate by reference the allegations in paragraphs 1-301 above

297.    The Defendants abused the legal process to seek arrest warrants and probation

69

revocation judgments with an ulterior motive to collect additional fees.

298.    When probationers are unable to pay what PCC, Inc. demands, PCC, Inc. files revocation petitions and secures warrants for the arrest of PCC, Inc. probationers.  Moreover, PCC, Inc. then participates through written documents, testimony, and informal *ex parte* conversations with Rutherford County prosecutors and judges in securing violation of probation judgments. PCC, Inc. engages in all of these activities with the ulterior motive of securing the additional court costs and fees that come as a matter of County policy and practice with each revocation violation. PCC, Inc. also engages in an abuse of process throughout its probation supervision by using the order of probation not to do justice and assist probationers, but for the ulterior motive of making profit by setting fees, performing drug tests, and using the threat of violating the probation order to extort money.

## **Request for Relief**

WHEREFORE, the Plaintiffs demand a jury trial for all issues so appropriate and request that this Court issue the following relief:

a.    A declaratory judgment that subjecting the Plaintiffs to Rutherford County's conduct as alleged in the Counts listed above is unlawful;

b.    An order and judgment preliminarily and permanently enjoining Rutherford County from enforcing the above-described unconstitutional and illegal policies and practices against the Plaintiffs and the Class of similarly situated people on whose behalf they are bringing suit;

c.    A judgment compensating the Plaintiffs and the Class of similarly situated individuals for the damages that they suffered as a result of the Defendants' unconstitutional and unlawful conduct;

d.    A judgment granting the treble and punitive damages authorized by statute based on the Defendants' willful and egregious violations of the law;

e.    An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 18 U.S.C. § 1964, and any other relief this Court deems just and proper.

Respectfully submitted,

*/s/ Alec Karakatsanis*

Alec Karakatsanis
(D.C. Bar 999294, Admitted *Pro Hac Vice*)
Elizabeth Rossi, Admitted *Pro Hac Vice*)
Civil Rights Corps
910 17th Street NW, Suite 200
Washington, DC 20006
alec@civilrightscorps.org
elizabeth@civilrightscorps.org

Kyle F. Mothershead
Law Office of Kyle Mothershead
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: (615) 982-8002
Facsimile: (615) 229-6387

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on **April 16, 2018** a copy of the foregoing **First Amended Complaint** was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, including:

- Attorneys for Providence Community Corrections, Inc. and the Individual Defendants: Lisa Rivera, Kathryn Walker, and David Esquivel of Bass, Berry, & Sims, PLC.
- Attorneys for Providence Community Corrections, Inc.: Manny Abascal and Julie Gerchik of Latham & Watkins, LLP.
- Attorneys for Rutherford County: Josh McCreary and Evan Cope of Hudson, Reed, & McCreary, PLLC.

*s/ Kyle Mothershead*
Kyle Mothershead, TN BPR 22953

71