UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CINDY RODRIGUEZ, STEVEN GIBBS,
PAULA PULLUM, YOLANDA CARNEY,
JACQUELINE BRINKLEY, CURTIS
JOHNSON, and FRED ROBINSON,

                Plaintiffs,                          Case Number 15-01048
                                                Honorable David M. Lawson

v.

PROVIDENCE COMMUNITY
CORRECTIONS, INC., RUTHERFORD
COUNTY, TENNESSEE, JASMINE
JACKSON, BRIANA WOODLEE,
AMANDA ROBERTS, TIARA SMITH,
AMANDA SCHEXNAYDER, and
NISHA HYDE,

                Defendants.
_____/

## ORDER GRANTING FINAL APPROVAL OF CLASS SETTLEMENT AND PLAN OF ALLOCATION, GRANTING MOTIONS FOR ATTORNEY'S FEES, GRANTING PERMANENT INJUNCTION, AND DISMISSING CASE

Pursuant to notice, the Court conducted a fairness hearing on June 25, 2018 to determine

whether a settlement agreement should be given final approval on behalf of the certified settlement

class in this case. The Federal Rules of Civil Procedure require court approval of settlements in

class actions, Fed. R. Civ. P. 23(e)(2) ("The claims, issues, or defenses of a certified class may be

settled, voluntarily dismissed, or compromised only with the court's approval."), and if the

settlement would determine the rights of and bind absent class members, "the court may approve

it only after a hearing and on finding that it is fair, reasonable, and adequate," *ibid.* The June 25

hearing was the second step in the settlement approval process. *See* Manual for Complex Litigation

§ 23.632-.633 (4th ed.); *see also Tennessee Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d

559, 565 (6th Cir. 2001). On January 2, 2018, the Court granted preliminary approval of the settlement agreement under Federal Rule of Civil Procedure 23(e) as the first step in the process. The order directed that a written notice to the class be given by February 16, 2018 via first-class mail augmented by other media. Plaintiffs' counsel retained Dahl Administration LLC of Minneapolis, Minnesota as the agent of the named plaintiffs and class counsel to give notice in the manner approved by the Court, and ultimately to administer the settlement, process claims, and make distributions. The Court approved the retention of Dahl as the settlement administrator.

## I.

The proposed settlement addresses the plaintiffs' claims that the County of Rutherford's outsourcing of misdemeanor probation services to a private for-profit corporation, Providence Community Corrections (PCC), resulted in an unconstitutional scheme that deprived indigent probationers of their due process and equal protection rights. The plaintiffs alleged that the defendants' arrangement constituted a "conspiracy to funnel misdemeanor probation cases in which court debts are owed to a private company, which then extorts money out of individuals who have no ability to pay court costs, let alone private fees." Compl. ¶ 1.

The Court previously certified the following class, which the Court conditionally certified in an order granting in part the plaintiffs' first class motion:

> All persons who, at any time from October 1, 2011 to [October 5, 2017], (1) incurred court-imposed financial obligations arising from a traffic or misdemeanor case in Rutherford County General Sessions or Circuit Court; and (2) were supervised on probation in that case by Providence Community Corrections, Inc. or Rutherford County's Probation Department.

Plf.'s Mot. for Prelim. Approval of Settlement [dkt. #190] at 4 (Pg ID 2412). However, the Court denied the initial motion for preliminary approval of the terms of the settlement agreement and

-2-

directed the parties to supply more information about the scope of the class and the actual damages incurred by class members as a result of the defendants' conduct. In response, the plaintiffs filed a second unopposed motion in which they asserted that, based on historical records kept by defendant PCC, and database queries run against those records in August 2017, they believed that around 27,000 persons were on probation under the defendant's authority during the class period, and that the total fees paid by them to the defendant from October 1, 2011 through March 28, 2016 amounted to more than $7.7 million. The Court granted preliminary approval to the revised settlement.

II.

Under the proposed settlement, PCC agrees to deposit $14,000,000 into a settlement fund from which claims, expenses, and attorney fees will be paid. PCC also agrees to pay $350,000 to co-defendant Rutherford County, which will add $300,000 of that amount to the settlement fund, resulting in a total of $14,300,000.

The County also agrees to issuance of an injunction providing that, under the County's probation program, "no individual may be held in jail for nonpayment of fines, fees, costs, or a pre-probation revocation money bond imposed by a court without a determination, following a meaningful inquiry into the individual's ability to pay, that the individual has the ability to pay such that any nonpayment is willful. The meaningful inquiry into the individual's ability to pay includes, but is not limited to, notice, an opportunity to present evidence, and the assistance of appointed counsel." Ex. C, Injunctive Agreement (ECF Doc. No. 192-5).

The agreement calls for payments from the fund to be allocated as follows. *First*, to cover the costs for the settlement fund administrator, and any other administrative expenses associated

-3-

with the settlement; *second*, to pay out awards of attorneys' fees and costs according to hours and reasonable hourly rates approved by the Court; *third*, to pay $10,000 as an incentive award to each of the seven named plaintiffs (a total of $70,000); *fourth*, to pay to each class member whose probation ended before October 1, 2014 125% of the amount that he or she actually paid to PCC for fees from October 1, 2011 to October 1, 2014, as well as 125% of any fees paid by the class member for an offense committed before October 1, 2011, but for which the plaintiff paid related fees on or after October 1, 2011; *fifth*, to pay to any class member whose probation ended after October 1, 2014 125% of the fees that he or she actually paid to PCC, plus an additional $50 per month for each month on probation after October 1, 2014.  Class members in the second category also will be paid 125% of any fees paid after October 1, 2011 related to any offense committed before October 1, 2011.  *Sixth*, to pay to each class member who was on probation under the supervision of the County's Probation Department from March 2016, based solely on failure to pay court-imposed financial obligations, the same 125% refund and $50 per month awards applicable to the October 1, 2014 probationer category.

Finally, if any money remains in the fund after paying out all expenses, fees, and timely claims according to the above schedule, then those excess funds will be used to increase payments to all claimants on a *pro rata* basis, up to a maximum of five times the base award determined for each claimant.  And if any funds yet remain after applying the five-times multiple to all claims, then those will be deposited as a *cy pres* award for the benefit of the No Exceptions Prison Collective of the Harriet Tubman House in Nashville, Tennessee.

III.

Under the schedule set by the Court, the period for filing claims, objections, and opt-out notices ran from January 26, 2018 to April 27, 2018. The settlement administrator sent notices to 25,879 class members who were identified from the defendants' records, via a website set up to provide information about the settlement, as well as notices mailed to each class member. The administrator received 5,309 notices that were returned as undeliverable, and it employed a search firm to locate updated addresses for those persons. The search produced new address results for 2,648 of the claimants, and the administrator mailed new notices to each of them. Of those, only 655 were returned as undeliverable. The administrator also received 86 of the resent notices back with a forwarding address, and it forwarded new notices to all of those addresses. The administrator also identified class members who were in prison and mailed notices to them in custody. It also sent reminder notices to all claimants, after the initial round of mailings.

The administrator also ran ads on the internet and by radio, and it ran a phone campaign focused on the 2,000 claimants with the highest valued potential claims who did not respond to the mailings. It also conducted "a strategic in-person 'grassroots' outreach facilitated by the local non-profit 'Free Hearts.'" Finally, the administrator also posted notices of the claims period and procedures around Rutherford County in places such as the courthouse and probation office.

As of May 1, 2018, the administrator had received a total of 7,961 claim forms that were timely submitted. The administrator validated 6,462 of those claims as payable, and identified deficiencies in 1,248 other claims. The administrator mailed deficiency letters requesting additional information to all of those claimants with incomplete submissions. The settlement administrator estimates, based on its calculations of the amounts claimed for all timely and valid claims, that all

claimants will receive some multiple of their nominal claims from the approximately $12,600,000 in settlement funds that would be available to pay claims, after deduction of the costs of administration, the attorney fee awards applied for by counsel, and incentive payments. According to those numbers, based on potential pay outs to between 6,000 and 8,000 claimants, the average award comes to between $1,500 and $2,100 per claimant.

There were no objections to the settlement filed by the deadline set by the Court, and only one opt-out. One individual, Mikesha Graham, filed a "Notice of Pain and Suffering" (ECF Doc. No. 216). However, the settlement administrator contacted Ms. Graham, and she indicated that she has submitted a claim form and intends to participate in the settlement. At the fairness hearing, no one raised any objections to the settlement or appeared in opposition.

IV.

Federal Rule of Civil Procedure 23(e) imposes certain "rules for the settlement, dismissal, or compromise of class claims." *Whitlock v. FSL Management, LLC*, 843 F.3d 1084, 1093 (6th Cir. 2016). "It requires that class-action claims 'may be settled, voluntarily dismissed, or compromised only with the court's approval.'" *Ibid.* (quoting Fed. R. Civ. P. 23(e)). "Approval is only warranted where the court determines, *inter alia*, that the proposed class settlement would be 'fair, reasonable, and adequate.'" *Ibid.*

As an initial matter, it appears that the absent class members will receive approximately 90% of the settlement fund proceeds, and that they could receive individual payments of $1,500 to $2,100 each, comprising as much as 500% of the fees paid by them to the defendants. The settlement will produce a very substantial recovery for every absent class member who submitted a timely claim, and they will receive the lion's share of the settlement fund.

-6-

The plaintiffs have established that the proposed settlement is adequate, reasonable, and fair to the class. "Factors that guide [the assessment by the Court of a proposed class settlement] include: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *Whitlock*, 843 F.3d at 1093 (quoting *UAW v. GMC*, 497 F.3d 615, 631 (6th Cir. 2007)).

*First*, the risk of fraud and collusion is low. The matter has been pending for a bit more than two years and eight months. The parties engaged in hotly contested adversarial proceedings over the grant of preliminary injunctive relief and several interlocutory appeals. They also participated in prolonged negotiations presided over by a professional mediator, spanning more than a year. After the Court stayed discovery in the case and directed the parties to engage in further mediation, they engaged in a two-day facilitation session in Tennessee on August 8 and 9, 2016. On September 2, 2016, the named plaintiffs and the PCC defendants attended another in-person mediation session in Washington, D.C., in which Rutherford County participated by telephone. The parties also communicated and met with the assigned mediator, Carlos Gonzalez, numerous times over several months. The mediation process presided over by Mr. Gonzalez eventually resulted in a settlement that was approved by all parties.

*Second*, the litigation is complex and the expense and duration already has been substantial, and would grow more so if the case proceeded to trial. The complaint alleges numerous constitutional violations and a conspiracy between the institutional defendants that they believe trenched upon the rights of more than 25,000 probationers through Kafka-esque ordeals. As noted

above, the case already has been pending for more than two years, during which dispositive motions were filed by both sides and ruled on by the Court, with subsequent appeals. Counsel for the plaintiffs estimated that a trial of the case would take weeks or months, and likely would provoke an appeal regardless of the outcome. If the course of the proceedings to date is an indicator, it is apparent that the parties and the Court all would need to expend considerable additional effort to shepherd the case to its ultimate conclusion.

*Third*, the parties have engaged in considerable informal investigation and formal discovery to explore the basis of the plaintiffs' claims. Counsel for the plaintiffs represent that, before the litigation began, they spent numerous hours investigating the defendants' violations of the plaintiffs' and class members' rights by: "(a) conducting interviews of hundreds of probationers over the course of seven months; (b) demanding documents from Rutherford County and PCC in writing and orally; (c) observing court proceedings; (d) reviewing court records; (e) reviewing records obtained through Tennessee open records requests; (f) reviewing PCC documents and recordings of PCC probation officers; and (g) representing probationers in probation proceedings." They also assert that since the complaint was filed, they engaged in further efforts to vindicate the plaintiffs' rights that included "(a) seeking and obtaining individual and . . . classwide preliminary injunctive relief after an adversarial evidentiary hearing; (b) successfully defeating motions to dismiss; (c) producing 1,331 documents to [d]efendants; (d) reviewing 6,747 pages of documents produced by defendants; (e) filing a motion for partial summary judgment and seeking an expedited hearing date; (f) engaging in multiple days of in-person mediation over several months; (g) preparing and filing merits briefs in the Sixth Circuit; and (h) continuing to interview dozens of probationers by phone and in person during numerous trips to Rutherford County."

-8-

*Fourth*, the plaintiffs' prospects for success on the merits appear good, but not certain. They prevailed in securing preliminary injunctive relief despite dogged resistance by the defendants. Interlocutory appeals were taken, but they were dismissed by stipulation of the parties. There is no reason to expect that the plaintiffs would do markedly worse in pressing their case to a conclusion through trial than they have done so far. Nevertheless, the defendants did secure early dismissal on some of the claims initially mounted, so the outcome at trial certainly is not foreordained in the plaintiffs' favor.

*Fifth*, class counsel and the named plaintiffs have expressed their strong endorsements of the settlement. Plaintiffs' counsel and the individual class representatives — themselves former probationers subjected to the alleged abusive practices by the defendants — represent that they believe that the settlement is fair, reasonable, and adequate for all concerned, and they "are particularly pleased that the [a]greement provides for permanent injunctive relief, which will ensure that no one else has to go through what the Class Representatives went through."

*Sixth*, the absent class members who received notice and who have responded in any way unanimously favor the settlement. Nearly 8,000 of the 25,000 absent class members filed claims for payments, but there were no objections filed and only one opt-out.

Finally, the public interest favors resolution of the matter by way of a settlement that will secure a substantial recovery for the class members while avoiding the wastage of considerable time and effort by the parties and the Court, likely to reach more or less the same end.

At the fairness hearing, the Court directed the plaintiffs to furnish additional information to support the requests for incentive payments of $10,000 per named plaintiff. They had not at the time submitted any detailed records of the time that they spent in pursuit of the litigation. Late last week,

-9-

however, the plaintiffs supplemented the record with declarations establishing that the time spent by each of the named plaintiffs responding to discovery and assisting class counsel in prosecuting the action substantially justifies the proposed awards, which are in any event a minuscule fraction (less than 1%) of the total recovery for the class. The Court is satisfied that "these amounts are not in fact a bounty," *see Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 311 (6th Cir. 2016), but instead represent just compensation for the time and effort spent on bringing this action to a successful conclusion. These incentive awards may be paid as expenses of administration.

V.

As noted in the order preliminarily approving the settlement class, "[a]ny class certification must satisfy Rule 23(a)'s requirement of numerosity, commonality, typicality, and adequate representation." *Clemons v. Norton Healthcare Inc. Retirement Plan*, 890 F.3d 254, 278 (6th Cir. 2018). "Further, a class action must fit under at least one of the categories identified in Rule 23(b)." *Ibid.* "The district court must conduct 'a rigorous analysis' as to all the requirements of Rule 23." *Id.* at 278-79 (quoting *Pipefitters Local 636 Insurance Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 630 (6th Cir. 2011)).

That "rigorous analysis" was performed when the Court conditionally certified the settlement class. The evidence presented by the parties in their motion for final settlement approval fortifies the previous findings. *First*, the conditionally certified class comprising approximately 25,000 current or former probationers certainly meets the requirement of being so numerous that joinder of all those persons as individual plaintiffs would be impracticable.

-10-

*Second*, there are prominent common questions of law and fact affecting all of the class members that are pertinent to the defendants' liability. The plaintiffs alleged that the defendant County and PCC operated a sort of "debtors prison" system where they repeatedly were cited for being in violation of the terms of their probation due to the failure to pay fees for "services" provided by defendant PCC, and that those violations would lead to their arrest and detainment pending probation review hearings. Because many probationers had no ability to pay the assessed fees, and could not afford to post the cash bond required for release from detention, they wound up in a downward spiral of repeated violations, with no way to escape. Many probationers also had their terms of probation extended due to the repeated assessments of violations, which only made things worse. The plaintiffs' principal claims are that their due process rights were violated by this system under which they were subjected to repeated arrest and confinement and increased financial penalties and terms of probation, without any assessment ever being made about whether their failure to pay was a result of their inability to pay, due to lack of resources, or whether they intentionally had refused to pay despite being able to. The assessment of the constitutional propriety of those policies that affected all probationers under supervision by the defendants is amenable to resolution on a common basis, despite the fact that the specific damages suffered by each individual class member could vary based on the duration and circumstances of their probation.

*Third*, because the claims and defenses of the parties principally would concern the propriety of the defendants' systematic actions and application of their policies, they are sufficiently typical of all class members to be addressed in common. For the same reasons, those common questions of law and fact about the propriety of the defendants' systematic practices would be dispositive of the defendants' liability, and a class proceeding therefore would be a superior vehicle for reaching

a verdict on those predominant questions that do not depend on any assessment of the particular circumstances of individual class members.

Finally, the named individual plaintiffs and class representatives adequately are positioned to represent the class, and their interests sufficiently are aligned, since they all are former probationers who suffered the same sorts of injuries imposed on all of the class members, and they seek to recover damages suffered under the same allegedly unlawful system.

The plaintiffs also have established that the membership of the proposed class is sufficiently ascertainable for certification under Rule 23(b)(3), as shown by the identification of the approximately 25,000 known class members from the defendants' records. Based on the record of returns of mailed notices, it appears that the notification was successful in reaching approximately 87% of the identified class members by mailing, with only around 13% of the notices that were returned being ultimately undeliverable.

The Court will certify the settlement class unconditionally.

VI.

The three law firms that represented the plaintiffs in this case submitted petitions asking the Court to authorize payments of a combined total of $1,373,603 in attorney fees and $22,158.39 in litigation expenses. "'When awarding attorney's fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved.'" *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 279 (6th Cir. 2016) (quoting *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993)). "These two measures of the fairness of an attorney's award — work done and results achieved — can be in tension with each other." *Ibid.* "The lodestar method of calculating fees better accounts for the amount of work done,

-12-

whereas the percentage of the fund method more accurately reflects the results achieved." *Ibid.*
(citations and quotations omitted in this and following citations except as otherwise noted). "To
determine the lodestar figure, the court multiplies the number of hours 'reasonably expended' on
the litigation by a reasonable hourly rate." *Ibid.* "The court may then, within limits, adjust the
lodestar to reflect relevant considerations peculiar to the subject litigation." *Ibid.* "In contrast, to
employ the percentage of the fund method, the court determines a percentage of the settlement to
award to class counsel." *Ibid.* "As the two methods measure the fairness of the fee with respect to
different desired outcomes, it is necessary that district courts be permitted to select the more
appropriate method for calculating attorney's fees in light of the unique characteristics of class
actions in general, and of the unique circumstances of the actual cases before them." *Ibid.* The
Court also may elect to "employ[] the lodestar method to determine the fairness of the fee, then . . .
cross-check it with the percentage-of-the-fund calculation." *Id.* at 280. However, regardless of the
method chosen, the Court's decision must include "a clear statement of the reasoning used in
adopting a particular methodology and the factors considered in arriving at the fee in order to allow
effective appellate review for abuse of discretion." *Id.* at 279.

 "District courts have the discretion to select the particular method of calculation, but must
articulate the 'reasons for adopting a particular methodology and the factors considered in arriving
at the fee.'" *Ibid.* (quoting *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009)).
"*Moulton* set out the germane factors," which include, "'(1) the value of the benefit rendered to the
plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were
undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such

-13-

benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides.'" *Ibid.* (quoting 581 F.3d at 352).

A.

The first motion for attorney fees was filed by the law firm Civil Rights Corps, and included a request for fees from a separately employed attorney, Kyle Mothershead. CRC asks the Court to authorize payment of $336,200 in attorney fees for its lawyers who acted as class counsel and $1,619.53 in expenses for travel by counsel to the State of Tennessee. Counsel submitted detailed time records showing that Alec Karakatsanis worked 382.5 hours on the case and Elizabeth Rossi worked 97.2 hours. Based on those figures, the imputed lodestar rate for CRC's counsel comes out to $700 per hour for a combined total of 480 hours of work. Attorney Kyle Mothershead was local counsel and asks the Court to authorize payment of $24,115 for 55.9 hours of work by him, which also was substantiated by detailed time records. Mothershead's imputed lodestar hourly rate for 55.9 hours would be $431 per hour.

This motion is somewhat confusing because, as with all of the motions, the CRC attorneys assert that they have used "the lodestar method" to calculate their requested fees, but the rates that they purport to claim are far lower than simple arithmetic on their total hours and amounts claimed imply. Attorneys Karakatsanis and Rossi contend that they seek only $450 and $350 per hour, respectively. At those rates, Karakatsanis would be due only $172,125, and Rossi should have billed $34,020. That comes to a total of $206,145. But the petition asks the Court to authorize payment for both lawyers' services combined of $336,200 — 61% more than the purported rates would imply. The imputed lodestar rate of $700 per hour is somewhat high, but not outside of the realm of reasonable compensation for experienced civil rights counsel on a case of this magnitude. And

-14-

the total number of hours billed is plausible in light of the lengthy pendency of the case, the extensive discovery and settlement efforts, and the extent of the contested adversarial proceedings over the motions for injunctive relief and appeals. Similarly, attorney Mothershead asserts in his declaration that he applied a "discounted rate" of only $350 per hour for his fee request. But that would imply a total fee of only $19,565 for 56 hours of work. The motion does not explain why the actual request was for $24,115, at an imputed rate of $431.

Considering as a cross-check the "percentage of the fund," calculation, the combined total of $1,395,761 in attorney fees and expenses comes out to 9.5% of the total settlement fund of $14,300,000. That is a modest percentage of the total recovery on its face, and well below percentage of the fund figures that the Sixth Circuit readily has affirmed. *See Gascho*, 822 F.3d at 275 (affirming award of $2.39 million in attorney fees and costs premised on a percentage of the fund assessed by the district court at 21% of the monetary benefit available to the class). The approval of the total fee requested is not problematic here on a percentage of the fund basis. At the hearing, counsel explained that the conflicting figures resulted from including a total fee request that anticipated additional work after the fee motion was filed, and the total hours worked corresponded more closely to the lodestar calculation based on the stated hourly rates.

When weighing the propriety of the requested attorney fee, the Court considers "(1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides." *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009). In this case, the factors favor

-15-

approval of the fee, despite the incongruities in the math presented by counsel. The value of the benefit rendered by plaintiffs' counsel certainly is substantial and evidently will result in payments to the claimants of $1,500 to $2,100 each, representing more than five times the allegedly unlawfully extracted fees paid by them to the defendants. The value of the services was high, since able counsel secured decisive victories for their clients at every crucial stage of the proceedings, culminating in a very favorable settlement including damages and injunctive relief. Counsel does not represent that they were engaged on a contingent fee basis, and they assert that they calculated their requested fees on a lodestar basis. As noted above, the litigation was complex, and the proceedings arduous. Every indication in the record is that counsel for the plaintiffs fought ably and hard to vindicate their clients' interests, and society would do well to reward those attorneys who engage in such practice to defend the rights of those subjected to a sort of "debtors prison" regime that allegedly was a staple of the misdemeanor criminal justice system in Rutherford County until this lawsuit was brought. Taking counsel at their word, the two attorneys who worked on the case under the umbra of CRC are experienced and well regarded civil rights lawyers, deserving of the rates of compensation for which they have applied.

## B.

The second motion for attorney fees was filed by the law firm Equal Justice Under Law. That motion asks the Court to authorize payment of $827,368.50 in attorney fees, plus litigation expenses in the amount of $14,992.30. In the motion, EJUL asserts that its attorneys billed the following hours on the case: Phil Telfeyan, 318.75 hours; Alec Karakatsanis, 929 hours; and Elizabeth Rossi, 759.66 hours. That comes to a total of 2,007.41 hours. The imputed lodestar rate based on those numbers works out to $412 per hour. The motion represents that EJUL "is a party

-16-

to the settlement agreement submitted to the Court for approval . . . and has been allowed to participate in this matter for the limited purpose of filing this petition for recovery of fees and expenses." But the docket also indicates that all of the named attorneys have entered appearances in the case as counsel for the plaintiffs. The motion does not explain the circumstances that led to attorneys Karakatsanis and Rossi billing hours under the umbrella of two different firms in the case and seeking payments for fees through two separate petitions. However, at the hearing, counsel explained that Karakatsanis and Rossi simply changed law firms during the litigation, and the billings represent the time spent while employed by the respective entities. Moreover, the fee requests are supported by declarations of the three attorneys accompanied by extensive detailed time records substantiating the hours of work on which the motion is premised. For the same reasons discussed above, EJUL's motion for attorney's fees will be granted.

## C.

The law firm of Baker Donelson filed a motion for attorney fees based on hours worked by unspecified attorneys of the firm. The court docket indicates that five lawyers from the firm entered appearances as counsel of record for the plaintiffs. However, the motion was supported by a declaration by only one of those, Matthew G. White. The firm asks the Court to authorize payment of $185,920 in attorney's fees and $5,546.56 in litigation expenses. As to the number of hours worked by lawyers at the firm, White declared as follows: "In the exercise of reasonable billing judgment, I have identified a total of 689 hours devoted by our attorneys to this work, including without limitation, document review, communications with clients, with co-counsel and with opposing counsel, document drafting, and hearing preparation and attendance." This motion was not supported by any specific time records.

At the motion hearing, the Court pointed out the deficiencies in Baker Donelson's submission and directed counsel to file a supplement. When counsel inquired about the level of detail required, the Court stated that was up to Baker Donelson, but that the submission must satisfy the basic requirements to permit the Court to conduct a proper examination. Baker Donelson filed its supplement on July 3, 2018. It did not include any itemized time records, but instead only added a bulleted list summarily stating for five attorneys of the firm the total number of hours each attorney worked and in general the nature of the work done by them. For example, the brief states that attorney Jonathan Cole "represented Plaintiffs in connection with the filing of the Complaint, the injunctive proceedings, and participated in the briefing with respect to various motions in this matter," and that he "worked approximately 122 hours in this matter and his rate as between $380 and $400 per hour." In that format, the supplement accounts for 596 hours worked by the five lawyers identified on various tasks relating to the litigation. The imputed lodestar rate based on those figures and the total fee request of $185,920 comes out to $311 per hour. As to the litigation expenses of $5,546.56, the supplement offers no documentation at all and only asserts in a generalized manner that several of the attorneys involved worked in the Memphis office of the firm during the case and incurred expenses for travel to Nashville.

The Sixth Circuit has not set any hard standard for the level of actuarial detail that must be supplied for fee requests based upon hours worked. But it has been skeptical of fee petitions not supported by *any* itemized documentation. "The key requirement for an award of attorney fees is that the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *Imwalle v. Reliance Med.*

-18-

*Prod., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008) (quotations and citations omitted). Considering that Baker Donelson relies entirely on the lodestar calculation to justify its fee request, its supplement falls short of that benchmark.

"Although counsel need not record in great detail each minute he or she spent on an item, the general subject matter should be identified." *Ibid.* In *Gascho*, the Sixth Circuit noted that it was "a close question whether the minimal billing information provided suffices to justify the lodestar award in light of our caselaw." 822 F.3d at 281 Nevertheless, the panel concluded that it did not need to decide the question, since the district court also had employed the percentage of the fund as a cross-check, and the requested fee passed muster by that method. In this case, where counsel purports to rely only on the lodestar justification, unmoored from any supporting documentation, application of the petition is problematic.

The initial motion was supported by nothing more than a sort of summary accounting analysis proffered by attorney White, and his declaration did not even summarize by name which lawyers did what tasks, or the total number of hours attributable to each attorney of the firm that worked on the case. The supplement gives a very general breakdown of the categories of work various attorneys performed, but there is no information on the amount of time spent on each task, and therefore no basis to determine "the number of hours 'reasonably expended'" to the respective tasks. *Gascho*, 822 F.3d at 279. Another reservation about the supplement is that it also states that "[o]ther Baker Donelson attorneys assisted with various tasks," and that "[d]etailed billing records will be made available to the Court if the Court desires submission of the same." If "detailed billing records" are available to support the request, then it is not apparent why counsel thought it was appropriate not to submit them. The Sixth Circuit has not found the sort of naked actuarial

-19-

declaration offered here sufficient to support a fee award under the lodestar method. *See Gascho*, 822 F.3d at 276 (questioning the soundness of the lodestar method where "class counsel had not submitted detailed billing records for review by the court [and merely] provided the number of hours worked and averred under penalty of perjury that those hours were reasonably necessary to prosecute the action").

Presumably Baker Donelson may eventually be able to submit a properly supported fee request. But to avoid further delays in approving the class settlement and proposed distribution, and in adjudication the other two fees requests, the Court will deny Baker Donelson's attorney's fee motion without prejudice to resubmission at a later date, when counsel can expend the time and energy to furnish suitable support.

VII.

For the reasons stated, the Court unconditionally certifies the settlement class, approves the settlement, and grants the motions for attorney's fees.

Accordingly, it is **ORDERED** that the plaintiffs' motion for approval of settlement and plan of allocation [dkt. # 217] is **GRANTED**.

It is further **ORDERED** that the settlement agreement and plan of allocation is **APPROVED**.

It is further **ORDERED** that the individual who sent a request for exclusion from the class is hereby deemed excluded from the class and is not bound by, nor may he participate in, the class settlement.

It is further **ORDERED** that Dahl Administration LLC of Minneapolis, Minnesota is **APPOINTED** as the administrator of the settlement fund. The administrator shall receive, disburse,

-20-

and account for the settlement proceeds as provided by the formula for distribution of the settlement fund set forth in the settlement agreement. Class Counsel shall provide and file with the Court and the defendants a report setting forth the proposed distribution of all funds paid by the defendants as called for in the settlement agreement upon completion of the evaluation of the requests for payment received from class members. After final distribution, class counsel shall file with the Court a certificate that the settlement fund has been disbursed according to the plan, or that funds remain undistributed, as the case may be.

It is further **ORDERED AND ADJUDGED** that the County of Rutherford, Tennessee is **PERMANENTLY RESTRAINED AND ENJOINED** from holding any individual in jail for nonpayment of fines, fees, costs, or a pre-probation revocation money bond imposed by a court without a determination, following a meaningful inquiry into the individual's ability to pay, that the individual has the ability to pay such that any nonpayment is willful. The meaningful inquiry into the individual's ability to pay must include, without limitation, notice, an opportunity to present evidence, and the assistance of appointed counsel.

It is further **ORDERED** that incentive awards in the amount of $10,000 each are approved for and may be distributed to the named plaintiffs, Cindy Rodriguez, Steven Gibbs, Paula Pullum, Yolanda Carney, Jacqueline Brinkley, Curtis Johnson, and Fred Robinson. The incentive awards may be designated as expenses of administration and paid according to the appropriate priority as outlined in the settlement agreement.

It is further **ORDERED** that Class Counsel's respective motions for attorney's fees and litigation expenses [dkt. #198, 202] are **GRANTED**, and payments from the settlement fund are approved as follows: Civil Rights Corps shall receive $336,200 for attorney's fees and $1,619.53

for litigation expenses; Kyle Mothershead shall receive $24,115 for attorney's fees; and Equal Justice Under Law shall receive $827,368.50 for attorney fees and $14,992.30 for litigation expenses.

It is further **ORDERED** that the motion for attorney fees by Baker Donelson [dkt. #208] is **DENIED** without prejudice to the filing of a renewed motion accompanied by adequate supporting documentation as indicated by the Court's previous directions.

It is further **ORDERED** that this action is **DISMISSED WITH PREJUDICE**; provided, however, that this Court retains jurisdiction over all matters relating to the enforcement of equitable relief, and the administration of the settlement agreement, including allocation and distribution of the settlement fund.

It is further **ORDERED** that Class Counsel and the settlement administrator Dahl Administration LLC shall remain responsible for completion of the administration of the claims and distribution of the funds, but they may not invade the settlement fund for further reimbursement or payment of fees absent further order of the Court.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge
Sitting by special designation

Dated:  July 5, 2018